## IN THE UNITED STATES DISTRICT COURT
## THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Jim and Laurie Gibson, | : | |
| as next friends of Chloe Gibson, | : | Case No.: 1:11-CV-329 |
| | : | |
| Plaintiffs, | : | Judge: Susan J. Dlott |
| | : | |
| vs. | : | |
| | : | |
| Forest Hills Local School District | : | |
| Board of Education, | : | |
| | : | |
| Defendants. | : | |

---

## PLAINTIFFS' MERIT BRIEF

---

Virginia S. Wilson (0040466)
Trial Attorney for Plaintiffs
gwilson@olrs.state.oh.us
Jason C. Boylan (0082409)
jboylan@olrs.state.oh.us
**OHIO LEGAL RIGHTS SERVICE**
50 W. Broad St., Suite 1400
Columbus, OH 43215-5923
(614) 466-7264 (Phone)
(614) 644-1888 (Fax)

Counsel for Plaintiffs

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

I.  INTRODUCTION ....................................................................................................1

II.  BACKGROUND AND FACTS .................................................................................2

   A.  Chloe's Elementary and Middle School Years. ................................................ 3

   B.  Chloe's High School Years...............................................................................5

   C.  Chloe's 2007 - 2008 School Year and the Complaint with the Ohio Department of
   Education. ..................................................................................................... 10

   D.  Chloe's 2008 - 2009 School Year And Beyond............................................. 11

III.  PROCEDURAL HISTORY ................................................................................... 15

IV.  OVERVIEW OF THE IDEA .................................................................................. 18

   A.  IDEA's Unique Needs, Educational Benefit, and Educational Progress Requirements.... 19

   B.  IDEA's Least Restrictive Environment Requirement....................................... 20

   C.  Meaningful Participation and Procedural Safeguards...................................... 22

V.  STANDARDS OF PROOF AND REVIEW ..................................................... 23

VI.  ARGUMENT................................................................................................... 26

   A.  The District denied Chloe a FAPE by failing to appropriately address her well
   documented communication deficits and Assistive Technology (AT) needs.......................... 26

The IDEA requires IEPs to be revised to address any lack of progress toward IEP goals and the child's needs.  34 C.F.R. § 300.324(b)(1)(ii); Ohio Admin. Code 3301:51-07(L)(2)(a)(ii). In doing so, the IEP team must consider the need for assistive technology and the district must conduct appropriate evaluations in order to determine whether assistive technology is warranted.

34 C.F.R. § 300.324(a)(2)(v); Ohio Admin. Code 3301:51-07(L)(1)(b)(v). Here, the District's failure to address Chloe's communication needs and provide an assistive technology evaluation violates the IDEA's requirement to periodically review and revise IEPs to enable students with disabilities to make meaningful educational progress. Chloe's lack of progress in communication was well documented, and the Gibsons made requests for the District to evaluate her communication needs. The District's mistaken belief that the Gibsons had obtained an independent communication evaluations does not relieve the District of the burden to address these needs through the IEP meeting and evaluation process. Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994). Further, the Gibsons do not have to prospectively identify the type of evaluation necessary to address Chloe's needs. Sch. Bd. of Indep. Sch. Dist. No. 11 v. Pachl, No. 01-342 (SRN), 2002 U.S. Dist LEXIS 23205 (D. Minn. May 10, 2002). The District's failure to give the Gibsons notice about its refusal to provide an evaluation was a substantive harm because it deprived the Gibsons of the opportunity to challenge the District's decision. The District's inaction denied Chloe a FAPE because she was deprived of a communication-focused IEP, as well as an evaluation and associated services, which negatively affected her progress throughout her high school years. Consequently, the IHO-ordered augmentative communication assessment should be provided along with compensatory educational services to make up for Chloe's lost opportunities and instruction.

1. The District's failure to appropriately address Chloe's communication deficits not only violated the IDEA's periodic review mandate, but also negatively impacted other aspects of Chloe's education........................................................................................................... 26

2. The District's failure to appropriately address Chloe's assistive technology needs and provide an Assistive Technology evaluation denied Chloe a FAPE. ................................... 32

3. The District's failure to consider Chloe's communication needs and provide an assistive technology evaluation caused harm to Chloe's education such that she should receive

compensatory education to account for the District's failure to ensure she made progress in communication...........................................................................................................................40

B.   The District's failure to ensure that Chloe's transition plans were developed in accordance with the requirements of the IDEA and the resulting lack of appropriate transition services denied Chloe a FAPE in violation of 20 U.S.C. § 1412 (a)(1). ...............................................44

The IDEA requires IEP teams to annually develop for all children with disabilities over age 16, appropriate measurable post-secondary goals based upon age appropriate transition assessments relating to training, education, employment and where appropriate, independent living skills, and to detail the transition services (including courses of study) needed to assist the child in meeting those goals. 34 C.F.R. § 300.320(b); Ohio Admin. Code 3301:51-07(H)(2)(b)(i). Transition assessment data that captures the student's post-secondary interests and preferences is the "common thread" in the transition plan and should link directly to the transition services and activities.  In re Brandywine, 111 LRP 64084( Del. SEA 2011).  Here, the District's low expectations for Chloe's future became circular and self-fulfilling.  The District's failure to collect necessary data, conduct a comprehensive transition evaluation, and draft appropriate post-secondary goals based on those assessments and Chloe's needs and interests caused Chloe to miss important community opportunities and develop important vocational skills.  The Gibsons' repeated requests for opportunities and evaluation went unanswered, thus depriving them of meaningful participation in the IEP process.  As a result of the District's inaction, Chloe never received necessary community experiences, job skills, and assessment to address her unique needs.  Accordingly, Chloe should be provided with an extended transition assessment and compensatory education in transition services in order to address the District's repeated failure to evaluate Chloe and develop IDEA-required appropriate post-secondary goals.

1.  The District failed to ensure timely, age appropriate vocational assessments that assessed Chloe's needs, preferences and interests in all of the areas required for transition. 47

   b)  The District failed to provide age appropriate assessments in all of the areas necessary to develop an appropriate transition plan. ....................................................... 54

      i.  Training/Education. ........................................................................ 55

      ii.  Employment. ................................................................................. 57

      iii. Independent Living Skills. .............................................................. 60

   c)  The SLRO's finding that the District did provide appropriate assessments is not supported by the evidence. ............................................................................. 61

   d)  Data taken on Chloe's IEP goals are insufficient to meet the requirements for age appropriate transition assessments required under the IDEA. ......................................... 65

2.  The IHO's and SLRO's reasoning that the District provided appropriate transition services is contrary to the purposes of the IDEA. .............................................................. 69

3.  The District denied Chloe's parents meaningful participation in the transition process by failing to meaningfully consider the Gibsons' plans for Chloe's future. ......................... 72

4.  The SLRO's conclusion that the District's limited vision for Chloe was appropriate as it was supported by the recommendations of Jack Darland and the Goodwill Industries assessment is not correct. .................................................................................. 75

5.  The District's transition plan for Chloe was not results oriented and did not include measurable post-secondary goals related to Chloe's plan for her future. ........................... 80

C.  The district failed to develop an IEP for Chloe which enabled her to be educated in the least restrictive environment. ......................................................................... 85

The IDEA requires districts to ensure that to the maximum extent appropriate, children with disabilities are educated with non-disabled children, and that those children with disabilities are removed from the regular education environment only if the nature of the disability is such that education in regular classes, with the use of supplementary aides and services, cannot be satisfactorily achieved.  34 C.F.R. § 300.114(a)(2).  Districts are required to ensure that the IEP

team considers, at least annually, to what extent a child with a disability can be educated with non-disabled peers. Here, the District's low expectations narrowed its vision for Chloe to a point that it significantly limited her lesser restrictive educational opportunities. Despite expert recommendations and the requests of the Gibsons, the District refused to consider options for Chloe to have more interactions with non-disabled children. The District was so rigid in its view of Chloe's future that its employees could not comprehend the relevance of a regular education teacher being present at Chloe's IEP meetings. As a consequence of the District's actions and inaction, Chloe was denied the opportunity to even attempt educational opportunities in her least restrictive environment.

1.   The District refused to meaningfully consider independent evaluations regarding Chloe's need for less restrictive environment options. ........................................................ 86

2.   The District repeatedly failed to meaningfully consider the Gibsons' attempts to incorporate opportunities for Chloe to participate in less restrictive regular education settings. ................................................................................................................... 91

3.   The District's failure to include a regular education teacher at IEP meetings prevented the team from meaningfully considering and discussing Chloe's least restrictive environment. ................................................................................................................ 96

4.   The District's failure to consider and provide educational opportunities in the least restrictive environment negatively impacted Chloe's educational progress. ....................... 98

D.   The District denied Chloe a FAPE by failing to provide her with an IEP reasonably calculated to provide her access to and progress in the general education curriculum to the maximum extent appropriate for her unique needs. .............................................................. 99

The District failed to provide Chloe with a FAPE because it did not develop an IEP designed to meet her unique needs and that allowed her to be involved and progress in the general education curriculum. 20 U.S.C. §§ 1414(d)(1)(A)(IV)(aa) and (bb). The District developed an IEP that centered on leisure/recreational programming only, and that was not

aligned to Ohio's academic content standards or designed to teach Chloe the life and self-sufficiency skills she needed to participate fully in her community as an adult. Further, the District provided services based on what was provided in the classroom she attended rather than what her individual needs required. Moreover, Chloe did not receive appropriate educational services because the District erroneously imposed its own low expectations of Chloe's potential. Any progress Chloe did make can be attributed to other community based skills she learned in middle school or through the Gibsons' efforts at home. Consequently, Chloe made minimal educational progress through the District based on her IEP goals and objectives, and the District denied Chloe a FAPE.

1.   The District's failure to ensure Chloe access to the general education curriculum prevented her from learning many of the skills and information that Ohio has determined all children need to learn as part of their education. ................................................................. 100

2.   The District denied Chloe a FAPE by providing her educational services based upon her placement, rather than her individual needs. ................................................ 103

3.   The District's low expectations for Chloe resulted in an education that failed to address her unique needs and potential. ......................................................................... 109

4.   Any progress made by Chloe was not conferred on her by an IEP but rather from services she received in her home ABA program or outside of the school setting............. 116

E.   The District failed to ensure that the Gibsons were afforded the opportunity to meaningfully participate in the educational process for their daughter with respect to her evaluation, educational placement and the provision of FAPE. ........................................... 122

The District denied the Gibsons the right to be meaningfully involved in the development of Chloe's IEP. Amanda J. v. Clark County Sch. Dist., 267 F.3d. 877, 881 (9th Cir. 2001). The District refused to include the Gibsons' requests or suggestions for Chloe's IEP goals and objectives, routinely prepared IEPs prior to the IEP meeting and refused to make changes reflecting the Gibsons' input, scheduled IEP meetings at times when the Gibsons could

not attend, and determined Chloe's educational placement prior to the IEP team meeting and without consideration to alternative options. The IHO and SLRO decisions that the Gibsons were provided meaningful participation in the IEP process are unsupported by the evidence as the record shows the Gibsons' participation was minimal and the District incorporated their input only after the Gibsons made numerous requests, sometimes over a period of several years. The IHO and SLRO decisions fail to uphold IDEA's purpose of ensuring parents are equal partners in the IEP process by effectively holding that multiple requests met with multiple refusals equates to meaningful participation.

1.    The District refused to meaningfully collaborate with the Gibsons regarding Chloe's IEP goals, services, and needs. ........................................................................ 125

2.    The District failed to schedule meetings at a mutually agreeable time and date. ....... 131

3.    The District predetermined Chloe's placement and repeatedly refused to discuss or consider any other options. ............................................................................. 133

4.    The IHO and SLRO decisions that the Gibsons were provided meaningful participation are not supported by the evidence. ................................................................... 137

5.    The IHO and SLRO decisions to find fault with the Gibsons for their efforts to obtain a FAPE for their daughter are contrary to the purposes of the IDEA. .................................. 140

F.    The Gibsons should be granted prevailing party status with regard to the claims on which they prevailed at the IHO and SLRO level. ............................................................ 145

The Gibsons are prevailing parties and entitled to an award of attorneys' fees under IDEA because they succeeded in a significant issue in this litigation and achieved the benefit they sought in bringing their claim. 20 U.S.C. §1415(i)(3)(B); Tompkins ex rel. A.T. v. Troy Sch. Dist., 199 Fed.Appx. 463, 466 (6th Cir. 2006). The IHO determined that Chloe had been denied a FAPE due to her IEPs' many deficiencies. As a result, the IHO ordered the District to make significant, material changes to Chloe's IEP, provide two assessments for Chloe, and provide

480 hours of compensatory education. The relief the IHO ordered addressed the specific requests the Gibsons made in their due process complaint. The SLRO did not review the issues on which the Gibsons prevailed. Consequently, the Gibsons are prevailing parties and entitled to an award of reasonable attorneys' fees under IDEA.

VII. RELIEF REQUESTED ................................................................................................ 147

   A. Communication and assistive technology evaluations. .................................................. 150

   B. Transition and least restrictive environment. ................................................................ 151

   C. Access to the general education curriculum. ................................................................. 153

   D. Meaningful parental participation and training on the IDEA. ....................................... 154

   E. Attorney's fees. ............................................................................................................. 154

VIII. CONCLUSION ....................................................................................................... 155

CERTIFICATE OF SERVICE ............................................................................................. A

# TABLE OF AUTHORITIES

**Cases**

*Amanda J. v. Clark County Sch. Dist.*,
  267 F.3d 877 (9th Cir. 2001) ...................................................................... 123

*Anchorage Sch. Dist. v. M.P.*,
  No. 10-36065, 2012 U.S. App. LEXIS 14791 (9th Cir. July 9, 2012) .......................... 141

*B.H. v. West Clermont Bd. of Educ.*,
  788 F. Supp. 2d 682 (S.D. Ohio 2011) ................................................. 109, 136

*Babb ex rel. Babb v. Knox County Sch. Sys.*,
  965 F.2d 104 (6th Cir. 1992) ...................................................................... 24

*Bd. of Educ. of East Windsor Regional Sch. Dist. v. Diamond*,
  808 F.2d 987 (3rd Cir. 1986) ...................................................................... 27

*Bd. of Educ. of Strongsville City Sch. Dist. v. Theado*,
  566 N.E.2d 667, 668 (1991) ...................................................................... 148

*Bd. of Educ. of the County of Cabell v. Dienelt*,
  843 F.2d 813 (4th Cir. 1988) ...................................................................... 147

*Bd. of Educ. v. Rowley*,
  458 U.S. 176 (1982) ............................................ 18, 22, 23, 25, 97, 123, 140, 147

*Big Beaver Falls Area Sch. Dist. v. Jackson*,
  615 A.2d 910 (Pa. 1992) ...................................................................... 149

*Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*,
  208 F.3d 560 (6th Cir. 2000) ...................................................................... 20

*Burr v. Ambach*,
  863 F.2d 1071 (2d Cir. 1988) ...................................................................... 150

*Campbell v. Talladega County Bd. of Educ.*,
  518 F. Supp. 47 (N.D. Ala. 1981) ................................................. 106, 107, 109

*Carrie I. ex rel. Greg I. v. Dept. of Educ., State of Haw.*,
  No. 11-00464 JMS RLP, 2012 U.S. Dist. LEXIS 83801 (D. Haw. May 31, 2012) ......... 47

*Cordrey v. Euckert*,
  917 F.2d 1460 (6th Cir. 1990) ...................................................................... 41, 43

*Cremeans v. Fairland Lo-Cal Sch. Dist. Bd. of Educ.*,
  633 N.E.2d 570 (4th Dist. 1993) ................................................. 148, 149

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*,
    118 F.3d 245 (5th Cir. 1997) ................................. 27

*Deal ex rel. Deal v. Hamilton County Bd. of Educ.*,
    No. 1:01-cv-295 Edgar, 2006 U.S. Dist. LEXIS 76324 (E.D. Tenn. Aug. 1, 2006) .. 23, 25

*Deal v. Hamilton Cty. Bd. of Educ.*,
    392 F.3d 840 (6th Cir. 2004) ..................... 20, 23, 24, 25, 26, 97, 109, 124, 125, 130, 136

*Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*,
    197 F.3d 793 (6th Cir. 1999) ................................. 23, 24, 123

*Doyle v. Arlington County Sch. Bd.*,
    806 F. Supp. 1253 (E.D. Va. 1992) .................... 134, 136

*Draper v. Atlanta Indep. Sch. Sys.*,
    480 F. Supp. 2d 1331 (N.D. Ga. 2007) .................... 27, 149

*Farrar v. Hobby*,
    506 U.S. 103 (1992) ................................. 145

*G. ex rel. R.G. v. Fort Bragg Dependent Sch.*,
    343 F.3d 295 (4th Cir. 2003) ................................. 149

*Hall ex rel. Hall v. Vance County Bd. of Educ.*,
    774 F.2d 629 (4th Cir. 1985) ................................. 23, 27, 124

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ................................. 145

*In re Brandywine*,
    111 LRP 64084 (Del. State Educational Agency 2011) .................... 46

*In re East Hartford Board of Education*,
    50 IDELR 240, 108 LRP 46228 (Conn. State Educational Agency 2008) .................... 48

*In re Horizon Instructional Systems Charter School*,
    58 IDELR 145, 112 LRP 5189(Ca. State Educ. Agency, Jan. 23 2012) .................... 82

*In re Las Virgenes United Sch. Dist.*,
    44 IDELR 201; 105 LRP 50330(Ca. State Educ. Agency 2005).................... 134

*In re Mason City Community School District*,
    21 IDELR 248, 21 LRP 2846 (Iowa State Educ. Agency 1994) .................... 73

*J.N. v. District of Columbia*,
    677 F. Supp. 2d 314 (D. D.C. 2010) ................................. 24, 131

*Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*,
    325 F.3d 724 (6th Cir.) ........................................................................ 24

*Knable ex rel. Knable v. Bexley City Sch. Dist.*,
    238 F.3d 755 (6th Cir. 2001) ................................... 20, 21, 24, 25, 116, 124

*Lane v. Kitzhaber*, No. 3:12-cv-00138-ST,
    Opinion and Order granting Class Certification (D. Oregon Aug. 6, 2012).................... 79

*Lester H. v. Gilhool*,
    916 F.2d 865 (3rd Cir. 1990) ................................................................ 148

*McLaughlin v. Holt Public Sch. Bd. of Educ.*,
    320 F.3d 663 (6th Cir. 2003) ............................................................ 23, 25

*Miener v. Missouri*,
    800 F.2d 749 (8th Cir. 1986) ................................................................ 149

*N.L. v. Knox County Schs.*,
    315 F.3d 688 (6th Cir. 2003) ........................................................... 124, 125

*Nack ex rel. Nack v. Orange City Sch. Dist.*,
    454 F.3d 604 (6th Cir. 2006) ................................................................ 136

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) .......................................................................... 2

*Penn Trafford Sch. Dist. v. C.F.*,
    No. 04-1395, 2006 U.S. Dist. LEXIS 13581 (W.D. Penn. March 28, 2006) ................ 149

*Reid ex rel. Reid v. District of Columbia*,
    401 F.3d 516 (D.C. Cir. 2005) .............................................................. 149

*Roland M. v. Concord Sch. Comm.*,
    910 F.2d 983 (1st Cir. 1990) ................................................................ 124

*Roncker v. Walter*,
    700 F.2d 1058 (6th Cir. 1983) ........................................................... 20, 23

*Sch. Bd. of Indep. Sch. Dist. No. 11 v. Pachl*,
    No. 01-342 (SRN), 2002 U.S. Dist LEXIS 23205 (D. Minn. May 10, 2002) ...... 35, 36, 37

*Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*,
    471 U.S. 359 (1985) ........................................................................ 149

*Shapiro v. Paradise Valley Unified Sch. Dist.*,
    317 F. 3d 1072 (9th Cir. 2003) ............................................................ 131

*Spielberg v. Henrico County Pub. Sch.*,
    853 F.2d 256 (4th Cir. 1988) .............................................................. 134, 136

*Thomas v. Cincinnati Bd. of Educ.*,
    918 F.2d 618 (6th Cir. 1990) ........................................................................ 25

*Tompkins ex rel. A.T. v. Troy Sch. Dist.*,
    199 Fed. Appx. 463 (6th Cir. 2006) ........................................................... 145

*Union Sch. Dist. v. Smith*,
    15 F.3d 1519 (9th Cir. 1994) ................................................................ 36, 116

*W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*,
    960 F.2d 1479 (9th Cir. 1992) ........................................... 24, 25, 36, 124, 125

*Warren G. v. Cumberland County Sch. Dist.*,
    190 F. 3d 80 (3rd Cir. 1999) .................................................................. 141, 144

**Federal Statutes**

20 U.S.C. § 1400 ..................................... 18, 19, 22, 46, 64, 68, 71, 103, 115

20 U.S.C. § 1401 ..................................................... 18, 20, 45, 99, 124, 125

20 U.S.C. § 1412 ......................................................................... 22, 44, 148

20 U.S.C. § 1413 ................................................................................... 100

20 U.S.C. § 1414 ..................... 20, 33, 45, 85, 86, 91, 96, 99, 100, 104, 115

20 U.S.C. § 1415 ............................................................................... 15, 23

20 U.S.C. § 6301 ..................................................................................... 19

Americans with Disabilities Act ............................................................... 1

Education for all Handicapped Children Act ........................................... 18

Individuals with Disabilities Education Act ............................................... 1

No Child Left Behind ............................................................................ 19

Pub. L. No. 94-142 ......................................................................... 18, 125

**Ohio Statutes**

Am. Sub. S.B. 316 (129th General Assembly) ................................... 70, 71

Ohio Rev. Code § 3310.41 ........................................................................... 148

Ohio Rev. Code § 3313.60 ........................................................................... 103

Ohio Rev. Code § 3323.011 (eff. Sept. 24, 2012) ...................................... 71

Ohio Rev. Code § 5123.022 (eff. Sept. 24, 2012) ...................................... 70

**Federal Regulations**

34 C.F.R. § 300 ........................................................................................... 123

34 C.F.R. § 300.106 ...................................................................................... 41

34 C.F.R. § 300.110 .................................................................................... 100

34 C.F.R. § 300.114 .............................................................. 20, 21, 85, 86, 92

34 C.F.R. § 300.115 ...................................................................... 21, 22, 85

34 C.F.R. § 300.116 ................................... 21, 22, 85, 86, 91, 92, 93, 134

34 C.F.R. § 300.117 ................................................................................ 21, 86

34 C.F.R. § 300.301 .................................................................................... 109

34 C.F.R. § 300.303 ................................................................. 33, 90, 109

34 C.F.R. § 300.305 ...................................................................................... 87

34 C.F.R. § 300.306 ...................................................................................... 90

34 C.F.R. § 300.320 .................................. 44, 45, 47, 50, 51, 54, 57, 64, 99, 100, 104

34 C.F.R. § 300.321 ..................................................... 45, 48, 49, 86, 124

34 C.F.R. § 300.322 ....................................................................... 124, 131

34 C.F.R. § 300.324 ......................................................... 26, 27, 33, 124, 125

34 C.F.R. § 300.327 ...................................................................................... 22

34 C.F.R. § 300.43 .......................................... 45, 50, 51, 64, 75, 76, 83

34 C.F.R. § 300.5 .......................................................................................... 33

34 C.F.R. § 300.500 ...................................................................................... 22

34 C.F.R. § 300.501 .................................................................................... 131

34 C.F.R. § 300.502 ................................................................................................... 87

34 C.F.R. § 300.503 ........................................................................................... 33, 123

34 C.F.R. § 300.516 ................................................................................................... 24

34 C.F.R. § 300.520 ................................................................................................... 22

34 C.F.R. § 300.6 ....................................................................................................... 33

## Ohio Regulations

Ohio Admin. Code 3301:51-01 ...................................................................... 45, 50, 63, 99

Ohio Admin. Code 3301:51-02 ................................................................................ 100

Ohio Admin. Code 3301:51-05 ............................................................................. 15, 23

Ohio Admin. Code 3301:51-07 ........................................... 22, 27, 33, 44, 45, 54, 57, 96, 99, 104

Ohio Admin. Code 3301:51-09 ............................................................................. 20, 21

## Court Rules

S. D. Ohio Civ. R. 54.2 ............................................................................................ 155

## Other Authorities

*Letter to Heath, OSEP*, 54 IDELR 171, 110 LRP 17415, (Aug. 21, 2009) ................................. 84

S. Rep. No. 94-168 (1975), reprinted in 1975 U.S.C.C.A.N. 1425 ........................................... 107

U.S. Dept. of Justice, Civil Rights Division, Letter of Findings
        June 29, 2012 addressed to Attorney General of Oregon ................................................... 79

## I.      INTRODUCTION

At its core, this case is about expectations and lost educational opportunities.  It is about the expectations that Jim and Laurie Gibson have for their child, Chloe.  And, it is about the expectations that Congress had when it passed the Individuals with Disabilities Education Act (IDEA) more than 35 years ago.  While the IDEA has been reauthorized many times, its central goal has remained the same:  to ensure that all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and *prepares them for further education,*[1] *employment and independent living*.

The common core of issues at the heart of this case has remained relatively unchanged since Chloe began high school.  As Congress intended, Chloe's parents have consistently advocated for appropriate educational services calculated to lead to Chloe's increased independence and future community employment.  Unfortunately, Chloe's school district does not share the same expectations for her.  As a result of the differing expectations for Chloe's future, she has not received the educational opportunities to help her develop important life skills or prepare her for adulthood and independence.  Instead, the District has remained focused on providing Chloe an education in recreation and leisure skills.

We are a nation whose expectations, attitudes, policies, and services for people with disabilities have improved and continue to improve.  As evidenced by the purpose of the IDEA and other federal laws, including the Americans with Disabilities Act, and the Court's review of those statutes, it is clear that the quality of life for people with disabilities should be based on inclusion and participation in the daily life of their communities.  *Olmstead v. L.C.,* 527 U.S. 581

---

[1] The phrase "further education" is new in the 2004 reauthorization of IDEA, as is the increased emphasis on effective transition services to promote successful post-school employment or education.

(1999), 138 F.3d 893 (11th Cir. 1998) (affirmed in part, vacated in part and remanded).  The District's outmoded approach to educating Chloe is contrary to the IDEA's stated purpose to ensure educational services to prepare students with disabilities for employment and independent living.  This approach has left Chloe without the instruction, training and educational opportunities she needs to prepare her for the future and has denied her a free and appropriate public education.  Ultimately, this case is before this Court because Chloe's school district's limited expectations for her have resulted in educational harm.

## II.    BACKGROUND AND FACTS

Chloe Gibson is a 21 year old student with a disability who lives in the Forest Hills School District (District) in Cincinnati, Ohio.  Ex. B1, p. 29.  Chloe has been diagnosed with pervasive developmental disorder/not otherwise specified, (PDD/NOS) (an autism spectrum disorder), seizure disorder, and mild to moderate mental retardation, which have impacted her learning, socialization and her communication.  Ex. 4, p. 129; Tr. Vol. 6, p. 980.[2]  Chloe's disabilities cause her to have significant difficulties with communication and learning.  Ex. 4, p. 130.  She relies on prompts and visual cues to learn tasks or follow directions given.  Ex. B1, p. 3.  While Chloe is capable of speaking eight to nine turn-taking exchanges at home, Ex. OO, Tr. Vol. 13, p. 2687, *see also*, Ex. VVV, she has consistently exhibited very limited speech in the school and community settings.  *See, e.g.* Exs. B1-B9.  In middle school, Chloe started to show some increased socialization, fewer behaviors and was starting to transition more easily into the community with regular community activities with her peers.  Tr. Vol. 6, p. 990.  Chloe's seizure disorder did cause some disruption in her education over the years, but became much more manageable during her later high school years.  Ex. C; Tr. Vol. 6, p. 1023; Tr. Vol. 13, pp. 2738-

---

[2] All references to the transcript and exhibits refer to the underlying administrative record, on file with this Court. Exhibits to this Merit Brief are referred to as Attachments.

41.  However, during the past several years in high school, Chloe would often hold her head down and appear disinterested and unmotivated.  She has difficulty transitioning to new places and can exhibit noncompliant behaviors if proper interventions are not utilized.  Ex. B1, p. 3. While it is generally agreed that Chloe is able to learn and make educational progress with the proper supports, she does need specialized help to make progress academically and socially.  Tr. Vol. 25, pp. 4954, 5102; Tr. Vol. 8, p. 1523.

As with other students her age, Chloe's biggest educational need at this time is to prepare her for adulthood, future employment and independent living.  Toward that end, Chloe must be provided an education that helps her to develop effective communication, work towards learning independence skills, and develop employability and specific job skills.

A.      **Chloe's Elementary and Middle School Years.**

From kindergarten to the end of sixth grade, Chloe missed school on a regular basis because of the medical issues related to her seizure disorder.  Tr. Vol. 6, p. 993.  She regularly had a short period of regression following a seizure episode, but was able to catch up with appropriate re-teaching and effort by her teachers.  Tr. Vol. 13, p. 2740; Ex. B8, p. 271.  Despite the serious nature of her seizure disorder at that time, she still made significant educational progress.  *Id.*; Tr. Vol. 6, pp. 998, 1768; Tr. Vol. 9, p. 1768.  She improved reading fundamentals such as right to left sweep and decoding,[3] and brought her reading to a second to third grade level by mastering the Edmark sight word reading program.  Tr. Vol. 9, p. 1767; Ex. B7, p.261;

---

[3] To decode words, students must have the ability to hear the sounds of spoken words (phonemic awareness) and to connect them with the written alphabet (phonics). The National Reading Panel referred to this skill as alphabetics. Instruction in word recognition involves teaching students the predictable relationships between the sounds that they hear in words and the way that words are written with letters.  Research shows that explicit, systematic instruction in phonics is important when learning to read (Adams, 2001; Chall, Jacobs & Baldwin, 1990; Foorman, Francis, Novy & Liberman, 1991; Kame'enui, Stein, Carnine & Maggs, 1981). To learn to read, students must understand the alphabetic principle, the systematic and predictable relationship between graphemes (letters) and their corresponding phonemes (sounds). Because students do not learn to read naturally, as they learn to speak, explicit instruction is important.

Ex. B8, p. 271-73; Tr. Vol. 6, p. 1003.  She also made educational progress in math,
socialization, transition to new places, and going out in the community.  Tr. Vol. 9, p. 1767-68;
Ex. B7; Ex. B8.

Chloe's instruction in her elementary and middle school years was generally integrated
with the rest of the school community.  While she has always needed to spend part of her school
day in a small group resource room to get the individual attention she needs to learn, she had
always successfully participated in the non-academic classes and school-wide activities with her
typical peers who do not have a disability.  Tr. Vol. 1, p. 111.  She ate lunch in the cafeteria,
went to assemblies, and attended specials such as art and music.  *Id.*  When she was in middle
school, she regularly went into the community with her classmates to learn independent living
skills.  *Id.* at p. 123-124.

Chloe's seventh grade year was more difficult.  She transitioned to a new school, new
teacher and classroom, and experienced the death of a cherished relative.  Tr. Vol. 6, p. 1009-10.
During this school year, Chloe exhibited some behaviors and refused to complete tasks.  *Id.*
However, by the end of seventh grade at Nagel Middle School (Nagel), Chloe was coming out of
her shell and was engaging with the other students to such an extent that her teacher, Cindy
Gajus, was excited for her.  Tr. Vol. 6, p. 1010-12.  Chloe attended several regular education
classes including art and music, and ate her lunch with typical peers in the cafeteria.  Tr. Vol. 6,
p. 1041.  Mrs. Gajus stated that by the end of the seventh grade, Chloe felt good about herself
and "did quite well" and "[t]hen the eighth grade year was even better."  Tr. Vol. 1, p. 108.  Mrs.
Gajus wrote in the eighth grade Evaluation Team Report (ETR) that "Chloe has a nice group of
friends in her calendar/social group."  Ex. D2, p. 45.  She further documented that Chloe states
"the weather, her feelings, and what she ate for breakfast and then picks another friend to ask a

question." *Id.* Chloe's performance indicated that she was developing social skills and increasing her ability to interact with peers and adults.

Chloe had a behavior plan in place at Nagel. Tr. Vol. 1, p. 181. The behaviors that Chloe exhibited in seventh grade had decreased by eighth grade and had, in fact, improved with the implementation of a behavior plan and a behavior goal. Tr. Vol. 1, p. 181-83. Mrs. Gajus indicated there were a few behavior incidents in her middle school years, but believed that the behavior plan and behavior goal were "very effective" and that Chloe interacted appropriately with peers and adults. Tr. Vol. 1, p. 183.

**B.      Chloe's High School Years.**

When Chloe started high school, the Individualized Education Program (IEP) team met to discuss transition to a new classroom. Acknowledging Chloe's disability-related learning challenges, the Gibsons asked the District to focus Chloe's instruction on functional academics such as reading, writing, money, and learning life skills in a community setting. Ex. JJJ. Chloe's parents wanted the District to individualize her program to provide Chloe with regular community participation and the opportunity to explore various job experiences. The Gibsons requested that Chloe's IEP focus on developing the skills she would need to live and work in a community setting as an adult. *Id.* However, the District's plan for Chloe had an entirely different focus.

In ninth grade, the District decided unilaterally to place Chloe in a program in a self-contained, social leisure/recreation-based classroom at Anderson High School (Anderson) with teacher Susie Giesting. Tr. Vol. 1, p. 209-210; Vol. 9, p. 1689. The District did not consider other options, including the community-focused program that was to be taught by Chloe's former teacher, Mrs. Gajus, at Turpin High School (Turpin), Tr. Vol. 3, p. 551-52, even though the Gibsons later discovered that all of Chloe's middle school classmates would be attending the

Turpin program. Tr. Vol. 6, p. 1032. The familiarity of the teacher, classmates, and community program focus at Turpin were important to Chloe and had a big impact on her progress in middle school. Tr. Vol. 9, p. 1710-12. In an effort to persuade the District to allow her into the Turpin program, the Gibsons requested an IEP meeting and a review by the District Superintendent of the decision to place Chloe at Anderson. Tr. Vol. 6, p. 1037-38; Ex. 60. These efforts were unsuccessful.

Without conducting comprehensive vocational assessments, the District had concluded that Chloe would never be able to work in the community. Tr. Vol. 13, pp. 2696-99. *See e.g.* Ex. EE, p. 2; Ex. B1, p. 2. The District's vision for Chloe was for her to be happy and "safe" and spend her life in a segregated "supportive/assisted living environment, participating in a small group recreational/leisure environment (i.e. adult program) … where she would have opportunities to interact socially with other adults and enjoy activities that are related to such interests as music, dance, magazines, books, movies, art, cooking, and exercising spend her days." Exhibit B1, p. 2. This would likely entail non-vocational recreation/leisure activities at a sheltered workshop.[4]

While the Gibsons certainly wanted Chloe to be happy and safe, interact socially with her peers and enjoy leisure activities as an adult, they also wanted her to learn new skills, be part of her community, and have the opportunity to develop some basic employment and life skills. The District's limited vision for Chloe led it to severely restrict her educational activities and her participation in her school program and the community. By trying to keep Chloe safe and only providing educational activities that would lead to a sheltered workshop-type adult program, the District limited Chloe's opportunity to participate in her community, become more independent

---

[4] A sheltered workshop is a program sponsored by county boards of developmental disabilities which normally has segregated employment, but also has non-vocational recreation/leisure activities for individuals with developmental disabilities who choose not to work.

6

and work towards attaining meaningful employment.

The District made this unilateral decision about Chloe's future based on its conclusions about her potential, without doing appropriate transition assessments.  In addition to failing to conduct appropriate transition assessment, the District refused to consider any other outcomes for Chloe or provide her with educational opportunities to assess the possibility that she might be able to work and become more independent.

In contrast to the District's vision for Chloe, the Gibsons envisioned a better future for her.  They repeatedly asked the IEP team to individualize her IEP to provide her with measurable goals to develop life skills such as safely crossing the street, writing and saying her phone number and address, telling time to the hour and half hour, using the telephone and calling 911, practicing stranger danger skills, learning to grocery shop and counting money.  *See e.g.* Ex. ZZ; Ex. AAA; Ex. CCC.  They continued to request that the District provide her regular access to a variety of community settings to learn and practice these skills.  *Id.*  In spite of the Gibsons' urgings to further individualize Chloe's education, the District's programming remained focused on recreation and leisure.

When Chloe began high school at Anderson, she initially had a very difficult time with the new setting, classroom, teacher, classmates and limited programming in the self-contained classroom.  Tr. Vol. 6, p. 1038-39.  She exhibited several behaviors in response to the change.  The Gibsons had such difficulty getting Chloe to get on the school bus in the morning that they had to request an aide to assist her in this process.  Tr. Vol. 9, p. 1694.  Chloe had never needed a one-on-one aide on the bus before.  Tr. Vol. 7, 1257; Tr. Vol. 17, p. 3398.

The IEP team also began to have difficulties.  The District's legal counsel had been attending IEP meetings, which caused additional tension between the parties.  The Gibsons

sought legal assistance from the Ohio Legal Rights Service in order to help facilitate appropriate services for their daughter. Tr. Vol. 9, pp. 1686-87.

The IEP team met in October of 2006 to develop a new IEP for the 2006-2007 school year. Ex. 144. The Gibsons made several requests at that meeting to try to develop an appropriate program for Chloe so she would not lose the skills she had gained in elementary and middle school. *Id.* Instead of addressing those requests in the meeting, the District asked the Gibsons to put their requests into writing. The Gibsons, through their counsel, followed up with a letter detailing what they were asking the team to consider adding to Chloe's 2006-2007 IEP. Ex. JJJ, p. 1.

Many of the Gibson's requests focused on their desire for Chloe to spend more time with typical peers and have access to the regular education curriculum. Since her first day at Anderson, Chloe remained in the self-contained classroom setting for her entire school day except when she attended a regular education dance class and adaptive PE class. Ex. JJJ, p. 1. Except for the dance class, Chloe was not permitted to attend any regular education classes like she had done regularly in the past. The Gibsons requested that Chloe have more interaction with typical peers by eating lunch in the cafeteria and attending specials like she had done in middle school. *Id.*; Tr. Vol. 9, p. 1717-18. They asked for the District to provide Chloe with community experiences on a regular basis with her peers because similar outings had been so successful in the past. Tr. Vol. 9, p. 1688, 1711-12; Ex, JJJ, p. 1. Dr. Julie Rubin, the District's expert, had evaluated Chloe in 2006 and suggested the IEP team develop a similar program for Chloe in high school because of the great progress she had noted in Chloe during middle school. Ex. LL, p. 5.

Further, the Gibsons requested that Chloe continue to work on academics, such as math

and handwriting, and for the District to provide her with a research-based reading program since she was successful with the Edmark program in the past. Ex. JJJ; Tr. Vol. 9, p. 1739, 1741-42. Finally, they requested that Chloe have specific goals to address her behaviors, Ex. JJJ, p. 3, and asked for details as to how Chloe was being provided related services of occupational therapy, physical therapy and speech therapy. *Id.* at p. 2. Instead of discussing the Gibsons' requests, the District presented the Gibsons with a new proposed IEP. *Id.* at p. 5. The District's proposal did not include additional time in a regular education environment or in the community. The goals proposed were unmeasurable and for skills Chloe had already accomplished. *Id.*

In response to the requests for community experiences, Ms. Giesting stated that her classroom did not go into the community because many of the children in the class were in wheelchairs. Tr. Vol. 9, p. 1704. When the Gibsons advised Ms. Giesting that these services needed to be decided based upon Chloe's individual needs, not the condition of the other children in the classroom, Ms. Giesting immediately said Chloe was not "ready" and that she would let the Gibsons know when Chloe was ready to go into the community. *Id.* at p. 1708; Tr. Vol. 10, p. 2030-31.

In February of 2007, the Gibsons again wrote a letter outlining their requests. Ex. JJJ, p. 5. Director of Special Education, Betsy Ryan, responded that the last IEP was the District's "final position" and the Gibsons' requests were "inconsistent in terms of what our hopeful outcome for Chloe is." Ex. JJJ, p. 16. The Gibsons responded to the District with specific requests with an emphasis on adding measurable goals, and requested specific details as to what the District would or would not provide. Ex. KKK, p.1. The Gibsons received no response from the District. When the Gibsons followed up on June 1, 2007, they also asked for a meeting to discuss extended school year (ESY) services over the summer. *Id.* at p. 7. Ms. Ryan responded

that same day with a prior written notice reiterating the District's March 12 "final position" and advising the Gibsons that she had met with the school team and they had determined Chloe was not eligible for ESY services.  *Id.* at 9.  None of the Gibsons' requests were incorporated into Chloe's IEP for the 2006- 2007 school year, and the District's notice was clear that it would not address these concerns for the upcoming year.

### C.    Chloe's 2007 - 2008 School Year and the Complaint with the Ohio Department of Education.

After the District provided prior written notice to the Gibsons that Chloe's IEP would not be modified, the Gibsons filed a complaint with the Ohio Department of Education (ODE). Ex. III.  The complaint outlined the District's failure to provide: (1) a transition plan; (2) community outings; (3) research-based reading instruction; (4) measurable IEP goals and objectives; (5) access to the general curriculum; and (6) goals to address Chloe's transitioning deficits.  *Id.*  The Gibsons also alleged that the provision of related services was not being documented or specified in goals, and Chloe's least restrictive environment (LRE) had been changed without parental consent.  *Id.*  The parties engaged in voluntary mediation on these issues which proved to be unsuccessful.  *Id.* at p. 12.

ODE issued a letter of findings in October of 2007, finding multiple violations and ordering the District to develop a plan to address the amount, type, and kind of services needed to ensure that Chloe was able to make progress toward her annual goals and in the general curriculum.  Ex. KKKK.  Among other things, the District was ordered to ensure transition services, compensatory education, measurable goals, and parent participation in the educational decision-making process.  *Id.* at p. 25.  Although Chloe was ordered 90 hours of compensatory services, she never received many of those hours.  Ex. LLLL.  ODE ordered the District to meet with the Gibsons and develop a plan for the provision of compensatory education.  The District

ignored the corrective action in the letter of findings for over a year until the Gibsons contacted ODE to enforce these measures. Ex. W, p. 4 (May 20, 2009 Letter from the District).

Because the District did not want to provide compensatory education to Chloe, at some point during this process, the District asked ODE to reconsider its findings. On April 14, 2009, almost two years after the original complaint was filed, ODE advised the District that, after review, it had reconsidered its compensatory order and determined that the October 16, 2007 Letter of Findings would stand. Ex. W, p. 17. In that same letter, ODE advised the District that there continued to be problems with Chloe's IEP and services, and that her goals were not measurable. ODE noted that many of the IEP goals appear to involve working on skills that Chloe had already mastered or working at lower success rates than previous IEPs. *Id*.

ODE specifically advised the District that Chloe's verbal responses had remained at three-word phrases for over 18 months with no progress and indicated the team needed to create a measurable goal to move Chloe beyond a three-word phrase. *Id*. ODE again ordered the District to provide the 90 hours of compensatory services, focusing on areas such as behavior, math, and self-help skills. *Id*. In response to ODE's second order, the District provided Chloe with a summer program. However, that program did not fully compensate Chloe and failed to address the needs noted by ODE. *See*, Tr. Vol. 7, p. 1201-15; Ex. YYY.

**D. Chloe's 2008 - 2009 School Year And Beyond.**

While all aspects of Chloe's IEP and development were important, a central element of the Gibsons' requests was for Chloe to have opportunities for community outings to further develop skills which would lead to greater independence, including future meaningful employment. In April of 2008, the District finally offered to develop a "community outings plan" for Chloe and to provide a few outings by the end of the 2007 - 2008 school year. Ex. Y, p. 22. This did not happen. When the Gibsons finally received a written community outings

11

plan in the fall of 2008,[5] the plan did not actually provide for Chloe to go into the community. *Id*. Instead, it focused on going to the vending machines in the District administration building and walking around the school track. *Id*. The Gibsons provided consent for the school to take Chloe into the community but did not sign the specific proposed plan that was limited to the track and administrative building. Ex. AA, p. 34. The teacher sent home the signed consent and advised the Gibsons that they had to sign the exact plan proposed by the District or Chloe would not be provided any community outings. Tr. Vol. 11, p. 2177-79; Ex. XX, pp. 1-2. The District eventually developed a revised plan that included a provision that there could be actual outings in the community in the future. Ex63.

The accompanying IEP that was provided by the District in October of 2008 also failed to address the Gibsons' other requests and provide Chloe with appropriate educational services. The previous year's IEP goals and objectives had simply been rearranged,[6] and several important objectives had been removed. Ex. AA, p.1. Though requested, no behavior goals were identified to address Chloe's refusals to do work and dependence on prompts from adults. *See e.g.* Ex. JJJ, p. 6 (decreasing supports). Chloe's reading goal focused primarily on words she had already learned and, consequently, was not calculated to confer educational benefit and had no baseline from which to measure progress. Tr. Vol.8, 1580-83. *See also* Ex. AA, p. 6; Tr. Vol. 10, p. 1987-91. Her math goal was a reiteration of a skill of using a vending machine, which her records indicated she had already mastered in middle school. Ex. B4, p. 114. In spite of the Gibsons' urgings, the District did not address their concerns regarding the inadequacies of the proposed goals.

---

[5] The community outings plan was given to the Gibsons for first time in the fall of 2008, but was dated April 2008 because that was when the District had agreed to write a plan. *See*, Ex. AA, p. 1; Ex. Y, p. 1.
[6] For instance, Chloe's previous "all content areas" IEP goal to "complete both academic and prevocational tasks," became a "social studies/citizenship" goal to "independently complete various work-based tasks, self-care tasks, and recreational activities requiring the use of both hands." Comparing Ex. 17 to Ex. AA.

Because the parties could not reach agreement about appropriate educational goals and services for Chloe, they agreed to seek another opinion. The District and the parents agreed to outside evaluations to be conducted by Cincinnati Children's Hospital staff. Evaluations were conducted by Dr. Melissa Foti-Hoff, Jane Gaspar, and Dr. Matheis. Ex. II; Ex. JJ. Further, the District requested that its school psychologist, Jennifer Bullock, conduct additional evaluation of Chloe in response to the parent's request for information about Chloe's academic present levels. Ex. KK. The recommendations of Jennifer Bullock followed those of her employer, the District. Among other things, Cincinnati Children's Hospital recommended that Chloe have more educational opportunities in the community. Ex. II at pp. 4-5. Those recommendations were not incorporated into Chloe's IEP by the District because the District did not agree with them. Ex. ZZ, p.12. In fact, the District would not even invite the Cincinnati Children's Hospital evaluators to discuss transition planning at the IEP meeting. *Id*.

The Gibsons sent letters in October and December of 2008 requesting that the District invite the Cincinnati Children's Hospital experts to discuss the evaluations and do transition planning. Ex. ZZ, pp. 2, 9. The District responded in February of 2009 that the evaluations were biased and would "disrupt the transition planning process." Ex. ZZ, p. 12. On February 20, 2009, the District sent the Gibsons an invitation to discuss transition and Chloe's Multi-Factored Evaluation (MFE) reevaluation six days later on February 26th. Ex. P, pp. 9-10. After a series of attempts to schedule a mutually agreeable meeting date, the District unilaterally chose April 21st. Ex. P, pp. 15-16. Unfortunately, the Gibsons were again unavailable that date, so they alerted the District in writing twice that they had to reschedule. Ex. P, p. 16; Ex. CCC, p. 14. In spite of the Gibsons' clear intention to attend, the District held the meeting on April 21st without the Gibsons or the Cincinnati Children's Hospital evaluators. Ex. P, pp. 1-8.

13

Another meeting was later set on June 1, 2009, to discuss the MFE, the need for extended school-year services, and compensatory education. Ex. E1, pp. 1-5. At the meeting, the Gibsons requested that as part of the MFE review, the IEP team consider Chloe's least restrictive environment options. Ex. E1, p. 5. The District refused to discuss other options and sent the Gibsons a notice indicating that the District had determined that Chloe's least restrictive environment was her current classroom. Prior Written Notice, July 8, 2009, Attachment to Response Brief of Petitioner, March 4, 2011, pp. 39-40.

The 2010 - 2011 school year was Chloe's fifth year in the same self-contained classroom with similar unmeasurable IEP goals, negligible community experiences, and a continuation of the limited vocational skills work in the classroom. In light of this, the Gibsons have repeatedly made the same core requests of the District:

- A research-based reading program;

- Handwriting/keyboarding skills;

- Regular community experiences to help Chloe develop skills to shop in a variety of stores, use the post office, and order in restaurants as Chloe had developed an unwillingness/difficulty in going into the community;

- Goals to increase Chloe's communication skills including increasing her sentence length and initiation of conversations;

- Goals to decrease prompt dependency, transitioning times and refusals to do work (through positive reinforcement);

- Measurable goals to address functional skills such as preparing meals, address stranger danger skills, saying and writing phone number and address, asking for help in the community, using ID, travel safety (crossing street safely), fire safety

and using the telephone;

- Work on math, money and time skills;

- Increased time in regular education specials, (art, music, lunch assemblies, library) with typical peers in class and the community and extra-curricular and non-academic settings; and

- A transition plan that includes measurable transition goals, job trials and employability skills.

Because the District did not agree to develop an IEP for the 2009-2010 school year that addressed these needs, in December of 2009, the Gibsons requested the impartial due process hearing at issue in this case.

## III.   PROCEDURAL HISTORY

The Gibsons filed a request for an impartial due processing hearing pursuant to Ohio Admin. Code 3301:51-05(K)(7) and the IDEA, 20 U.S.C. §§ 1415, *et seq.* on December 14, 2009.  Ex. A.  The hearing was held before an Impartial Hearing Officer (IHO) over twenty-six nonconsecutive days beginning May 3, 2010 and ending December 6, 2010.  The IHO issued a decision on April 5, 2011, ruling in the Gibson's favor on several major issues raised.  The IHO held that Chloe had been denied a FAPE for the two years preceding the filing of the request for due process based upon the deficiencies in her IEPs.[7]  IHO Decision, p. 16, ¶ 22.  The IHO determined that Chloe's IEP goals for the 2007-2008, 2008-2009, 2009-2010 school years were inadequate in several respects and were not sufficiently challenging to move her forward.  IHO Decision, p.6, ¶ 19.  The IHO determined that Chloe's prompt dependency was an impediment to her independence as an adult, and ordered the District to incorporate into Chloe's IEP a goal to

---

[7] The IDEA has a two-year statute of limitations.  Consequently, hearing officers are limited to awarding remedies for violations that occur up to two years prior to the filing of a due process complaint.

address her prompt dependency in all aspects of her education. IHO Decision, p.16, ¶ 21. The IHO ordered the District to provide a total of 480 hours of compensatory education (240 hours each in reading and math), and set specific parameters for Chloe's instruction. IHO Decision, pp. 7, 16-17. The IHO ordered the District to revise Chloe's current IEP goals regarding bilateral hand coordination and maneuvering to increase the skills demanded, to include specific safety instruction, and to increase Chloe's physical stamina and strength. IHO Decision, p. 17, ¶ 4.

During the course of the hearing, the IHO also found that the Gibsons had requested a vocational transition assessment, that the assessment was needed, and that the District had not provided a thorough transition assessment. Tr. Vol. 6, p. 898. By order of the IHO, a vocational assessment was completed by Goodwill Industries, Inc. (Goodwill) during the pendency of the hearing. The IHO found that the Goodwill assessment showed that Chloe is capable of working, and she appears to enjoy working, especially where she is not sedentary. IHO Decision, p.12, ¶ 20.

The IHO found that Chloe had significant communication needs, and thus ordered that the District provide an augmentative communication assessment. IHO Decision, pp. 13, 17 at ¶ 6. She also ordered the District to develop IEP goals, objectives and related services to increase Chloe's speech initiation and output based upon the results of the assessment. *Id*. The IHO also concluded that the District had denied Chloe a FAPE "to a lesser extent" regarding the provision of related services of physical therapy and occupational therapy goals for the two years prior to the due process filing. IHO Decision, p. 24. However, the IHO did not order a remedy for these FAPE denials.

In spite of these findings regarding Chloe's IEP service provision, the IHO found that the

Gibsons had been provided meaningful parental participation in the IEP process.  The IHO did not address the Gibsons' claims that the District had failed to consider the least restrictive environment (LRE), specifically Chloe's participation in the regular education program with her typical peers.

The District did not appeal the IHO's decision to the State Level Review Officer (SLRO).  However, the Gibsons timely appealed the IHO's failure to award Chloe a remedy for the two years prior to the due process filing for several issues, including communication, assistive technology, transition planning, meaningful participation, IEP educational benefit, and prevailing party status.  Notice of Appeal to the State Level Review Officer, May 19, 2011.  The Gibsons did not appeal the IHO's determination of a denial of FAPE based upon the inadequate IEPs, the award of compensatory services for math and reading, or any of the other issues on which they prevailed.  The Gibsons also filed a complaint in this Court for attorney's fees related to the issues upon which they prevailed in the due process hearing.

The SLRO issued a decision on August 15, 2011, finding for the District on all of the issues appealed by the Gibsons.  However, the SLRO refused to review other issues raised by the District solely in its brief to the SLRO, because the District failed to file an appeal.  IHO Decision, p. 23.

On October 14, 2011, the District filed a Complaint in this Court, Case No. 1:11-cv-628, alleging that the SLRO erred by failing to address the issues it raised in its brief to the SLRO.  On November 14, 2011, the Gibsons filed a Motion to Dismiss the District's claims based upon their failure to exhaust remedies.  Case No. 1:11-cv-628, ECF No. 2.  The Gibsons also filed a Complaint in Counterclaim at that time.  Case No. 1:11-cv-628, ECF No. 3.  On April 11, 2012, this Court granted the Gibson's Motion and dismissed the District's claims leaving only the

Gibsons' claims for review by this Court.

## IV.    OVERVIEW OF THE IDEA

The first federal law to require appropriate education of children with disabilities was the

Education for all Handicapped Children Act (EHA), the precursor to IDEA.  EHA required that

all children with disabilities had a right to an education, and established a process for state and

local education agencies to be held accountable for providing educational services for all

students with disabilities.  Pub. L. No. 94-142.  Before the EHA, it was a common misperception

that individuals with disabilities could not learn, become employable or fully participate in

society.  Before 1975, many children with disabilities were excluded from receiving any

education at all.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 189 (1982) citing Note to 20 U.S.C. §

1401 (referring to the Congressional findings and intent to address the roughly one million

children whom Congress had found were excluded entirely from the public school system and

the approximately four million children receiving inappropriate education).  The EHA was

passed to address this problem.  While this state of affairs has significantly improved with the

enactment of the EHA and subsequently the IDEA, the language in the most recent amendment

of the IDEA confirms that these misconceptions about what individuals with disabilities can

accomplish are still prevalent.

In reauthorizing and amending the IDEA in 2004, Congress noted that the amendments

were necessary because "implementation of this title has been impeded by low expectations and

an insufficient focus on applying replicable research on proven methods of teaching and learning

for children with disabilities."  20 U.S.C. § 1400(c)(4).  Specifically, Congress explained:

> (5) Almost 30 years of research and experience has demonstrated
> that the education of children with disabilities can be made more
> effective by

(A) having high expectations for such children and ensuring their access to the general education curriculum in the regular classroom, to the maximum extent possible, in order to
> (i) meet developmental goals and, to the maximum extent possible, the challenging expectations that have been established for all children; and
> (ii) be prepared to lead productive and independent adult lives, to the maximum extent possible;

20 U.S.C. §§ 1400 (c)(5)(A)(i)-(ii). Congress also found that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring *equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.*" 20 U.S.C. § 1400(c)(1) (emphasis added).[8]

The primary purposes of the 2004 IDEA are to "ensure that all children with disabilities have available to them a free appropriate, public education that emphasizes special education and related services designed to meet their unique needs and *prepare them for further education, employment and independent living.*" 34 C.F.R. § 300.1(a), 20 U.S.C. § 1400(d)(1)(A) (emphasis added). The IDEA also seeks "to ensure the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B); *see also*, 34 C.F.R. § 300.1(b). In other words, the IDEA promotes high expectations for children with disabilities and requires school districts to provide the necessary services to meet that goal.

### A.    IDEA's Unique Needs, Educational Benefit, and Educational Progress Requirements.

The IDEA ensures that children with disabilities receive an appropriate individualized education program (IEP) that is designed to meet the child's unique needs and provide the child

---

[8] This national policy towards ensuring that individuals with disabilities are provided the same educational opportunities as all children is also reflected in the 2001 enactment of No Child Left Behind (NCLB). 20 U.S.C. § 6301. The purpose of NCLB is "to ensure that all children have a fair, equal, and significant opportunity to obtain a high quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and State academic assessments." 20 U.S.C. § 6301. Congress indicated that this purpose can be accomplished by "meeting the educational needs of low-achieving . . . children with disabilities…" and "closing the achievement gap between high- and low-performing children" and "ensuring the access of children to effective, scientifically based instructional strategies and challenging academic content." 20 U.S.C. §§ 6301(2), (3) and (9) (emphasis added).

with a meaningful educational benefit.  *Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840, 862-65 (6th Cir. 2004); *Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.,* 208 F.3d 560, 565 (6th Cir. 2000) (citing 20 U.S.C. §§ 1401(25), 1412).  The Sixth Circuit has held that whether a child receives a meaningful benefit must be gauged in relation to the potential of the child at issue, and that it is "only by considering an individual child's capabilities and potentialities may a Court determine whether an educational benefit provided to that child allows for meaningful advancement.  In conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children."  *Deal,* 392 F.3d at 864.

School districts subject to the IDEA are required to develop a written IEP for each child with a disability.  *Id.* at 864-65; 20 U.S.C. § 1414(d)(2)(A); *see also*, *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1414(a)(5)).  "The IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress."  *Knable, 238 F.3d* at 763.  This must be individualized for that child's needs and further meaningful progress and educational benefit.

## B. IDEA's Least Restrictive Environment Requirement.

In addition to developing IEPs that are individualized and designed to confer educational benefit, a district must also ensure that a child with a disability is provided with educational services in the least restrictive environment (LRE) to the maximum extent appropriate.  34 C.F.R. § 300.114(a); Ohio Admin. Code 3301:51-09(A) and (B); *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983).  The concept of LRE, a guiding principle of the IDEA, helps to ensure that districts meet the overarching goal of the law: to ensure that students with disabilities are independent and prepared to participate in their communities and work with their typical peers.

20

The district must ensure that to the maximum extent appropriate, children with disabilities are educated with children who are non-disabled. Ohio Admin. Code 3301:51-09(B)(2)(a). Further, the district must ensure that children with disabilities are not removed from the regular education environment because of the nature or severity of their disability, unless the use of supplementary aids and services are insufficient to allow the education of the child in the regular classroom to be achieved satisfactorily. Ohio Admin. Code 3301:51-09(B)(2)(b); *see also*, 34 C.F.R. § 300.117. Districts must ensure that prior to considering removal from the regular education classroom, the IEP team has given adequate consideration to placement of the child in the regular education classroom with supplementary aids and services, such as the support of a paraprofessional aide or itinerant special education teacher support. *See* 34 C.F.R. § 300.114(a)(2)(ii); Ohio Admin. Code 3301:51-09(B)(2)(b). Further, districts must ensure that children with disabilities participate with non-disabled children in the extracurricular services and activities of the district to the maximum extent appropriate to the needs of that child. 34 C.F.R. § 300.117; Ohio Admin. Code 3301:51-09(E).

Regular or special education classroom placement decisions need to be considered annually by the IEP team and must be based on the child's IEP. 34 C.F.R. §§ 300.116(b)(1)-(2); Ohio Admin. Code 3301:51-09(D)(2)(a) and (b); *Knable*, 238 F.3d at 763 citing 34 C.F.R. part 300, appendix C, cmt 5. Districts are prohibited from placing children with disabilities based on what happens to be available classrooms or programs without discussing the child's possible participation in the general education settings and determining that child's LRE. To ensure that the unique needs of children with disabilities are met in the LRE, districts are required to ensure that a continuum of alternative placements is available. 34 C.F.R. § 300.115; Ohio Admin. Code 3301:51-09(C). Additionally, districts are required to determine what services a child needs,

including whether supplementary aids and services could assist a child to participate in the general education settings before making a decision about the child's LRE.[9]  34 C.F.R. § 300.115.

### C.  Meaningful Participation and Procedural Safeguards.

Also central to the IDEA is the concept of parental participation and advocacy for children with disabilities.  Consequently, the IDEA requires that districts ensure that a child's parents must be a part of any group that makes decisions about the services to or the educational placement of the child.  34 C.F.R. § 300.116(a)(1); 34 C.F.R. § 300.327; Ohio Admin. Code 3301:51-07(N).

Congress created a complex statutory scheme to provide children with disabilities a substantive right to a FAPE.  To ensure this right, Congress also put into place very specific procedural safeguards to ensure that children with disabilities and their parents are able to meaningfully participate in the educational process, including the development of the IEP.  The IDEA framework and procedural requirements are designed to ensure parents are "equal partners" along with school personnel in developing, reviewing and revising the child's IEP.  As the Supreme Court noted, it was this vigorous advocacy that would safeguard the child's right to an appropriate education and ensure appropriate services for the child.  *Rowley*, 458 U.S. at 208-09 (internal quotes omitted).

When parents and districts cannot agree on the provision of a FAPE, additional safeguards are provided to parents and districts through comprehensive administrative remedies to address issues related to the identification, evaluation, educational placement, and the provision of a FAPE.  34 C.F.R. §§ 300.500 through 300.520; Ohio Admin. Code 3301:51-

---

[9] Placement under the IDEA is not a location but is a combination of the specific services and supports that will be provided to a child in combination with the amount of time the child's education will be provided with non-disabled peers (that child's LRE).  20 U.S.C. § 1400(c)(5)(C); 20 U.S.C. § 1412 (a)(5).

05(K)(7); 20 U.S.C. § 1415(i)(2)(A).  The impartial due process hearing at issue in this case is one of those available remedies.

## V.  STANDARDS OF PROOF AND REVIEW

The Court's two-part inquiry in IDEA FAPE cases is:  1) whether the school system has complied with the procedures set forth in the IDEA, and if so; 2) whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits.  *Deal,* 392 F.3d at 853-54, citing *Rowley,* 458 U.S. at 206-07; *McLaughlin v. Holt Public Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003).  The Court must also determine whether the district has provided the child's educational services in the least restrictive environment (LRE) to the maximum extent appropriate for that child.  *Roncker*, 700 F.2d at 1063.  Schools are not required, however, to provide the "best" education or maximize each child's potential commensurate with the opportunity provided other children, *Rowley*, 458 U.S. at 198, but it must provide the child a meaningful educational benefit.  *Deal*, 392 F.3d at 862 (citing *T.R. ex rel. N.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3rd Cir. 2000)).

The IDEA contains procedural requirements regarding all aspects of a student's special education, including identification, evaluation, and the development of IEPs.  Because of the importance Congress placed on the procedural requirements of the IDEA, courts must "strictly review an IEP for procedural compliance."  *Deal*, 392 F.3d at 864-65, citing *Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999).  Federal courts have ordered reimbursement to parents of students with disabilities on the basis of procedural violations alone, without consideration of whether substantive violations occurred.  *Deal ex rel. Deal v. Hamilton County Bd. of Educ.*, No. 1:01-cv-295 Edgar, 2006 U.S. Dist. LEXIS 76324, *8 (E.D. Tenn. Aug. 1, 2006); *see also Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 632-35 (4th Cir. 1985).

While not every technical violation of the procedural prerequisites will invalidate the legitimacy of an IEP, procedural inadequacies that seriously infringe upon the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE. *Knable*, 238 F.3d at 765; *J.N. v. District of Columbia*, 677 F. Supp. 2d 314, 320 (D. D.C. 2010). In addition, procedural violations that deprive an eligible student of an individualized education program or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA. *See Babb ex rel. Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 109 (6th Cir. 1992); *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992). Failure to follow the very specific procedures under the IDEA can be a denial of FAPE if the procedural violations (1) impeded the student's right to FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *Knable*, 238 F.3d at 765; *J.N.*, 677 F. Supp. 2d at 320; *Babb*, 965 F.2d at 109; *Target Range Sch. Dist.*, 960 F.2d at 1484.

Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate. *Deal*, 392 F.3d at 864-65, citing *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 729 (6th Cir.); *Dong*, 197 F.3d at 799.

Parties aggrieved by due process administrative rulings may bring a civil action in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516. In an action brought under the IDEA, the District Court receives the records of the administrative proceedings, hears additional evidence at the request of a party, and basing its decision on the

preponderance of the evidence, grants the relief the court determines to be appropriate. 20 U.S.C. § 1415(i)(2)(C); 34 C.F.R. § 300.516(c).

Courts reviewing the administrative record in an IDEA case undertake a "modified de novo" standard of review, whereby "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable*, 238 F.3d at 764. An initial reviewing court should, therefore, make an independent decision based on the preponderance of the evidence, but should also give "due weight" to the determinations made during the state administrative process. *Rowley*, 458 U.S. at 206. As the Court in *Deal* explained, "although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Deal II*, 2006 U.S. Dist. LEXIS 76324, citing *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206).

The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. *McLaughlin ex rel. McLaughlin v. Holt Public Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation." *Id*. Mixed questions of law and fact are to be reviewed de novo, such as a determination of whether a child has received a FAPE. *Target Range Sch. Dist.*, 960 F.2d at 1483.

VI.    **ARGUMENT**

A.    **The District denied Chloe a FAPE by failing to appropriately address her well documented communication deficits and Assistive Technology (AT) needs.**

The Gibsons raise the issue of communication in order to obtain the comprehensive augmentative communication evaluation that Chloe was ordered by the IHO, and to seek compensatory education for the District's failure to appropriately address her communication.  In this case, Chloe has the potential to communicate more effectively, but the District failed to address this potential even in the face of recommendations by its own staff.  The District's inaction deprived Chloe of an evaluation-driven, communication-focused IEP, which negatively affected her progress throughout her high school years.  The SLRO's dismissal of  Chloe's entitlement to compensatory services is a departure from established IDEA law because compensatory educational services are to be provided where there has been substantive harm for failure to provide a free and appropriate public education.  Since the District failed to appropriately evaluate Chloe for assistive technology and revise her goals to address her lack of progress, this Court should order a comprehensive augmentative communication evaluation and sufficient compensatory speech services.

1.    **The District's failure to appropriately address Chloe's communication deficits not only violated the IDEA's periodic review mandate, but also negatively impacted other aspects of Chloe's education.**

The District's failure to address Chloe's significant communication needs throughout her high school career negatively affected her education and was contrary to established principles of the IDEA.  In order to provide a FAPE, an IEP must be designed to enable the child to make meaningful educational progress.  *Deal*, 392 F.3d at 861-865.  To that end, districts must ensure that the IEP team reviews the IEP periodically, but not less than annually, to determine whether the annual goals for the child are being met.  34 C.F.R. § 300.324(b)(1)(i); Ohio Admin. Code

3301:51-07(L)(2)(a)(i).  In conducting the review, the IEP must be revised as appropriate to address any lack of expected progress toward annual goals, the results of any reevaluation, information provided to or by the parents, and the child's anticipated needs.  34 C.F.R. § 300.324(b)(1)(ii); Ohio Admin. Code 3301-51-07(L)(2)(a)(ii).  This periodic review is not simply a procedural exercise designed to ensure that a child's progress report shows progress; the results of the review should result in an IEP that is "likely to produce progress, not regression or trivial educational advancement."  *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997), quoting *Bd. of Educ. of East Windsor Regional Sch. Dist. v. Diamond,* 808 F.2d 987, 991 (3rd Cir. 1986).  "Congress did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal advancement, no matter how trivial."  *Hall*, 774 F.2d at 636.

When a district is aware that a child has not made educational progress, it is required to revise the IEP goals to address the lack of progress.  34 C.F.R. § 300.324(b)(1)(ii).  In *Draper,* the district refused to make adjustments in the student's reading program even though the student's reading level was unchanged for three years.  *Draper v. Atlanta Indep. Sch. Sys.*, 480 F. Supp. 2d 1331, 1343 (N.D. Ga. 2007).  The court in *Draper* found that the district had insisted on a reading program that had not resulted in an educational benefit, and had therefore violated the student's right to a FAPE.  *Id.* at 1347.  Here, the District's own acknowledgement of a significant communication deficit, coupled with repeated failure to adjust instruction to develop measurable goals to ensure progress, has resulted in continued stagnation of Chloe's acquisition of communication skills.  The ultimate result of this inaction is *de minimus* educational progress and a denial of a FAPE.

In this case, the IHO determined that Chloe's communication needs were so significant

that she ordered the District to provide an augmentative communication assessment, develop measurable goals and change Chloe's related services to increase speech initiation and output based upon the results of the evaluation. IHO Decision, pp. 13, 17. Effective communication is central to independence in the community and the IHO acknowledged that the District was "obligated to provide education designed to foster independence to the extent of [Chloe's] capabilities." IHO Decision, p. 19.

The IHO was correct in concluding that Chloe had serious communication deficits. The record is replete with such evidence. Chloe's IEPs clearly document an ongoing lack of progress in communication. In fact, Chloe's IEPs for multiple consecutive school years use almost the same phrasing. Ex. B6, p.1 (2005-2006 IEP: "She requires wait time and most of her answers are one word answers or 2-3 word phrases."); Ex. B5, pp. 1-2 (2006-2007 IEP: "She requires wait time and most of her answers are one word answers or 2-3 word phrases."); Ex. B4, p. 1 (2007-2008 IEP: "Chloe can respond in up to 3-word phrases."); Ex. B1, p. 6, Objective 1.4 (2009-2010 IEP: "[G]enerally speaks one-word responses when prompted."). Chloe's sentence length has remained the same, and she speaks in a very low volume and rarely initiates conversation.

The District's speech and language pathologist, Nicole Ponting, identified Chloe's primary needs as improving her initiation of communications, decreasing the need for modeling/prompts, staying on topic and increasing the number of communicative exchanges. Tr. Vol. 5, p. 685-86. In spite of these specifically identified needs, the only IEP goals that addressed Chloe's communication involved having her typing and reading words and short sentences/scripts from a list of functional and safety words/scripts about events in her day. Ms. Ponting conceded that this approach does not address her initiation of communication. Tr. Vol.

28

24, pp. 4668-69.  Instead, she described Chloe's communication goals as requiring Chloe to read

the words or sentence scripts she is given.  Tr. Vol. 24 at pp. 4617-18.  But Chloe already had the

ability to read sentences, so requiring her to read these scripts and prepared sentences was clearly

something she was already able to do.  Ex. I, p. 1 (6th grade: "Chloe can easily read a 2 line

sentence and she is beginning to use appropriate phrasing instead of reading word-by-word.");

Ex. B6, p. 1 (eighth grade: "Chloe can read a story and answer basic comprehension questions by

circling the answer.")

In addition, when the speech and language pathologist was asked about the goals in the

IEP to increase Chloe's vocabulary, she testified that she did not even know if the words on

Chloe's vocabulary list were actually new words or words she had already learned in the past.

Tr. Vol. 5, pp. 696-97. Chloe's teacher, Ms. Giesting, testified that the words are randomly

chosen from activities in which Chloe participates and are therefore "new" words, even if Chloe

had already mastered those words previously in elementary or middle school.  Tr. Vol. 10, p.

1987-91.  Ms. Gibson reviewed the word lists provided by the teacher and testified that only

about seven of the words on those lists for the past four years were actually "new" words for

Chloe.  Tr. Vol. 26, pp. 5315-16.  It is not an increase in vocabulary if Chloe "masters" words

she already knows.

The Ohio Department of Education (ODE) identified what the District should have been

doing as early as 2007.  In response to the Gibsons' 2007 complaint, ODE noted the lack of

progress in length of Chloe's spoken responses and ordered the IEP team to "create a measurable

goal to move Chloe beyond a three word phrase."  Ex. W, p. 19.  ODE also noted that the IEP

team needed to determine a baseline for Chloe's initiation of conversations and participation in

group settings and develop a measurable goal to help Chloe "move to initiating interaction with

others and participating with other people." *Id*. Instead of incorporating these changes into

Chloe's IEP, the District advised ODE that Chloe had made progress because her progress notes

for the 2008- 2009 IEP indicated that Chloe had mastered communicating with three word

phrases. Ex. 33, p. 505; Ex. G. This was not progress because Chloe's previous IEPs clearly

indicated that she spoke in up to three-word phrases in the several years prior to the 2008-2009

IEP. *See*, *e.g.*, Ex. B4, B5, B6.

The District's failure to revise Chloe's IEP negatively impacted not only her

communication skills, but also her adaptive skills, which are vital to making educational progress

and increasing future independence. Chloe's 2006 triennial multi-factored evaluation (MFE)

noted the negative effect of Chloe's expressive language deficits on her adaptive behavior.[10]

Exhibit D 2, p. 15 (marked p. 44 of Ex. D). Nicole Ponting, the District's speech and language

pathologist, confirmed these communication deficits and added that Chloe is very prompt

dependent and still does not initiate conversations without prompting. Tr. Vol. 5, pp. 689, 724-

25; Ex. D1, p. 23 (2009 MFE). Similarly, Chloe's 2009 IEP specifically noted the effect of these

communication deficits on her adaptive skills stating that "Chloe's adaptive skills are most

impacted by her lower level of expressive vocabulary, prompt dependency and lack of problem-

solving" skills. Ex. B1, p. 3. Thus, the District's own records show that Chloe did not make

meaningful progress in increasing her communication, increasing sentence length or in initiating

conversations during her high school years.

This was not lost on the Gibsons. They repeatedly asked the district to appropriately

address Chloe's communication deficits in a manner that is objectively measurable and to help

increase her communication length, output and initiation of conversations in school and in the

---

[10] "Adaptive behavior skills are the skills a person needs to get along with others and perform the everyday demands of life, such as taking care of themselves, and are measured in comparison to other people their age." Tr. Vol. 23, p. 4437.

community.  Tr. Vol. 13, pp. 2686-90.  They were concerned that Chloe continues to exhibit very limited communication skills in the school and community, and that the District's failure to write objectively measurable goals has limited Chloe's opportunities for future independence.  Tr. Vol. 13, pp. 2686-90.  This raises the concern that the District's limited view of Chloe's capabilities, even in the face of contrary evidence, had impacted its willingness to even try to make educational progress in communication.

However, the Gibsons know that Chloe is able to speak in significantly longer sentences when she is at home.  They provided the IEP team with an audiotape of her speaking sentences at home and requested goals to increase her communication length and initiation at school and in the community.  Ex. OO; Tr. Vol. 13, pp. 2687-88; *see also*, Ex. VVV (Home videos of Chloe exhibiting the use of full sentences, initiating conversation, and increased responses).  One of the hallmarks of children diagnosed with pervasive developmental disorder (autism spectrum) like Chloe is the inability to generalize skills learned in one environment to a different environment. Tr. Vol. 8, p. 1525.  As noted by behavior specialist Steven Woods, if you want children with autism to generalize skills, you have to teach them to generalize those skills.  Tr. Vol. 8, p. 1431-33.  It is not atypical for these children to exhibit skills at home that cannot be replicated at school or in the community without specific instruction in those different environments.  Tr. Vol. 8, pp. 1525-26.  Chloe needed instruction on communication in school to develop that skill further.  The District refused to recognize this as something Chloe could do and excused Chloe's inconsistent and limited speech at school as "just who Chloe is."  Tr. Vol. 13, pp. 2687-2690; Tr. Vol. 5, p. 725.

Given the parental input about Chloe's capabilities at home, the District should have revised her IEP to include measurable goals to ensure that she received appropriate instruction in

communication at school.  However, when asked if the IEP team had ever discussed ways to

increase Chloe's responses as a result of the audiotape provided by the Gibsons, the speech and

language pathologist responded "no."  Tr. Vol. 5, p. 712.  Though she did review the audiotape,

the speech-language pathologist explained, "I was just asked to review it [the audiotape] and

that's what I did."  *Id*.  When asked if that would be an important conversation for the IEP team

to have had, Ms. Ponting replied, "I think what we're doing what is appropriate for her right

now—at her functioning level and age appropriate."  Tr. Vol. 5, p. 712.  But it is not age

appropriate for a 19-year-old to speak in two- to three-word phrases.  Tr. Vol. 24, p. 4695

(Nicole Ponting, the District's speech language pathologist)  The District's pattern of inaction

with regard to Chloe's communication needs signaled not only exceedingly low expectations for

Chloe's capabilities, but also a blatant disregard for the dictates of the IDEA requirement that the

IEP must be revised where a lack of progress is clearly observed.

> **2.     The District's failure to appropriately address Chloe's assistive
> technology needs and provide an Assistive Technology evaluation
> denied Chloe a FAPE.**

While Chloe's educational records clearly recommended an assistive technology (AT)

evaluation, the District never provided it.  The District tried to justify its failure to act because of

the Gibsons' efforts to seek outside opinions.  The District also claimed that because Chloe is

verbal, she should not need assistive technology.  However, the District still bore the burden to

address Chloe's well-documented communication deficits.  If the District was going to refuse to

provide an assistive technology evaluation, it should have provided the Gibsons with notice such

that they could properly challenge the District's decision.  Instead, the District simply failed to

evaluate Chloe, thereby denying Chloe of necessary assistive technologies and associated

services.

The IDEA defines an assistive technology device as "any item, piece of equipment, or

products system . . . that is used to increase, maintain, or improve functional capabilities of a child with a disability." 34 C.F.R. § 300.5. An "assistive technology service" "directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." 34 C.F.R. § 300.6. An augmentative communication evaluation is a type of evaluation that may include trials of voice output technologies or the use of other technologies to help increase a child's communication output. The IDEA and Ohio law require IEP teams to consider the need for assistive technology every time an IEP is developed. It also requires districts to conduct appropriate evaluations in order to determine whether assistive technology is warranted. 34 C.F.R. § 300.324(a)(2)(v); Ohio Admin. Code 3301:51-07(L)(1)(b)(v). In fact, a functional evaluation across environments to determine whether a child needs assistive technology is itself an assistive technology service under the IDEA. 34 C.F.R. § 300.6. The functional evaluation can be conducted in the child's normal environments such as home or school. *Id.*

The procedural requirement that districts must conduct timely and comprehensive evaluations triennially and more often if necessary, indicates the importance Congress placed on the need for evaluations. *See*, 20 U.S.C. §§ 1414(a)(1) and (a)(2); 34 C.F.R. § 300.303. The IDEA and its implementing regulations also require districts to reevaluate a child if requested by a teacher or the parents. 20 U.S.C. § 1414 (a)(2)(ii); 34 C.F.R. § 300.303. If a school refuses to provide an assistive technology evaluation when requested to do so by a parent, it is required to provide the parent with prior written notice of this refusal, and then the parents are entitled to an independent educational evaluation at the district's expense unless the district files for due process to challenge the parents' request. 20 U.S.C. § 1415(c)(1); 34 C.F.R. § 300.503. Here, the District failed to provide an evaluation to determine Chloe's assistive technology needs and failed to provide prior written notice of its refusal to evaluate. Tr. Vol. 20, p. 3990; IHO

Decision, pp. 13, 15.

In finding that Chloe needed IEP goals, objectives and related services to increase speech initiation and output, the IHO ordered the District to provide Chloe with an augmentative communication assessment on which those changes were to be based.[11]  IHO Decision, p. 13. However, the IHO found that although the District had committed a procedural violation for failing to provide prior written notice of the refusal to provide the evaluation, that violation was *de minimus* because the District erroneously assumed that the Gibsons were in the process of obtaining such an evaluation on their own and the District had issued many other prior written notices in the past.  IHO Decision, p. 15.

The SLRO went much further than the IHO, concluding that the District had not violated FAPE for failure to evaluate Chloe's communication needs.  SLRO Decision, p. 25.  The SLRO justified this finding by concluding that "[i]t is not clear whether the assessment will recommend that such assistive technology should be utilized." *Id*.  In other words, the IHO found that the District's clear procedural violation didn't matter, and the SLRO found that in order to warrant an evaluation, the Gibsons would have to prove that Chloe needs assistive technology *prior* to conducting an evaluation to determine what was needed.  In truth, these conclusions are a serious departure from the significance of the IDEA's evaluation requirements and the burden of providing a FAPE, which is squarely on the District.

The Gibsons made several requests for an assistive technology evaluation.  Being well aware of Chloe's needs and the evaluations recommendations, the Gibsons requested an assistive

---

[11] At the time of this filing, the District still has not provided Chloe with an augmentative communication evaluation or assistive technology evaluation that complies with the IHO's order.  The District did provide an initial assistive technology "screening" by Deb McGraw at the Educational Service Center on October 25, 2010, but she did not appear at the hearing to testify.Tr. Vol. 26, pp. 5276-77.  This screening was cursory and does not equate to an assistive technology evaluation or service.  Tr. Vol. 26, pp. 5305 (District's counsel stating "Deb McGraw didn't do an evaluation").

technology evaluation in letters dated December 17, 2007 and February 13, 2008. Ex. AAA, pp. 1, 7. The District never explicitly refused to do the evaluation, but instead never arranged for an evaluation to take place. Tr. Vol. 1, p. 231; Tr. Vol. 3, p. 513. The Gibsons made repeated requests over the next several years. *See, e.g.* Ex. E1, p. 2 (IEP meeting notes from June, 2009). Ms. Gibson testified that she repeatedly requested the evaluation to determine if there could be additional technology to address Chloe's communication delays and increase her independence. Tr. Vol. 26, p. 5302-03. In the June, 2009 IEP meeting, Ms. Gibson again explained her concerns regarding Chloe's communication, but the team did not complete the discussion and moved on to another subject. Ex. E1, p. 2. Chloe never received an assistive technology evaluation in her high school years. *See,* Tr. Vol. 3, p. 513-517 (Betsy Ryan, Special Education Director).

The court in *Pachl* provides an excellent example of the analysis that should be used in determining this case. *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Pachl*, No. 01-342 (SRN), 2002 U.S. Dist. LEXIS 23205 (D. Minn. May 10, 2002). The parents in *Pachl* had requested an assistive technology evaluation for the student, but the district argued that it could not determine what evaluation to provide because the parents could not tell the district exactly what they wanted. The Court concluded that the district should have proceeded with an assistive technology evaluation without requiring additional meetings with the parents. *Id.* at *51. The court held that the law does not support shifting the burden of providing a FAPE to the parents. *Id.* at *54. Therefore, it was not the parents' obligation to determine what resources were necessary to provide a FAPE; it was the district's burden to make that determination. *Id.*

As in *Pachl*, the Gibsons made repeated requests for an assistive technology assessment, but the District dragged its feet because it did not think the evaluation was necessary, and

justified its inaction by stating that it did not know what type of evaluation the parents wanted. *Id.* at *51-54; Tr. Vol. 12, p. 2442-43.  Similarly, the District had the burden to ensure that the IEP team carefully considered whether there was any assistive technology that would assist Chloe to improve her communication or increase her ability to participate in more regular education settings. *See Pachl* at *54-55.  In this case, the District failed to meet its burden.  The result of the District's failure was a denial of a FAPE to Chloe.

Here, District personnel suggested in the due process hearing that they did not provide the assistive technology assessment because they were waiting for the Gibsons' assessment to be provided to them.  Tr. Vol. 3, pp. 513-18; Tr. Vol. 21 , p. 4217; IHO Decision, p. 15.  The Gibsons contacted Cincinnati Children's Hospital to ask about assistive technology and asked the District to provide Chloe's IEP information to the hospital staff.  Tr. Vol. 15, pp. 3134-34; *see also*, p. 3131.  The Gibsons did not receive a report outlining their visit to the hospital, but instead were provided with general information about assistive technology options.  Tr. Vol. 15, pp. 3134-35.

However, the parents' failure to secure an evaluation, even if they had agreed to obtain it, does not excuse a district's obligation under the IDEA to independently secure such an evaluation. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994); *Target Range Sch. Dist.*, 960 F.2d 1479, 1484-85 (9th Cir. 1992) ("Any failure of the [parents] to turn over portions of a[nother] specialist's report cannot excuse the District's failure to procure the same information for itself.").  Unlike the case before this Court, the parents in *Smith*, intentionally withheld portions of a private evaluation from the District. *Smith* 15 F.3d at l523.  Nonetheless, the *Smith* court held that because the district must make a full and individual evaluation of the child' s educational needs, it was still legally obligated to procure its own report from a

specialist.  *Id.*; *see also*, *Pachl*, 2002 U.S. Dist. LEXIS 23205 at *54-55.  Thus, even if the

District did believe that the Gibsons were going to obtain a formal assistive technology

evaluation for Chloe, it should have taken the necessary steps to conduct its own evaluation in

light of Chloe's serious communication needs.

In addition to the alleged confusion over the Gibsons' request for an evaluation, the

District posited at the due process hearing that Chloe did not even *need* an evaluation.  Ms. Ryan,

the District's special education coordinator, testified that one of the reasons the District did not

do an assistive technology evaluation is that the team knew the best way to address Chloe's

communication needs and what they were doing was very effective.  Tr. Vol. 3, p. 513-17.

Ms. Ryan explained, "I think the team knows Chloe very well and understands the kinds of tools

that are necessary to promote her independence… not her independence, her communication,

especially spontaneous communication."  Tr. Vol. 3, pp. 513-17.  She stated "I don't think the

team has concerns that additional [assistive technology] was necessary" for Chloe.  Tr. Vol. 12,

p. 2442-43.  She reasoned that Chloe did not need an assistive technology evaluation for

communication because her primary mode of communication was verbal, and there was concern

by the IEP team about substituting a device for her voice.  Tr. Vol. 3, p. 513-14.  The District's

speech and language pathologist and teacher took the same approach. Tr. Vol. 3, p. 513-16 (Ms.

Ponting); Ex. QQ, p. 33 (Ms. Giesting).  Finally, Ms. Ryan testified that they were not certain

from the Gibsons' request what kind of assistive technology was being requested, which

indicated to her that further discussion with the parent and team was necessary.  Tr. Vol. 12, p.

2442.

However, the IHO noted that "virtually all witnesses who testified on the subject at the

hearing" agreed that an assistive technology assessment would be valuable for Chloe.  IHO

Decision, p. 13.  This was not surprising, given that Chloe's eighth grade IEP team had recommended continuing to explore other devices to assist with her communication upon transition to high school.  Exhibit D2, p. 8 ([T]he team would like Chloe to continue to explore other devices that might be a better fit for Chloe.").  The IEP team even listed "communication device" under "the implications for instruction" section as part of that evaluation.  Exhibit D2, p. 17.  The multi-factored evaluation specifically noted that the eighth grade team had "just recently introduced a talker for Chloe, in hopes that it will assist her with her words and help decrease frustration."  Ex. D2, p. 16.  It appeared the talker would benefit Chloe's language output because it motivated her.  Chloe's middle school teacher, Ms. Gajus testified that "[t]he best time to get language from Chloe was in the morning when we had the talker and the talker helped her.  And she began to be motivated by it.  And I'm talking about a talker her friend-actually another classmate had in the class."  Tr. Vol. 1, p. 184.  Despite this information, the District did not provide an assistive technology assessment for Chloe at high school, or trial any other devices with her to see if her communication skills and functioning would improve.  Tr. Vol. 20, p. 3989-90.

The need for an assistive technology evaluation was also noted by the Gibsons' expert, Dr. Kopnick.  She noted that understanding Chloe's language was hard for someone who is new to Chloe, and that her slow processing time makes it difficult for others to learn what she wants and needs.  Ex. ZZZ, p. 8.  Dr. Kopnick explained that an assistive technology evaluation was important because there was a tremendous amount of technology that could help Chloe interact more with peers and adults.  Tr. Vol. 8, p. 1520.  Dr. Kopnick further opined that Chloe could transition into using assistive technology to communicate in the community if she was first taught how to use the technology while she was in school.  Tr. Vol. 8, pp. 1520-21.  Dr. Kopnick

specifically noted that there is a wide array of options for assistive technology for students with Chloe's needs, and research shows that offering augmentative and alternate forms of communication actually increases total communication output, including verbalizations. Ex. ZZZ, p. 8.

Many months after the filing of the original due process complaint, the District did finally agree to start the process for an assistive technology consultation. The expert evaluator, Deb McGraw, did an initial screen of Chloe's communication needs with the IEP team on October 25, 2010. Tr. Vol. 26, pp. 5276-77. Not surprisingly, the expert acknowledged Chloe's needs in initiation of communication and prompt dependency, and made several recommendations to address those deficits. Tr. Vol. 26, pp. 5302-03. She also suggested several technologies that could help decrease Chloe's prompt dependency, sentence length, number of sentences and increase her independence. Tr. Vol. 26, p. 5307. Ms. McGraw advised Chloe's IEP team that assistive technology devices do not necessarily inhibit speech, but instead can benefit speech by increasing verbalizations and sentence length. Tr. Vol. 26, p. 5302.

So even though Chloe had well documented communication needs, the District's records supported and even *recommended* that Chloe trial communication devices, and the Gibsons were requesting the evaluation, the District failed to provide a Chloe with an evaluation while she was in high school until the due process complaint had been filed. Chloe had not had an assistive technology evaluation since elementary school. Tr. Vol. 12, p. 2441. As a result, the District failed to meet its burden to address known communication needs and Chloe's access to assistive technology devices and services was never realized.

Finally, the District's procedural violation of failing to provide prior written notice was not harmless error in this case. Because the District failed to provide prior written notice, the

Gibsons were deprived of the important procedural right to be fully informed about decisions made by the District, including the reasons for the decision, such that they could determine whether to pursue the IDEA remedies available to them at that time. Without prior written notice, parents are in a sort of limbo, never knowing when their right to a remedy is ripe. The Gibsons were in such a limbo for several years; the result of which was a lack of evaluation and assistive technology services to Chloe.

The District's failure to provide prior written notice also resulted in a significant denial of services, the need for which had been identified by the District's own records and the testimony at the hearing. Because Chloe's IEP did not adequately address her communication needs and the District did not provide Chloe with a comprehensive assistive technology evaluation to determine what additional technology could assist Chloe in improving her communication and initiation of communications, Chloe never received the other accompanying assistive technology *services* such an evaluation would likely have recommended. Thus, Chloe missed out on the assistive technology trials, services, and a determination as to whether she could participate more in the community or general education setting with those services.

> **3. The District's failure to consider Chloe's communication needs and provide an assistive technology evaluation caused harm to Chloe's education such that she should receive compensatory education to account for the District's failure to ensure she made progress in communication.**

As a result of the District's failure to meet its burden, for more than four years the IEP team did not get valuable information on how to improve Chloe's communication skills. However, in concluding that the District's violations did not rise to the level of a FAPE denial, the SLRO stated that "[i]t is not clear whether the assessment will recommend that such assistive technology should be utilized." SLRO Decision, p. 25. The SLRO justified this position on the premise that if Chloe is not provided with the evaluation or the District fails to write goals based

upon the evaluation as ordered by the IHO, the Gibsons could then file due process on that violation in the future.  *Id.*  Whether an assistive technology device would ultimately be recommended is not the point.  The important point is that there was sufficient evidence in this case to warrant further investigation, and the only way to investigate the matter further was to conduct an evaluation to determine what was needed to address her communication deficits.  Further, the Gibsons should not be forced to again assert Chloe's rights after harm has already occurred.

The Sixth Circuit addressed this proof issue in the context of extended school year services.[12]  *Cordrey v. Euckert*, 917 F.2d 1460 (6th Cir. 1990).  In *Cordrey*, the court was tasked with determining what standard should apply when determining the need for extended school year services.  Under the regression standard, the need for extended school year services is determined by the existence of evidence of loss of skills during summer breaks or other breaks in instruction.  *Id.* at 1470.  However, the court was clear that it is not necessary for a child to actually regress or suffer harm in order to receive the extended school year services.  The court explained that:

> the regression standard in *Rettig* and like cases is best interpreted not to require absolutely that a child demonstrate that he has regressed in the past to the serious detriment of his educational progress in order to prove his need for a summer program.  Instead, where there is no such empirical data available, need may be proven by expert opinion, based upon a professional individual assessment.

*Id.* at 1472.  In other words, when the issue is raised by IEP team members, in the absence of clear information to the contrary, the IEP team can resolve such issues through conducting an evaluation.

---

[12] Extended school year services are special education and related services provided to a child with a disability beyond the normal school year and in accordance with the child's IEP.  34 C.F.R. § 300.106.

The same rule expounded by the Sixth Circuit is applicable in this case.  The SLRO in this case did not order a remedy for Chloe because there was no empirical data (assistive technology evaluation) available.  SLRO Decision, p. 25.  However, there *were* prior opinions available that thought it likely that Chloe would benefit from available technology.  Had the District done the evaluation when recommended by the eighth grade IEP team at the beginning of high school or later when the Gibsons requested it, Chloe could have been provided with these educational opportunities and services and her communication would likely have improved beyond the levels she currently exhibits at school and in the community.  At the very least, Chloe would have been provided with the opportunity to trial new assistive technology devices and the IEP team would have been provided with valuable information about her communication needs.  As such, the District should have evaluated Chloe, and the SLRO was wrong to not order a remedy for the District's failure to evaluate.

The SLRO's premise that the Gibsons could simply file another due process complaint if the District fails to provide the augmentative evaluation or write evaluation-based goals is also problematic.  Under this reasoning, the Gibsons would be left without a remedy for the District's failures from 2007 to 2009 because of the IDEA's two-year statute of limitations.  20 U.S.C. § 1415(b)(6)(B).  Even if the Gibsons were to somehow avoid statute of limitations preclusion, they would be left with having to take the position that they have a viable remedy.

Requiring Chloe's parents to wait until an assessment is done so that they can *prove* she needs assistive technology is contrary to the IDEA's charge to ensure that children with disabilities receive regular and timely evaluation of their assistive technology needs, and are provided with the supports and services that will enable them to participate in the general education setting to the maximum extent appropriate.  If parents are required to wait until

educational harm has occurred to prove the need for a service, the resulting loss of educational opportunity could never be recouped, and parents would be without a timely remedy when schools refuse to evaluate.  It stands to reason that requiring a child to suffer harm to prove the need for a service is contrary to sound educational theory, particularly where there is expert testimony suggesting the need for the service.  *Cordrey*, 917 F.2d at 1472.

The point of all this is that without an award of compensatory education, the District will have gotten away with this relatively unscathed.  Indeed, without a compensatory award, the District will have been *rewarded* for its inaction and its disregard for procedural violations. Chloe has still not even been provided with a full evaluation for her communication.  She is almost twenty-two years old, and she attended the District for five years.  And Chloe, whose fundamental communications skills may have been increased with the proper consideration, is the one who bears the harm.  Still, the IHO failed to order the District to provide compensatory speech and language services to make up for the years of lost interventions and the resulting lack of progress in Chloe's communication from 2007 to the present.

The District's repeated violation of the law by failing to evaluate Chloe and failing to revise her communication goals to ensure she made progress substantively harmed Chloe's progress in many areas of her education.  This was done without any concern for the Gibsons' pleadings and in spite of the District's own recommendations.  Chloe should be provided a comprehensive assistive technology evaluation that includes the opportunity for her to trial different communication devices at school and in the community.  Compensatory educational services are necessary to address the District's failure to appropriately address Chloe's lack of progress in communication and to ensure that she receives the necessary services resulting from the assistive technology evaluation.

**B.** **The District's failure to ensure that Chloe's transition plans were developed in accordance with the requirements of the IDEA and the resulting lack of appropriate transition services denied Chloe a FAPE in violation of 20 U.S.C. § 1412(a)(1).**

Chloe should have had in place an appropriate transition plan with measurable post-secondary goals based on her needs, taking into account her interests and preferences each school year since December 2007, when she started in the ninth grade and turned 16 years old. The District did not provide Chloe with an appropriate transition plan for any of the school years from 2007 to the present.

The IDEA requires IEP teams to annually develop for all children with disabilities over age 16, "[a]ppropriate measurable post-secondary goals *based upon age appropriate transition assessments relating to training, education, employment and, where appropriate, independent living skills*" and to detail "[t]he transition services (including courses of study) needed to assist the child in meeting those goals." 34 C.F.R. §§ 300.320(b)(1)-(2); Ohio Admin. Code 3301:51-07(H)(2)(b)(i)-(ii) (emphasis added).  Transition plans are defined as:

> a coordinated set of activities for a child with a disability that:
>
> 1) [i]s designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including, post secondary education, vocational education, integrated employment(including supported employment), continuing and adult education, adult services, independent living, or community participation.
>
> 2) [i]s based on the individual child's needs, taking into account the child's strengths, preferences, and interests and includes:
>
>> (i) Instruction;
>> (ii) Related Services;
>> (iii) Community Experiences;
>> (iv) The development of employment and other post school adult living objectives; and
>> (v) If appropriate, acquisition of daily living skills and provision of a functional vocational evaluation.

34 C.F.R. § 300.43(a); Ohio Admin. Code 3301:51-01(B)(63)(a)(i)-(ii).

Because the purpose of the transition requirements is to assist children with disabilities in meeting their educational, vocational and independent living goals for their future, the IDEA requires districts to invite the child to attend any meeting where transition is going to be discussed  34 C.F.R. § 300.321(b)(1); Ohio Admin. Code 3301:51-07(I)(2)(a).  If the child chooses not to attend the meeting, the district must take other steps to ensure the child's preferences and interests are considered.  34 C.F.R. § 300.321(b)(2).  At least one year before a student's birthday, Districts are required to provide a child with disabilities notice of the transfer of IDEA rights to the student when he or she turns 18 years old.  34 C.F.R. § 300.320(c).

The IDEA requires that transition services be based on age appropriate transition assessments in the areas of training, education, employment, and where appropriate, independent living skills.  20 U.S.C. § 1401(34); 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa).  While the Act does not define age appropriate transition assessments, transition assessments are defined by the Division on Career Development and Transition (DCDT) of the Council for Exceptional Children[13] as:

> an ongoing process of collecting data on the individual's needs, preferences and interests as they relate to the demands of current and future working, educational, personal and social environment. Assessment data serves as the common thread in the transition process and forms the basis for defining goals and services to be included in the IEP.

Exhibit GGG, p. 17 (Transition to Adulthood: Guidelines for Individuals with Autism Spectrum Disorders, OCALI, 2008).

---

[13] The Counsel for Exceptional children (CEC) is the largest international professional organization dedicated to improving the educational success of individuals with disabilities and/or gifts and talents. CEC advocates for appropriate governmental policies, sets professional standards, provides professional development, advocates for individuals with exceptionalities, and helps professionals obtain conditions and resources necessary for effective professional practice. www.cec.sped.org

Age appropriate transition assessments assist the team in developing needed transition instructional services and IEP teams should consider the child's needs in the areas of academic instruction and career development, life and social skills, self-determination skills and community-based career development.  Ex. GGG, p. 31.  The purpose of requiring age appropriate assessments is to enable the IEP team to gather data necessary in the areas of education, training, employment and independent living to develop measurable goals to help students with disabilities reach their transition goals.  The focus on helping the student meet his or her goals is central to the development of a transition plan along with Congress' intention that all children with disabilities be prepared to lead productive and independent adult lives, to the maximum extent possible.  20 U.S.C. § 1400(c)(5)(A)(ii).  The Ohio Department of Education (ODE) has provided guidance to school districts by spelling out the child focused questions[14] the team should ask in developing a future plan that is designed to assist a child and his family in developing and meeting the child's post-secondary goals in education/training, employment and independent living.

Transition assessment data that captures the student's post-secondary interests and preferences is the "common thread" in the transition plan and should link directly to the transition services and activities.  *In re Brandywine*, 111 LRP 64084 (Del. State Educational Agency 2011).  As explained by the administrative law judge in *Brandywine*, there must be a connection between the transition goals, services, and activities, and the child's needs, interests and preferences.  *Id*. at p. 5.  The lack of necessary age appropriate transition assessments alone

---

[14] What interests does the child have? What strengths and needs does the child have? How can these interests, strengths and needs be supported and incorporated into the child's educational program? What skills does the child possess? How can these skills be improved and used in the child's educational program? What does the child want to do after high school in terms of living, working and learning? What do the parents want the child to do after high school? What coursework, job coaching activities and career tech programs will assist the child in accomplishing what he or she wants to do after high school?  Ex. XXX , p. 7.

can constitute a lost educational opportunity and thus a denial of FAPE.  *Carrie I. ex rel. Greg I. v. Dept. of Educ., State of Haw.*, No. 11-00464 JMS RLP, 2012 U.S. Dist. LEXIS 83801, *54 (D. Haw. May 31, 2012).

> **1.    The District failed to ensure timely, age appropriate vocational assessments that assessed Chloe's needs, preferences and interests in all of the areas required for transition.**

Chloe's post-secondary transition goals from 2007-2008 through 2009-2010 were not based upon age appropriate assessments as required by the IDEA.  Here, the IHO determined that the District had not provided a thorough vocational assessment for Chloe, held that she needed assessment and ordered the District to provide one during the hearing.  Tr. Vol. 6, p. 898. The SLRO determined, to the contrary, that adequate assessments had been done.  SLRO Decision, P. 26.  This determination is incorrect.

Chloe's team failed to develop a results oriented and coordinated plan for Chloe because age appropriate assessments in these areas were not completed. The first thorough vocational assessment was ordered by the IHO in 2010 during the hearing below.  Data taken by the district on Chloe's IEP goals over the years in question and informal observations and questions regarding general interests were not sufficient for transition planning.  Because the District never obtained any data about Chloe's interests and preferences nor conducted any comprehensive age appropriate assessments to address her independent living and vocational needs, the transition goals and services it developed were not based upon those assessments or Chloe's particular interests and preferences in violation of the IDEA.  34 C.F.R. §§ 300.320(b)(1)-(2).

> **a)    The District failed to assess Chloe's needs, preferences and interests in developing her transition plan or include her in the transition planning process.**

The District did not make any effort to include Chloe's preferences or interests for her future in her transition plan.  It did not invite her to her own IEP meetings or provide her any

supports or assistance to enable her to be part of the transition planning process.  This failure

denied Chloe a FAPE.  As Dr. Kopnick, the Gibson's expert, testified, "[i]t really isn't a

transition plan if they are not part of it."  Tr. Vol. 8, p. 1598.  "And there's not a whole lot of

point to talking about the future for Chloe if Chloe's not part of the discussion."  Tr. Vol. 8,

p. 1530.  As one hearing officer explained, an IEP that is not based upon an updated transition

plan that reflects the future objectives of the student and his family is not appropriate under the

IDEA.  *In re East Hartford Board of Education*, 50 IDELR 240, 108 LRP 46228 at p. 19(Conn.

State Educational Agency 2008).

Self-advocacy is an important part of the transition planning process for students with

disabilities.  As noted in ODE's guidance to schools in providing appropriate transition services:

> The future planning component of the IEP gives the team the
> opportunity to discuss the child's plans for the future each and
> every year. It also presents the opportunity to get the child actively
> involved early in developing his or her IEP, allowing the child to
> take an increasing role in and ownership of what the child plans to
> do in the future and how each school year prepares him or her for
> that future.

Ex. XXX, p. 7

The District did not take any steps to help Chloe develop the self-advocacy skills she will

need as she moves into adulthood. In fact, Chloe was never even invited to any of her IEP

meetings including those to discuss her transition plan in violation of 34 C.F.R. § 300.321(b)(1).

Tr. Vol. 11, p. 2312; Tr. Vol. 3, pp. 493-94.  Ms. Giesting, Chloe's teacher, testified that the

reason she had never invited Chloe to her IEP meeting was "that would be for the parents to

bring the child if they want to."  Tr. Vol. 11, p. 2313.  She also stated that she had never been

asked to invite Chloe to her meetings.[15]  Tr. Vol. 11 at p. 2313.  However, school districts must

---

[15] Ms. Gibson testified that she did ask for Chloe to be at her meeting and the staff laughed at her.  Tr. Vol. 9, pp.
1813-1814.

invite the student to their transition meetings; it is not up to the parent to ensure their child is invited to their transition meeting. 34 C.F.R. § 300.321(b)(1). The District's failure to invite Chloe to her own transition meeting denied Chloe the opportunity to participate in developing her own transition plan.

If, as indicated in the testimony of District staff, the concern was that Chloe would be intimidated by the large group of adults or wouldn't understand how to participate in her IEP meeting, the District should have addressed those issues as part of Chloe's transition services. Tr. Vol. 3, p. 494; Ex. XXX, p. 7.  There was no effort to modify Chloe's transition or IEP meetings in any way so that Chloe could participate, in spite of the fact that the District expressed concerns that Chloe might be uncomfortable participating in a meeting with the adults who cared for her.  Tr. Vol. 3, p. 494; Tr. Vol. 11, p. 2315.

The District could have structured Chloe's IEP and transition meetings in such a way that helped prepare Chloe to participate in her IEP meetings.  Chloe's teacher testified that she could have helped prepare Chloe to participate in her IEP meeting by developing a social story, taking her over to see the room beforehand, and scheduling the meeting so as to not interfere with Chloe's regular routine.  Tr. Vol. 21, pp. 4250-51. In fact, she had invited other children to their IEP meetings and modified them so they were only there for part of the meeting to share what they liked or wanted to accomplish for that school year.  Tr. Vol. 21, p. 4251.  When asked if it would have been possible to have a smaller meeting of Chloe's IEP team so that she would feel more comfortable participating,  the teacher replied, "sure." Tr. Vol. 11, pp. 2315-2316.  Because the District never provided such a simple and available accommodation for Chloe to participate, she was, therefore, precluded from the opportunity to assist in her own transition plan and denied an important opportunity to work on her self-advocacy skills.

The District's failure to include Chloe in her transition planning left the IEP team without important information about what Chloe wanted for her future in order to develop her transition plan in accordance with her interests and preferences. In addition to failing to invite Chloe to her transition meetings and ensuring her participation in the transition discussions, the District failed to complete any substantive preference or interest assessments or surveys or interviews during the time Chloe was in high school to assess Chloe's interests or preferences for her future. Tr. Vol.3, p. 493. This resulted in a transition process that was defective because it failed to result in a transition plan that was based on the individual child's needs, taking into account the child's strengths, preferences, and interests, in violation of 34 C.F.R. § 300.43(a)(2) and Ohio Admin. Code 3301:51-01(B)(63)(a)(ii).

The reasons given for not following the transition procedures[16] or asking Chloe's interests and preferences was that staff "knew" Chloe and did not think she would be able to understand her rights or options. Tr. Vol. 3, pp. 496-498; Tr. Vol. 11, pp. 2308, 2314-2316. Betsy Ryan, Special Education Coordinator for the District, testified that the District did not ask Chloe what she might like to do after graduation because she would probably say, "I would like to watch my videos or I would like to dance with my -- with my peers or I -- I enjoy music." Tr. Vol. 3, p. 495. Ms. Ryan testified that the District did not discuss independent living options with Chloe, although she admitted they could have talked to her about her options. Tr. Vol. 3, p. 495-96. She also stated they did not, but could have talked to Chloe about her vocational options, different jobs and things she might like to do in the future. Tr. Vol. 3, p. 496-99.

As Dr. Kopnick, the Gibson's educational expert testified, there are many ways a team

---

[16] Ms. Giesting and Ms. Ryan also testified that they did not attempt to explain to Chloe her rights under the IDEA or explain the fact that these rights would transfer to her when she turned 18. Tr. Vol.3, p. 495-95; Tr. Vol. 11, p. 2314. Consequently, the District failed to inform Chloe of her important rights to IDEA substantive and procedural protections within the time frames under the law, and it has still not done so in violation of 34 C.F.R. § 300.320.

can help a child with cognitive or communication issues participate in her IEP and share her interests and preferences for the future.  Tr. Vol. 8, 1526-1530.  The team can utilize pictures, have pre-meetings with a smaller team, offer choices or take the child into the community so the child can actually see what options are available for work and living.  *Id.*  Even Ms. Giesting explained that if she was going to ask Chloe about her interests for the future, she would have had to scale it down to her level using pictures and narrowing down her choices.  Tr. Vol. 21, p. 4252.  Though staff could have taken the kinds of steps suggested by Dr. Kopnick and Ms. Giesting to modify the transition assessments and accommodate Chloe's disability to allow her the opportunity to participate in her transition plan, they did not do so.

In addition to failing to ask Chloe about her interests or preferences, the District did not take any steps to make Chloe aware of any vocational opportunities available or have her visit any vocational programs in the area to see if there was any career center program she might be interested in pursuing because, Ms. Ryan explained, "it would be inappropriate" and "detrimental" to even take Chloe to look at these programs.  Tr. Vol. 3, p. 497-98.  But when Ms. Ryan was asked if the team could have talked with Chloe about what she likes to do and her interests,  she replied, "yes, absolutely."  Tr. Vol. 3, p. 496. She stated that they could have talked to Chloe about the different jobs people have and what they do, and agreed that she could have talked to Chloe about what tasks people, such as a librarian, do in their jobs.  Tr. Vol. 3, p. 496-98.  Again, the District failed to use an available and simple method of including Chloe in the transition process and assessing her strengths, preferences, and interests, in violation of 34 C.F.R. § 300.320(b) as defined in 34 C.F.R. § 300.43.  As Ms. Giesting testified, "Chloe was not involved in the process."  Tr. Vol. 11, p. 2314.

The District's special education coordinator, Betsy Ryan, explained that she was aware

there are a lot of training materials available to assist in transition planning for children with disabilities, including scales and other processes to determine vocational interests.  Tr. Vol. 3, p. 501.  She admitted, however, that she did not do any research to see if there were materials the District could use to help the IEP team determine Chloe's preferences and interests with regard to transition or to help her understand her options.  Tr. Vol. 3, p.499.  Ms. Ryan stated that "Susie's [Ms. Giesting] well aware of materials and resources to support a child's self-advocacy and independence or functional skills." Tr. Vol. 3, p. 540.  Yet, in spite of the knowledge that materials existed to assist Chloe in participating in her own transition, no effort was made by the teacher or Ms. Ryan to include Chloe in the process.  Tr. Vol. 11, p. 2314.

Given their concerns about Chloe's understanding, the District could have used alternate methods to assess Chloe's interest, preferences and aptitudes about work by using situational community-based assessments to determine if there was a type of work Chloe might like or be interested in pursuing.  In other words, they could have taken Chloe to various job sites in the community and let her trial different jobs to see if she seemed interested and able to complete certain kinds of work. This is what was done at Goodwill Industries during the assessment ordered by the IHO.  Exs. SSSS and TTTT.  These assessments provided valuable information to the team about Chloe's interest in working.  These types of assessments were specifically requested by the Gibsons because they believed them to be necessary in order to determine what Chloe might like to do. Tr. Vol. 13, pp. 2693-95.

Dr. Kopnick, the Gibsons' expert, reviewed Chloe's transition plans and agreed with the Gibsons that Chloe needed to be provided with an evaluation or determination as to the type of placement in which Chloe would be interested and able to work so she can learn the skills she will need for that type of job.  She stated:

> But you know, also if she's going to be successful in a job situation, then she's got to actually learn the job skills. And she can't learn those until there's some assessment done of what type of job environment that's going to be. So the sooner that some sort of assessment is done and that sort of broad direction is figured out, then the sooner that skill area can be defined and we can start working on it.

Tr. Vol. 8 at p. 1532.

Dr. Kopnick testified that it is not necessary that Chloe get her vocational training in the same location that she wants to eventually work, but Chloe would need to learn the job skills she will need in the same type of community setting. "Because, again, since folks like Chloe don't transfer skills or generalize well, if she's not in similar types of employment locations, the skill doesn't mean anything to her." Tr. Vol. 8, p. 1534. Likewise, the Transition to Adulthood Guidelines for Individuals with Autism Spectrum Disorders "strongly suggested" that transition plans promote community-based experiences because such experiences can help these students develop employability skills. Ex. GGG, p. 33.

When asked if the team could have provided community-based transition experiences to Chloe such as job shadowing to assess her interests, Betsy Ryan indicated it could have done so. Tr. at Vol. 3, pp. 496-97. She testified that while she did not think Chloe could understand the librarian's job duties even if she shadowed her for an hour, she did think it was possible Chloe could assist the librarian. Tr. Vol. 3, p.497. Chloe's teacher testified that Chloe could have been successful in a job in the community with total support, but it would have meant she could not have worked on other things she was working on in the classroom. Tr. Vol. 11, pp. 2333-34. These comments show that the District staff could see Chloe was able to work with supports in a community setting, but they failed to even consider it or explore it as an option for Chloe's transition plan because of the level of support they felt she would need.

Until the IHO ordered the vocational assessment during the hearing, the District had not

assessed Chloe's vocational interests and skills because the District refused to consider she was

capable of work, even on a volunteer basis.  Tr. Vol. 13, p. 2696-98.  Because it had failed to

assess Chloe's preferences and interests for her future, the District told the Gibsons that Chloe

would not ever be able to work and therefore the team would not provide assessments related to

vocational skills or develop any goals related to her employment.  Tr. Vol. 9, p. 1802.

Instead, when it developed Chloe's IEPs, the District substituted its own exceptionally

low future vision for a vision that rightfully belongs to Chloe. By leaving her out of the process

entirely, she lost valuable opportunities to develop self-advocacy and independence skills needed

for her future.  The District's actions are especially troubling because its vision was not based on

any data.  Rather, it was based on the District's own low expectations for Chloe, expectations

which did not include future employment or community involvement.  Ex. B1,  Tr. Vol. 12, p.

2430-31;  Tr. Vol. 13, p. 2707-08.  The District's dismal view of Chloe's future potential

resulted in a denial of FAPE.

> **b)** **The District failed to provide age appropriate assessments in all of the areas necessary to develop an appropriate transition plan.**

The IDEA requires IEP teams to annually develop for all children with disabilities  over

age 16, appropriate measurable post secondary goals *based upon age appropriate transition*

*assessments relating to 1) training and education, 2) employment, 3) and where appropriate,*

*independent living skills* and to detail the transition services (including courses of study) needed

to assist the child in meeting those goals.  34 C.F.R. § 300.320(b); Ohio Admin. Code 3301:51-

07(H)(2)(b)(i).

In order to develop appropriate post-secondary goals, a district must assess the child in all

of the areas laid out by the statute, training/education, employment and independent living.

When Dr. Kopnick reviewed all of Chloe's records, she noted that she did not see a transition evaluation for Chloe to assist the team in developing her transition goals and services. Tr. Vol. 8, p. 1531. This failure to comprehensively evaluate Chloe in all of the areas related to transition denied her opportunities to develop the skills she would need to prepare her to become as self-sufficient as she is able.

### i.    Training/Education.

During the years at issue in the due process hearing (2007-2009), the District did not provide any assessments that addressed whether Chloe would benefit from any training/course of study such as a consideration of possible research-based curriculum related to transition to adulthood or career center/vocational educational programs available to students in the Forest Hills School District. Although the District has a vocational work study resource person in the District, she has apparently not assessed or worked directly with Chloe since Chloe was in eighth grade. Tr. Vol. 3, pp. 479-80. The IEP team did not have any discussions about whether Chloe could benefit from any of these kinds of job training programs, but instead chose to simply rely on any instruction she received as part of her IEP goals. In fact, when questioned at the hearing, Special Education Coordinator Betsy Ryan testified that she did not ever consider a career center vocational program for Chloe, even though she was aware the vocational center did serve individuals with disabilities in its programs. Tr. Vol. 3, p. 497-98.[17]

Additionally, the District did not provide Chloe with any assessment to determine if there were courses of study to address her post-secondary goals. Although some of her IEPs list a "life skills curriculum" and "functional curriculum" as her course of study, Ex. B1, Ms. Giesting did

---

[17] But the Great Oaks vocational center in Cincinnati has programs specifically designed for individuals with disabilities such as Project Search that may have been an appropriate option for Chloe and her family. Ex. FFFF, p. 7-8.

not use an actual curriculum to teach Chloe these skills.[18]  The District could have provided

Chloe with a course of study similar to the life skills program used by Ms. Gajus in the District's

Turpin life skills program.  Ex. AAAA.  As Dr. Kopnick noted in reviewing this curriculum, the

areas covered under that curriculum were important areas of need for Chloe.  Tr. Vol. 8, pp.

1557-60.  The District could have assessed and instructed her by providing her with a social

skills curriculum, as requested by the family, which would document her skills in the areas of

social skills and communication.  It did not.  Tr. Vol. 9, pp. 1707, 1720.  As noted by Dr.

Kopnick, social skills are a crucial need of Chloe's, especially as it relates to success in

employment.  Tr. Vol. 8, p. 1532.

The District could have, but did not, use any of a variety of assessment and teaching

curricula available to teach self-advocacy and independent living skills for Chloe and  Ms. Ryan

indicated that the teacher was well aware of materials to help Chloe learn the skills she needed to

increase her independence skills, self-advocacy  and functional skills .  Tr. Vol. 3, p. 540.

Independent living skills were another area of need noted by Dr. Kopnick, such as getting into

the community, purchasing, and cooking.  Tr. Vol. 8, p. 1534.  There are many different types of

assessments and materials available to assist schools in assessing and addressing these skills for

children with disabilities.  Examples of life skills include purchasing, shopping, cooking,

budgeting, and banking, mobility (crossing the street), safety (first aid), and "soft skills" such as

learning to recognize moods and emotions in co-workers.  Ex. GGG, p. 31-32.  The guidelines

also provide resources for specific assessments that can assist a team in doing the necessary

assessment to develop an appropriate transition plan for children with disabilities.  *Id*. p. 40-43.

---

[18] As explained by the school psychologist, Jennifer Bullock , she is not aware of any written curriculum being used in Chloe's classroom other than what the District has in content standards and  the child's IEPs.  Tr. Vol. 23, p. 4520. When asked about her understanding of the curriculum being used in Ms. Giesting's classroom, Dr. Rubin, the District's expert, stated, "She is teaching Chloe the things that her goals and objectives are stating."  Tr. Vol. 25, p. 5104.

The Gibsons even provided the IEP team with specific materials from the National Secondary Transition Technical Assistance Center (NSTTAC) that detail very specifically a variety of different lesson plans for teaching transition related skills for the team to consider using with Chloe,  Ex. V, but the IEP team did not even discuss or consider them for use with Chloe.  Tr. Vol. 9, p. 1821; Tr. Vol.11, pp. 2275-77.

By failing to assess whether Chloe needed any additional training or education to reach her goals or even consider her need for other specific training or instruction beyond her IEP goals, the District denied Chloe an opportunity to have an objective assessment of her need for additional training programs, and ultimately denied her the programming to ensure her needs were met.  Had the District provided Chloe with objective assessments in areas such as social skills, functional life skills, money skills and safety skills, the IEP team could have then discussed and considered additional training she would need to meet her transition goals.  The District denied Chloe a FAPE when it failed to timely provide a comprehensive assessment of Chloe's needs, interests and preferences in the area of training and education, in violation of  34 C.F.R. § 300.320(b)(1); Ohio Admin. Code 3301:51-07(H)(2)(b)(i).

### ii.    Employment.

The Gibsons requested that the IEP team provide Chloe with regular community experiences and functional vocational assessments to assess her needs, preferences and interests in the area of employment. Ex. T, p. 3-4; Tr. Vol. 13, pp. 2673-75, 2693-95.  Dr. Kopnick testified that she felt it was important for Chloe to get community job experiences before graduation "[b]ecause if she doesn't get out and work on the skills that are challenges for her now, then she's certainly not going to get those after age 22.  And so now is the time to get out there and get the supports and get the training under her belt so that after 22, hopefully she can start to actually be a good employee."  Tr. Vol. 8, pp. 1533-34.

The District advised the Gibsons that they did not think Chloe would ever be able to work, and refused to include community-based vocational assessments for Chloe. Tr. Vol. 13, pp. 2694-96. Consequently, Chloe's needs, interests and preferences were not assessed in the area of employment. Ms. Gibson testified that the school had never even done an interest survey with Chloe until after the filing of the due process. Tr. Vol. 13, pp. 2694-95.[19] The District did not take any steps to determine what Chloe's interests were in the area of employment.

The District did not provide any age appropriate assessments in employment for Chloe that addressed her interests, preferences or job skills from 2007 until 2009, and when it finally considered any type of employment assessment for Chloe, it was limited to a few observations of sorting and assembly activities for Chloe at school. In the 2009-2010 school year, Jack Darland, a transition coordinator from the Hamilton County Board of Developmental Disabilities, was asked by the District to observe Chloe and presented the team with some information about those observations on December 1, 2009. Tr. Vol. 24, p. 4814; Ex. T at p. 3-4.[20] While Mr. Darland may have done some observations of Chloe in the beginning of the 2009-2010 school year, he indicated that his understanding of the purpose of his observations was to provide the team with information regarding adult programs available for Chloe, not a formalized vocational assessments. Tr. Vol. 24, pp. 4810, 4815-16. He did not do any observations of Chloe in the community as requested by the parent (except for his observation of one trip to Steinmart with the school) even though he agreed that it would be important information to see how Chloe does when she is in the community with her home staff. Tr. Vol. 24, p. 4817. Mr. Darland did not

---

[19] In eighth grade, Cheryl Henkel, the District's vocational specialist, did an observation of Chloe completing her pre-vocational tasks as part of her 2006 evaluation. Ex. D2, p. 12. It is unclear whether Ms. Henkel ever met with Chloe to do an informal interest survey although the special education coordinator indicated she may have met with Chloe when she was 15 years old. Tr. Vol. 3, pp. 479-80.
[20] The Gibsons were provided with Mr. Darland's report dated February 2010 for the first time during the due process hearing. Ex. 145.

review Chloe's records as part of his observation, Tr. Vol. 24, p. 4818, and was not aware of what skills or activities Chloe may have already accomplished in the past.  Tr. Vol. 24, p. 4818-4820.  He testified that his opinion about Chloe attending a non-vocational program was based on the amount of time Chloe took to complete tasks and the needed prompts for the tasks during his limited observations.  Tr. Vol. 24, p. 4811; Ex. 145.

However, Mr. Darland testified that his recommendations were not his final opinion about what Chloe could accomplish in the future and indicated that his opinion could change depending on how much schooling she has left and whether she learned any new skills during the rest of her time at school.  Tr. Vol. 24, p. 4816.  He also indicated that although he did not know if Chloe liked the tasks she was doing during her observations, her preferences might make a difference in how she responds to a task.  Tr. Vol. 24, p. 4821.  He also stated that in his experience, some individuals with developmental disabilities may need to try a lot of different jobs before they find the right fit in a job.  *Id*.  Mr. Darland shared with the team his ideas about possible programs for Chloe on December 1, 2009, (Ex. E 1, pp. 3-4).  The transition planning meeting for Chloe took place on December 1, 2009.  Ex. E1, p. 5.  The parents requested vocational assessments and asked for Chloe to be included in her meetings.  Ex. T, pp. 3-4.  Mr. Darland's report, dated 2/2010, was first provided to the Gibsons during the due process hearing in February 2010.  If this evaluation was used by the District to develop Chloe's transition plan, it was not done so in conjunction with the parents.  This information could not, then, have been the age appropriate assessments upon which Chloe's transition plans were based in 2007, 2008 or 2009.

Failing to adequately assess Chloe's preferences and interests in working and failing to take the necessary steps to collect accurate and meaningful data on her interests, abilities and

aptitudes in the area of employment denied Chloe a FAPE because it limited her opportunities to explore job experiences in the community and prevented her from exploring her interests in the area of employment.  Ultimately it resulted in a transition plan that does not reflect any of Chloe's interests or preferences and which fails to provide her with the experiences and instruction she needs to be able to work in the community.  This is especially problematic as several witnesses, including the District's expert, Dr. Rubin, testified that it was their opinion that Chloe could work in some capacity in the community with supports.  Tr. Vol. 11, p. 2333; Tr. Vol. 25, pp. 5025-26; Tr. Vol. 7, p. 1146.

### iii.    Independent Living Skills.

The District did not complete any age appropriate assessments of Chloe's functional independent living skills.  While there is some information in Chloe's progress reporting records related to her exposure to cooking, cleaning and grooming activities, the data taken basically only documents whether she used two hands to complete the task.  Tr. Vol. 5, p. 705; Tr. Vol. 10, pp. 1927-28, 1935, 1965; Tr. Vol. 11, pp. 2304-07; Tr. Vol. 24, pp. 4767-68.  Because the monitoring was for the use of her two hands and her actual completion of specific job tasks was not targeted, there is no clear indication in the District's data of how well she completed the task, how many steps she was able to follow, what specific parts of the task she could complete and whether she mastered the skill and could do those skills independently.

Many of the requests made by the Gibsons throughout this process were for the school to assess Chloe in different areas and move her to the next step toward independence.  Tr. Vol. 9, p. 1749.  The Gibsons asked the team to take her into the community many times to work on independence skills.  Tr. Vol. 10, p. 2024.  They requested the team develop goals to increase Chloe's skills in different important life activities such as learning to use the telephone, learning to say her address and phone number, telling time, learning stranger danger skills, learning to

grocery shop and learning to cross the street safely.  Tr. Vol. 13, pp. 2699-2700, 2710-2714.

Instead of assessing Chloe in these areas and using research-based materials and instructional

strategies designed so Chloe could make and show progress on the skills in these areas, the

District simply made a determination that Chloe could not do these tasks because of her

disabilities and refused to meaningfully assess and increase Chloe's abilities in these skills by

developing measurable goals for Chloe.  Tr. Vol. 13, pp. 2615-16.  The District did not take steps

to actually assess her skill level for any of these activities with Chloe even though the teacher

was aware of transition materials to support self-advocacy, independence and functional skills

for individuals with disabilities.  Tr. Vol. 3, p. 540.  As Ms. Gibson testified, they didn't even

try, or provide Chloe with the opportunity to learn these skills.  Tr. Vol. 13, pp. 2707-08, 2694-

95, 2698-2700.

The District's assumption that Chloe could not learn independent living skills because of

her disability instead of the district collecting actual objective data is contrary to the purposes of

the transition requirements of the IDEA.  Districts are to do age appropriate assessments in the

area of independent living skills and develop the necessary services and measurable goals to help

the child become as independent as possible.  Schools aren't held responsible for guaranteeing

the child's independence in these skills, but they are required to develop a results-oriented

transition plan designed to help Chloe make progress towards becoming more independent and

prepared for her future.  The District's failure to take these steps denied Chloe a FAPE.

   c)   **The SLRO's finding that the District did provide appropriate
        assessments is not supported by the evidence.**

The IHO determined that Chloe had not received thorough vocational assessments that

she needed.  The IHO ordered the District to provide a comprehensive vocational assessment

during the hearing.  Tr. Vol. 6, p. 898.  The SLRO held that the District did provide age

61

appropriate assessments, but she does not specify what those assessments were in her decision. SLRO Decision, p. 26. The SLRO reasoned that the District provided adequate assessments because the IDEA does not require certain kinds of assessments and does not require these assessments be done by any particular person. SLRO Decision, p. 26.

The SLRO's decision is incorrect for several reasons. First, in response to the Gibsons' motion asking the IHO to order the District to provide an independent educational assessment (IEE) presented during the due process hearing, the IHO correctly decided that Chloe had not been provided thorough vocational assessments. Tr. Vol. 6, p. 898-99. *See also* Petitioner's Motion for Independent Educational Evaluation (IEE). This decision was based, in part, on the District's own admission that it did not provide a thorough vocational assessment. Tr. Vol. 6, pp. 884, 891-92.

During the due process hearing, the District initially agreed to provide the IEE, but changed its mind saying the Gibsons were not entitled to an IEE because the District had not yet done thorough vocational assessments. Tr. Vol. 6, p. 892. Despite making this argument, the District indicated that it did not intend to do vocational assessments for Chloe. *See* Petitioner's Motion for an IEE. After hearing the arguments, the IHO made the decision to order the vocational assessments. Tr. Vol. 6, p. 898-99.

Secondly, while it is not clear from the SLRO's decision what age appropriate assessments she had concluded the District had provided for Chloe, testimony from District staff indicate that the only transition-related assessments that had been done were 1) an eighth grade observation done by the District's transition specialist, Cheryl Henkel, Ex. 8, p. 173, and 2) informal observations done by Jack Darland in 2009. Ex. 145; Tr. Vol. 11, p. 2311. While such information can and should be part of the information the team considers in developing a

transition plan, the data in this case fails to meet the requirements of the IDEA for age appropriate transitions in all the areas including education, employment, training and independent living skills.  Ms. Henkel's assessment in February 2006 was simply an observation of Chloe participating in pre-vocational tasks in the classroom.  Ex. D, p. 12.  Mr. Darland's observations were also based on observations of certain vocational tasks in the classroom and were very limited in scope.  These are not age appropriate assessments.  This information is not sufficient to enable the team to develop a coordinated, results oriented plan for Chloe's transition to adulthood.

The SLRO's reasoning that the District provided appropriate assessments because the transition regulations "do not require that assessments be done by a particular entity or comply with any particular format" is incorrect.  SLRO Decision, p. 26.  The definition of transition services under Ohio's regulations specifically states that transition assessments are to be completed by individuals who have the competencies, experiences and training required to meet the individual student's transition service needs, and may include job training coordinators, vocational special education coordinators, career assessment specialists, work study coordinators, or other qualified individuals.  Ohio Admin. Code 3301:51-01(b)(63)(a)(iii).  Moreover, Dr. Kopnick in her recommendations stated that  because  transition is so complex, it is best done by a vocational assessment expert (citing research by Clark & Kolstoe, 1995)  Ex. ZZZ, p. 8.  This is especially true where, as here, the child with disability has significant challenges and varying levels of skills.

Because of Chloe's unique educational needs and challenges, it was even more important for the team to conduct comprehensive vocational assessments and to bring in individuals with expertise in the area of vocational rehabilitation to develop appropriate evaluation and transition

services to meet her unique needs.  As explained by Dr. Kopnick:

> [a]nd I think Chloe's a very complex person.  It's -- as we've said, it's very complicated to look at all the issues with Chloe.  You're dealing with uneven learning patterns, you're dealing with communication issues, you're dealing with just so many issues that I think she really needs a specialist to evaluate her in terms of the right fits for vocational -- for her vocational needs.  And there are so many really good tools out there to use for looking at work samples, situational assessment.  And I know I'm not an expert in these things, none of us can be an expert in everything, but there are people who are experts.  And they have to, you know, take advantage of that and work with the people who are specialists in what they do.

Tr. Vol. 8, p. 1531.

The SLRO's decision seems to imply that as long as the District provides Chloe with any type of assessment, it is sufficient because there are no specific requirements for age appropriate assessments.  However, the IDEA requires transition assessments to be age appropriate and address training, education, employment and independent living where appropriate.  34 C.F.R. § 300.320(b)(1).  Transition plans are to be designed to be results oriented and focused on improving the academic and functional achievement of the child and must be based upon the child's needs, taking into account the child's strengths, preferences, and interests.  34 C.F.R. § 300.43.  In order to be adequate, there must be assessments of Chloe's needs, strengths, preferences and interests.  This was not done.  The purpose of these assessments is to drive the transition process to ensure the individual child is prepared for further education, employment and independent living.  20 U.S.C. § 1400(d)(1)(A).  As noted by Dr. Kopnick, the educational records she reviewed, including the District's data on Chloe's IEPs, did not constitute the meaningful, functional, vocational evaluation data needed to develop Chloe's transition plan.  Ex. ZZZ, p. 8.  She recommended a full transition assessment that included various different

types of assessments typically provided in a vocational assessment[21].  *Id*.  The District's

assessments on Chloe's IEPs lack the focus on transition, do not adequately address all the areas

needed for transition, do not provide information on Chloe's interest and preferences, and do not

provide the detail necessary to help drive Chloe's transition plan.

> **d)  Data taken on Chloe's IEP goals are insufficient to meet the requirements for age appropriate transition assessments required under the IDEA.**

The District's reliance on data from Chloe's IEP goals as the "age appropriate

assessments" that were the basis for Chloe's transition plan is problematic because the IHO

determined that all of Chloe's IEPs from 2007 to 2009 (especially the goals addressing her

maneuvering and bilateral coordination) were inadequate in several respects and were not

sufficiently challenging to move her towards progress.  IHO Decision, p. 16, ¶ 19.  If the goals

were not sufficient to provide Chloe with meaningful educational progress, then a transition plan

based upon that assessment information would not lend itself to the development of the results

oriented transition plan required by the IDEA.

Ms. Ryan testified that the District had provided age appropriate assessments and that the

data taken on Chloe's IEP goals was the age appropriate assessment used to develop Chloe's

transition plans.  Tr. Vol. 3, pp. 476-77.[22]  And, according to Ms. Giesting, Chloe's regular goals

are her transition goals.  Tr. Vol. 11, pp. 2316-18.  Data taken by the District on Chloe's IEP

goals was generally limited to data on whether she used two hands, her ability to walk safely in

the halls at school, her ability to recognize and read her list of functional/safety words and some

very limited anecdotal information about her daily activities at school.  In addition, Dr. Kopnick

---

[21] Vocational aptitude tests, interest inventories (done with pictures after Chloe experienced those activities), work sample/situational assessment (done in actual setting to eliminate generalization problems), rating scales, behavioral assessment and medical evaluations. Ex. ZZZ, p.8.
[22] Despite the District's counsel's statements to the contrary that no thorough age appropriate assessments were done.  Tr. Vol. 6, pp. 884, 892.

reviewed Chloe's data and educational records and testified that she did not see any transition evaluation in Chloe's records.  Tr. Vol. 8, p. 1531.  She also testified that she did not find any objective data in Chloe's school records that detailed Chloe's strengths relating to transition.  Tr. Vol. 8, p. 1571.

Furthermore, the data collected on these goals provide very limited and inadequate information to the team about Chloe's skills and needs related to future education, employment, or independent living.  District staff testified that the goals relating to bilateral coordination ("grooming and work-based learning goals") were only measured by whether Chloe used two hands to complete a task.  Tr. Vol. 10, p. 1927-28, 1935, 1965; Tr. Vol. 11, 2304-07; Tr. Vol. 24, pp. 4767-68; Tr. Vol. 5, p. 705; Tr. Vol. 3, p. 443-44.  The data collection on the maneuvering goals was comprised simply of notations as to where Chloe was going or whether Chloe safely arrived at her desired destination.  Tr. Vol. 24, p.4775; Ex. F, p. 1 (e.g. "to dance . . . to library . . . to cafeteria") Ex. F, p. 11 ("Pushed cart to café to get lunches and back to classroom") Ex. F, p. 1 ("[t]raveled in empty hallway in middle.  Traveled on right side of steps.")  Ex. MM, p. 5. Data collection on Chloe's expressive language goals was simply a notation of a percentage of how many words she recognized from a list of functional or safety words and would sometimes include a notation of whether she was prompted.  Ex. F, p. 58.

This type of data does not provide sufficient information about Chloe's abilities to actually complete the tasks in question.  Neither does it detail with any real specificity the areas of need and level of skill required for Chloe's future goals.  Indeed, District staff even testified that the way the goals and objectives on Chloe's IEPs are written "doesn't paint a good picture of what her strengths and weaknesses are."  Tr. Vol. 11, pp. 2215-16, 222 ("Is that the clearest objective written?  No.").

For transition planning purposes, the data collected by the school does not provide the team with any usable information about what kinds of jobs or activities Chloe may be able to do and what skills her transition plan needs to focus on to help her reach her educational, employment or independent living goals.  Knowing Chloe can use two hands to staple some paper together does not give any real information about how this will be used to help Chloe reach her post-secondary goals.  The goal, and therefore the data collected on that goal, is not clear as to the purpose of her doing this activity.

If the purpose is to see if she can follow directions, then data would need to be taken on that skill.  By taking data on using two hands, it is very difficult if not impossible to know if Chloe can follow directions and what parts of the activity may be more difficult for her and need more supports or instruction.  If the purpose is to see if she can follow a sequence, then the team needs to take data on that discrete skill.  Data on whether she used two hands does not tell the team anything about her skills in following directions.  If the purpose is to see if Chloe can staple a set number of papers in a set amount of time, then the team would need more detailed information to get any real sense of what she could do in a job setting.  If the purpose for the activity is to see if she can do the tasks independently, then more information is needed than whether she used two hands.

When the data collected on tasks is monitored by whether she used two hands and the tasks change with every trial, it is difficult, if not impossible to determine what skills Chloe has actually exhibited or learned.  If the team does not  have data to show what she can do and under what circumstances, and there is no indication of the purpose of her doing that task as it relates to her future employability, then the data is meaningless in planning and preparing Chloe to develop skills she will need in a future job.

While it does provide some information, anecdotal information such as that provided by the District on Chloe's IEP goals does not provide the team with the specific information needed to develop measurable post-secondary goals, determine what specific skills she needs to learn, and what supports she will need to reach her goals.  This is not the kind of age appropriate assessment that Congress requires districts to conduct in order to develop a transition plan that will prepare the student for further education, employment and independent living.  20 U.S.C. § 1400(d)(1)(A).  As explained by Dr. Kopnick, Chloe's team needs:

> to get somebody to really look at the issues and assess Chloe's strengths and weaknesses and really hone in on what would be -- you know, what we need to do between now and then to maximize her strengths; rather than, you know, the traditional focus that we would all tend to have on all challenges, I think, is just really important.

Tr. Vol. 8, p. 1531.

By evaluating and focusing on Chloe's strengths instead of her challenges, the team can develop a transition plan to assist Chloe in getting where she and her family want her to go after graduation.  Dr. Kopnick indicated in her report that she would recommend a full transition evaluation for Chloe that included any or all of the following: vocational aptitude tests, interest inventories (done with pictures after Chloe experienced those activities, work sample/situational assessments (done in actual setting to eliminate generalization problems), rating scales, behavioral assessment and medical evaluations.  Ex. ZZZ, p. 8.

The District's data, on the other hand, provides virtually no information about: 1) what Chloe's abilities were to complete the various tasks; 2) how long it took her to complete a task; 3) whether she was able to generalize the task; 4) whether she enjoyed the task; 5) whether she was able to do a particular task independently; or 6) how much of the task she was consistently able to complete or what supports she needs to help her increase her skills.

68

In spite of the Gibson's repeated requests that the team provide Chloe with jobs in school or in the community to work on her employability skills and to provide a functional vocational assessment, these services were never provided.  Ex. T, p. 4; Tr. Vol. 13, pp. 2693-2700. Relying only on the data taken on Chloe's goals and limited observations of her completing classroom-based vocational tasks that she had done for many years, the District did not get information about what Chloe might be able to do in the community.

Instead of taking the appropriate steps to provide Chloe with age appropriate assessments, the District simply assumed Chloe would not be working after graduation and provided her with a social recreation leisure program.  It did not take any steps to assess her interests or preferences.  It did not meaningfully assess her employability skills and did not develop measurable post-secondary goals based upon age appropriate assessments.  The District failed to conduct the comprehensive age appropriate assessments required to allow the team to develop measurable and meaningful post-secondary goals for Chloe.  The District's failure to collect data and information about Chloe's needs, preferences and interests for her future goals, failed to meet the express purpose of transition planning and denied Chloe a FAPE.

### 2. The IHO's and SLRO's reasoning that the District provided appropriate transition services is contrary to the purposes of the IDEA.

The IHO held that the District met the transition planning requirements of the IDEA because Chloe will not be living independently and will participate in a recreation/leisure program with a work component.  IHO Decision, p. 15, ¶ 14.  Chloe's parents want her to work towards getting a job in the community with supports and attending a community-based adult program called Starfire U. for individuals with disabilities.  The SLRO agreed and held that the IDEA does not require that the parents' vision for their child controls, only that it be considered. SLRO Decision, p. 26.  The IHO and the SLRO's decisions undermine the purpose of the

transition requirements.

The IHO and SLRO decisions reflect a continuing problem with transition planning for children with disabilities.  They are, in effect, saying that it was fine that the District did not provide the necessary age appropriate assessments that addressed Chloe's employment needs because it did not think Chloe would ever be able to work competitively in the community.  The problem with this reasoning is that it is circular and becomes self-fulfilling.  If children like Chloe, who need more assistance to develop the skills to become employable, are determined at the start of the transition process by schools as "unable to work" or instead seen as good candidates for a sheltered workshop *because of their disabilities*, and are therefore not provided the needed evaluations, instruction, services and opportunities to see if they could work, then the whole purpose behind the transition requirements will be nullified for those children.

Essentially, the District is saying to children like Chloe, the more help you need to become independent or employable, the fewer services we will provide towards you becoming more independent or employable.  Individuals with disabilities are often incorrectly assumed to be incapable of working or becoming independent.  The idea that people with disabilities are incapable of working is not only incorrect; it is contrary to our state's policy of integration for people with disabilities.

Recently, the Ohio legislature confirmed "[i]t is hereby declared to be the policy of this state that employment services for individuals with developmental disabilities be directed at placement whenever possible of each individual in a position in the community in which the individual is integrated with the employer's other workers who are not developmentally disabled. Am. Sub. S.B. 316 (129th General Assembly), Ohio Rev. Code § 5123.022 (eff. Sept. 24, 2012), Attachment 1.  Further, the legislature required the provision of "[a]ppropriate measurable post-

secondary goals based on age-appropriate transition assessments related to employment in a competitive environment in which workers are integrated regardless of disability."  Am. Sub. S.B. 316 (129th General Assembly), Ohio Rev. Code § 3323.011 (eff. Sept. 24, 2012), Attachment 1.[23]  For Chloe, the District's assumption about her inabilities resulted in the denial of appropriate assessments, work experiences and supports she needed to develop and show her capabilities.

The District cannot have it both ways.  It cannot credibly argue that Chloe lacks the independence necessary to work in the community or attend Starfire U. and in the same breath, refuse to provide measurable goals and objectives to increase her independence so she can learn the skills she needs to meet her transition goals.  Certainly such an argument is not sanctioned by IDEA.  The IHO and SLRO's support of this type of reasoning by holding that Chloe is "not likely" to be able to work or attend Starfire U. is contrary to the stated purposes of the IDEA.[24] The focus of the transition requirements is for *all* children to be provided a FAPE "designed to meet their unique needs and to prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  Concluding that Chloe cannot learn skills to be successful in a work setting with supports without actually assessing her vocational and adult living needs, failing to teach those skills, and then deciding that she is "unlikely" to become independent enough is the paradigm of a self-fulfilling prophecy.

_____

[23] In addition to S.B. 316, Ohio has recently recognized the importance of supporting individuals with disabilities in integrated, community based work environments and clarified its official policy as Employment First for people with disabilities.  On March 19, 2012, Governor Kasich issued an Executive Order for "The Establishment of the Employment First Policy and Taskforce to Expand Community Employment Opportunities for Working-Age Ohioans with Developmental Disabilities."  Exec. Order 2012-05K (A copy of this executive order is available at www.governor.ohio.gov/mediaroom/executiveorders.aspx).  This Executive Order also established a Taskforce whose role is to review policies and procedures to align them with the goal of Employment First, identify best practices for supporting individuals with disabilities in employment, and set benchmarks for improvements in Ohio's programs and services in this area.  Finally, the agency in charge of Ohio's vocational rehabilitation program recognizes the significance of transition to future work goals and is available to work with school districts to accomplish this.  www.rsc.ohio.gov/index/services/school-to-work-transition and www.rsc.ohio.gov/docs/internet-documents/s-2-guide-to-trans-servs-5-11-for-internet.pdf.

[24] SLRO Decision, p. 26; IHO Decision, p. 15, ¶ 14.

The purpose of the transition requirements of the IDEA is to require schools to do actual objective assessments to determine the students transition needs, develop measurable goals based upon those needs, and develop results oriented plans to help these students meet their goals.  The IHO and the SLRO focused on Chloe's current functioning without the appropriate supports and instruction and their perceptions of her limitations *based on her disability* when determining that the District appropriately addressed Chloe's transition needs.  This focus is contrary to the IDEA requirements because it allowed the District to deny Chloe the very transition activities she needed to make progress.

### 3. The District denied Chloe's parents meaningful participation in the transition process by failing to meaningfully consider the Gibsons' plans for Chloe's future.

Instead of considering the Gibsons' vision for their daughter's future, the District included its vision for Chloe into her IEP that she would attend a sheltered workshop program after graduation and developed a transition plan to meet its vision for Chloe.  The SLRO held that the District's transition plan was appropriate because that the IDEA does not require that the parents vision for child controls, only that it be considered.  SLRO Decision, p. 26. But the District failed to meaningfully discuss and consider the Gibson's vision for Chloe's future and this failure denied them the right to meaningfully participate in the development of Chloe's transition plan.

The Gibsons advised the IEP team when Chloe was in seventh grade that they did not intend for Chloe to attend a sheltered workshop after graduation.  Tr. Vol. 14, p. 2872.  They asked the District to develop a plan for Chloe to develop the skills she needed to attend the Starfire U. adult services program after graduation.  Tr. Vol. 11, pp. 2122-23.  They also asked the District to do a functional vocational assessment to help the team develop goals to help Chloe move towards supported employment in the community.  Ex. T.

Instead of treating the Gibsons as equal partners in their daughter's education, the District dismissed out-of-hand the family's suggestions for Chloe's post-secondary goals.  It failed to take any steps to actually gather information about the parents proposed post-secondary goals for their daughter and unilaterally determined that the district's vision for Chloe was more appropriate for her based on her disability.  As Dr. Kopnick, the Gibson's expert, noted in her report, she did not see any evidence in Chloe's records that her parents' plans for her future or her potential for growth were being addressed by the district in her educational programming and her future planning.  Ex. ZZZ, p. 9.  Failing to treat the parents as equal partners by dismissing valid parental concerns out of hand and taking an unalterable position violates the letter and spirit of the parents' right to participate in their child's educational program.  *In re Mason City Community School District*, 21 IDELR 248, p. 12, 21 LRP 2846 (Iowa State Educ. Agency 1994).

In order to prepare for Chloe's transition meeting in the fall of 2009, the Gibsons went to observe a local program for adults with disabilities called Starfire U., funded by the Hamilton County Board of Developmental Disabilities.  Starfire U. is an adult services program that provides community based training to adults with disabilities to help them become more independent in the community and to learn and practice functional social skills in a real life natural setting.  Ex. FFFF (brochure for Starfire U. program).

After talking with the Starfire administrator, the Gibsons asked the IEP team at Chloe's December 1, 2009 transition meeting to develop post-secondary goals for Chloe to learn the skills she would need to attend the Starfire U. program.  Tr. Vol. 11, pp. 2122-23.  Ms. Gibson informed the team that she had spoken with the director of Starfire U. and determined that Chloe would need to increase her independence in toileting and her community skills over the next 2

1/2 to 3 years before graduation to be ready for the program.  Tr. Vol. 13, pp. 2705-08; Tr. Vol. 11, p. 2122-23.  Ms. Gibson asked the team to provide Chloe with a variety of community experiences to improve her skills in the community so she would be ready to attend Starfire U. when she graduated.  Ex. B1, p. 1; Tr. Vol. 11, pp. 2122-23.

Instead of collaborating with the Gibsons and seeking information about what skills Chloe would need to participate in that program, Ms. Giesting refused to provide the requested goals or activities because she did not think they were realistic and did not think that Chloe would be a Starfire U. candidate.  Tr. Vol. 11, p. 2136.  Chloe's teacher testified that she did not consider Starfire U. as an option for Chloe because it is like a "special ed college."  Tr. Vol. 11, p. 2127.  She admitted, however, that she had never visited the program or reviewed its curriculum or materials in making that decision.  Tr. Vol. 11, pp. 2125, 2128.  Instead of contacting Starfire U. or visiting the program to determine what skills Chloe would need to go there when she graduated, the District simply decided, based on its low expectation, that Starfire U. was not an appropriate post-secondary goal for Chloe.  The District thus refused to address any of the pre-requisite skills needed to attend that program in Chloe's plan.

Had the District investigated the Starfire U program, it would have found that it was an appropriate post-secondary goal for Chloe. Starfire U. is not a college program. Sarah Handerman and Christy Gregg, Chloe's home staff who are familiar with Starfire U. and have worked in the program, explained that it is intended to provide a college like experience for individuals with disabilities to promote community participation and independence.  Students enrolled in the program work, over four years, towards the development of community and employability skills. Ex. FFFF, p. 2.

While Chloe has a cognitive developmental disability, it is not appropriate for a school to

assume that she will not be able to participate in an adult program or work in the community with supports such as those suggested by her parents without conducting age appropriate assessments or researching the skills needed for that program or job. Here, the District refused to meaningfully consider the parents' vision for Chloe and thus failed to develop appropriate measurable post-secondary goals based upon age appropriate transition assessments relating to training, education, employment and where appropriate, independent living skills, necessary to allow Chloe to participate in the Starfire U. program. Again, this refusal was based on the District's low expectations for Chloe, not on any reliable information or data. The refusal denied Chloe a FAPE.

> **4.    The SLRO's conclusion that the District's limited vision for Chloe was appropriate as it was supported by the recommendations of Jack Darland and the Goodwill Industries assessment is not correct.**

The SLRO upheld the IHO's decision that Chloe will not be living independently and will be participating in a recreational leisure program with a work component, and held that this vision was supported by the assessments done by Jack Darland and Goodwill. SLRO Decision, p. 26. But the Gibsons do not intend for Chloe to be participating in a sheltered workshop program and their vision for Chloe to obtain some type of part-time work with supports in the community is supported by the evidence at the hearing.

First of all, the transition sections of the IDEA define transition services as services focused on facilitating the child's movement from school to post school activities including integrated employment (including supported employment) and community participation, the post-secondary outcome Chloe's parents want for her. 34 C.F.R. § 300.43. Notably, the transition requirements of the IDEA do not limit appropriate transition assessments and services to children who can be competitively employed full-time without supports. This view is too limiting and does not recognize that individuals with disabilities may be able to work in a

community setting part-time. As noted by Amy Baker, Chloe's service and supports administrator from the Hamilton County Board of Developmental Disabilities, it is not at all unusual for individuals with disabilities to work part-time in some type of competitive employment in the community. They can also be provided supports from her agency and other agencies to allow them to receive supports they need to be able to work in the community. Tr. Vol. 7, p. 1139-46; 34 C.F.R. § 300.43(a)(1). Chloe has a Medicaid waiver and access to the county Department of Developmental Disabilities and Bureau of Vocational Rehabilitation Services available to provide her the supports she may need as an adult to be employed in the community. Tr. Vol. 7, pp. 1146-47, 1150.

The District's position that it is not required to provide Chloe with comprehensive vocational evaluations, community based instruction, job experiences and services because it believes she will never be able to be independent or work in the community in any capacity violates the whole purpose of the IDEA. The District cannot "opt out" of appropriate transition planning for Chloe for any reason, and to do so because of a perception of Chloe's disability is especially troublesome. The IDEA transition requirements are uniquely designed to ensure that all children with disabilities are prepared for a future guided by their unique needs and choices. By failing to even consider Chloe and her family's vision for her future, the District has denied her a FAPE.

Moreover, the evidence at the hearing supported the family's vision, not the District's low expectations. Neither Jack Darland nor the Goodwill Industries evaluator Marvel Slaughter said Chloe would not be able to work competitively. Ms. Slaughter testified that Chloe was able to carry out job tasks in the community settings with very limited training and experience in the setting or with the task. Tr. Vol. 26, p 5206. The Goodwill assessment did not, as indicated by

the SLRO in her decision, recommend that Chloe participate in a recreational/leisure program

after graduation. While Ms. Slaughter did indicate that Chloe was not currently at a competitive

level on the tasks she was provided during the initial evaluation, she recommended:

> If Chloe's goal was to move more quickly towards supported or customized competitive employment in the community: that she participate in site specific, extended community based assessments that would allow Chloe to fully identify interests, assess stamina over time, allow the team to see if repetition would improve pace and quality and allow the team to see how independent Chloe could work without prompts over a period of time.

Ex. SSSS, pp. 6-7.

In reaching this conclusion about the next step for Chloe in the transition process, the

vocational specialist detailed the several short term opportunities she provided so Chloe was able

to try different jobs and settings in the community with the supports she would likely need to be

successful. As a result, Chloe was able to do a variety of things the District had suggested she

would never be able to do. She was able to carry out job tasks in the community with limited

training and experience in the setting or the task. Tr. Vol. 26, p. 5206. Ms. Slaughter was able

to talk to Chloe about what she liked and did not like. Tr. Vol. 26, p. 5204. She had no

problems meeting new people (co-workers) and answered questions she was asked. *Id*. Chloe

was able to show the evaluator that she wanted to work and indicated she did not want to quit

when her two-hour job trial was completed. Tr. Vol. 26, p. 5223-24. Chloe was able to have a

conversation with peers she met at the job site and was able to adjust to the rules of the

unfamiliar work setting such as finishing her lunch in a set time frame. Tr. Vol. 26 at pp.

5226-27.

She was also able to learn new job tasks relatively quickly and even started to self-correct

once she had been taught the new skills. Tr. Vol. 26, p. 5206-07. For example, Chloe was taken

to TJ Maxx and shown how to clean out the dressing rooms.  She was shown how to clean three

dressing rooms and was able to complete the next 14 rooms independently.  Tr. Vol. 26, p. 5206-

08.  Ms. Slaughter also noted that Chloe needed less prompts during these trials and was able to

determine what she needed to do to complete a task with a very simple reminder to check and see

what she still needed to do.  Tr. Vol. 26, pp. 5210, 5212.  In the discharge summary dated

November 12, 2010, Goodwill noted various strengths Chloe had exhibited during the

assessment such as focus on task, ability to respond to prompts and decrease prompts with

routine and concrete tasks, ability to follow new directions, ability to improve her pace as she

became more familiar with routine and the tasks, and stamina to stand for two hours while

completing work tasks.  Ex. SSSS.

Ms. Slaughter also noted that "Chloe has demonstrated the ability to adapt to new

environments, places, people with the following techniques.  And kind of what we've been

talking about, verbal discussions, verbal praise, pictorial layout.  She's demonstrated positive

progress when presented with the opportunity to learn new vocational skills."  Ex. UUUU; Tr.

Vol. 26, p. 5222.  When asked if she still felt that was true after completing her evaluation of

Chloe, she stated, "I do."  *Id*.  When asked if she felt Chloe was interested in working, she stated

"Yes, I do."  *Id.*

Mr. Darland's recommendations for a recreation leisure program were based upon

Chloe's prompt dependency and slow pace.  Tr. Vol. 24, p. 4811.  As noted previously, Mr.

Darland did very limited observations of Chloe doing tasks in a school setting.  He did not know

if Chloe enjoyed the tasks, did not talk to her about whether she wanted to work and he testified

his recommendation was based only on his limited observations which even he did not consider

to be a formal vocational assessment.  But the more thorough evaluation by Goodwill indicates

that additional and extended job experiences would be appropriate to see if Chloe's pace and need for prompts would improve with additional opportunities to work.  In fact, Ms. Slaughter noted a decrease in prompting needed even during the short initial job experiences and also noted an increase in Chloe's pace as she learned the expectations of the task and the routine.  Ex. SSSS.

Moreover, the SLRO's decision that the District's vision for Chloe to attend a sheltered workshop recreation leisure program was correct is against the weight of the evidence.  The District's expert, Dr. Rubin testified that she could see Chloe as able to work in some community jobs with supports.  Tr. Vol. 25, pp. 5025-26; Tr. Vol. 26, p. 5361.  Chloe's SSA also testified that she could help Chloe be able to work in the community by providing her with supports available to her as an adult. Tr. Vol. 7, p. 1146.

To ignore the evidence in this case and the wishes of Chloe and her family and simply decide Chloe will be going to a sheltered workshop setting is not in accord with the purposes of the transition requirements of the IDEA.[25]  If a district is permitted to pick and choose which children it thinks will be able to obtain competitive employment in the community without going through the required procedures to assess them and without providing them with the instruction and services they need to move towards self-sufficiency, then children with intellectual disability and more significant challenges will never be given an opportunity to become independent and

---

[25] The District assumed Chloe would never be able to work and would always be in a sheltered workshop environment and failed to provide appropriate and effective transition services as a result of these low expectations. Sheltered workshops or segregated "employment-like" or recreation/leisure activities can be a form of discrimination against people with disabilities.  The Department of Justice recently issued a Letter of Findings to Oregon about its program of work support services for people with disabilities because it relied too much upon segregated environments like sheltered workshops and failed to offer individuals opportunities to work in the community with appropriate supports (e.g. job coach, training, assistive technology and other reasonable accommodations).  U.S. Dept. of Justice, Civil Rights Division, Letter of Findings June 29, 2012 addressed to Attorney General of Oregon, available at www.ada.gov/olmstead/documents/oregon_findings_letter.pdf; *see also Lane v. Kitzhaber*, No. 3:12-cv-00138-ST, Opinion and Order granting Class Certification (D. Oregon Aug. 6, 2012) (on claims of discrimination because of Oregon's segregated program of employment services).

employable.

**5.      The District's transition plan for Chloe was not results oriented and did not include measurable post-secondary goals related to Chloe's plan for her future.**

The District failed to provide Chloe with measurable post-secondary goals and a results-oriented plan for transition.  Due to the lack of the necessary age appropriate assessments and failure to incorporate Chloe and her family's input, the District developed a transition plan for Chloe that involved remaining in the school setting for all of her day, participating in social/leisure activities, and what Ms. Ryan refers to as "work-based activities in the classroom." The teacher refers to them as "chores."  Tr. Vol. 10, pp. 1925-26.

All the children in Chloe's classroom work on the same "work based" activities provided to Chloe.  Tr. Vol. 10, pp. 1942-43.  They were not developed as part of a coordinated plan to help Chloe meet measurable transition goals.  Tr. Vol. 9, p. 1801.  These "work" activities include shredding, wiping tables and unloading the dishwasher, watering plants, taking books to the library, recycling, taking mail to the office and participating in office tasks such as stapling, copying, hole punching, and completing varied outside jobs brought to the class for completion by small local businesses.  Tr. Vol. 10, pp. 1925-44.  The teacher testified and the records show that Chloe had participated in many of these same activities since middle school.  Tr. Vol. 10, p. 1930-31.  But since, as the teacher explained, there was no baseline, condition for success or monitoring of the specific tasks for achievement, Chloe's progress on any of these work activities is unclear.  Tr. Vol. 10, pp. 1925-44.

For example, Chloe has worked on shredding for over four years in Ms. Giesting's classroom.  Tr. Vol. 11, p. 2324.  When asked for the purpose of that activity and whether there was a plan to move this "skill" forward for Chloe, Ms. Giesting admitted that she was not aware of any place that has a job of shredding in the community.  Tr. Vol. 11, pp. 2323-24.  Another

80

example of a "work" activity was having Chloe and the other students water plants.  When asked what the purpose of that activity was, the teacher stated, "so they won't die."  Tr. Vol. 10, pp. 1933-34.

The Gibsons asked Ms. Giesting to see if Chloe could do a regular job in the library at school or in the office so she could learn job skills.  Tr. Vol. 9, pp. 1740-1741.  But Chloe was never provided a job in the school library.  *Id*.  Ms. Giesting initially testified that she did get Chloe a job in the library, Tr. Vol. 10, p. 2074, but conceded that this job was not something Chloe did regularly and was just tasks that included returning books, sometimes shelving books and checking out items for the teacher.  Tr. Vol. 10, pp. 1942, 2073-2076.  When asked if the team had considered looking at possible job experiences in the school library to help Chloe move towards getting a job in a library, the teacher said they were working on the skills for her to do that.  Tr. Vol. 10, p. 2075.  However, she admitted that there was no set schedule and Chloe only did that when they went to the library to return books.  Tr. Vol. 10 at 2075-76.  Interestingly, the teacher stated:

> I can take her to the public library today and she could shelve books, but I would need to be right next to her doing that.  With support services, she could do that.  She wouldn't be able to wait on someone checking out a book and find it and locate it in a card catalog or alphabetize or something like that.  Or if someone came and asked her to find something on someone, she wouldn't be able to pull it up on the computer.  But she could shelve books, return books with the proper assistance.

Tr. Vol. 10 at p. 2075.

Even though Chloe has the ability to work on specific job tasks in the community with supports, the teacher did not take any steps to have Chloe trial these job experiences in the community to see if she could increase her skills in these areas.  Instead of looking to Chloe's interests and working with her to increase her skills, the District chose to have Chloe continue to

work on the same "work" tasks she has done in the classroom for several years.  For example, the teacher noted that one of the community work jobs done in the classroom currently was for Chloe to put two crayons into a bag for area restaurants.  Tr. Vol. 10, p. 1939.  She noted that Chloe had done the same tasks before.  Tr. Vol. 10, p. 1938.  In Chloe's alternate assessment records in March of 2007, it was noted that Chloe had already mastered that task and was able to four crayons in the bag with a menu and crackers to complete the task.  Ex. 28, p. 485.  So three years prior, Chloe had mastered the task but she was still working on that task as part of her "work-based' activities.

In addition to not teaching her actual skills, repeatedly providing her "work" tasks in the classroom does not lead to Chloe being able to generalize any skills she may learn in a real employment setting.  As noted by one administrative law judge, in reviewing a school's in-school transition program for its disabled students, having children do work tasks in the classroom is not the same as having them practice these skills in the community.  *In re Horizon Instructional Systems Charter School*, 58 IDELR 145, 112 LRP 5189(Ca. State Educ. Agency, Jan. 23 2012).  As the administrative law judge explained, the IDEA requires districts to provide students with transition services that facilitate community experiences and employment and other post school living objectives; "on campus simulated employment is not an adequate substitute for real world experience."  *Id.*, at p. 16.  "It is unlikely that Congress, in fashioning a plan to ease the transition of disabled student from the campus to the outside world (which it designated the "community"), meant to include the campus itself in that outside world."  *Id.*  The administrative law judge went on to find that the mock job created for the student at Horizon was also problematic, because it was not related to any of the student's interests, needs or future plans and did not allow him to generalize any of the skills he learned in the outside community.  *Id.*, at

p. 17.

Similar to Horizon, the District here had no results-oriented plan to help Chloe develop skills she could use in a future job.  The "work activities" in the classroom did not teach her skills for a job related to her interests and did not allow her to generalize any skills she may have developed into the real community.  This was also a concern noted by Dr. Kopnick in her testimony when she indicated that Chloe needed to be taught skills in the same type of settings where she would be using the skills because of her difficulty with generalizing  skills from one setting to another.  Tr. Vol. 8, p. 1534.  Rather, the "work" activities provided to Chloe in the special education classroom are simply activities that provide Chloe something to do at school until she graduates.  As Ms. Giesting stated, it is her expectation that Chloe will never master the bilateral hand coordination work and grooming skills, but will continue with these same kinds of activities until she graduates.  Tr. Vol. 11, pp. 2285, 2294.

Chloe's transition plans were not designed to result in a particular job or training program for Chloe for future work or independence.  Consequently, these activities fail to meet the results-oriented standard required by IDEA because they are not designed to move her from school to post-school education, training, employment and independent living/community participation.  34 C.F.R. § 300.43.

Because the District thinks that Chloe can never work in the community, it refused to provide her with measurable goals and a results-oriented plan to get her ready for employment or to provide goals to move her towards independence even though that is the vision Chloe and her family have for her future.  The District rejected the adult program Starfire U. that could have provided further training and community involvement for Chloe after graduation and even refused to help Chloe improve her community skills so that she could work toward the Starfire

U. program.  The District rejected the Gibsons' requests that it focus on basic, very important life

skills for Chloe such as counting money, using a telephone, and learning safety skills, because it

believed those requests were too "unrealistic" for Chloe.  In effect, the District decided that

Chloe will never be able to meaningfully participate in the same basic important life activities as

other adults in her community such as shopping, eating at restaurants, traveling places or

working, even with supports.  These very limited expectations for Chloe and the District's failure

to meaningfully consider Chloe's interests, preferences and vision in her transition plan violates

the purpose of the transition planning process and denied Chloe the same educational

opportunities other students have to make and meet their future goals.

The District cannot choose to bypass any of the transition requirements of IDEA based

upon its perceptions about the potential of a child with a disability.  The IDEA contains no

exceptions to the requirements of transition planning based on the nature of the child's disability.

*Letter to Heath, OSEP*, 54 IDELR 171, 110 LRP 17415, (Aug. 21, 2009).  Yet, the District has

done just that.  The District's own expert testified that Chloe would be able to be competitively

employed in the future if she had supports.  Tr. Vol. 25, pp. 5025-26.  She further testified that

Chloe would not necessarily require one-on-one support in an employment situation.  *Id.*  "I

could see Chloe in some competitive employment situations.  Not all of them, of course, but

some of them."  *Id.,* at pp. 5025-26.  Even after the Goodwill assessment and testimony of its

expert, the District remained firm that Chloe would go into a sheltered workshop instead of

working with supports in the community.

The District's continued assertion that Chloe's diagnoses of intellectual disability and

seizure disorder impedes her from making real educational progress in academics and transition

skills is simply incorrect.  The District's low expectations for her, based upon her disability, and

its failure to provide Chloe with a results oriented transition plan that will lead her to increased independence and possible employment in the community, has prevented Chloe from making progress in her independence and employability skills.

Chloe's lack of progress is evidence that Chloe was denied a FAPE. Further, it is evidence of the harm she has suffered and support for this Court to award her compensatory services. As the weight of the credible evidence throughout the hearing supports the contention that Chloe has the potential to learn vocational tasks and skills necessary for supported employment in the community, the IHO and SLRO decisions to the contrary should be overturned by this Court and the District should be ordered to provide Chloe with the extended vocational community opportunities recommended by Goodwill Industries.

### C. The district failed to develop an IEP for Chloe which enabled her to be educated in the least restrictive environment.

The least restrictive environment provision of the IDEA requires districts to ensure that to the maximum extent appropriate, children with disabilities are educated with non-disabled children, and that those children with disabilities are removed from the regular education environment only if the nature of the disability is such that education in regular classes, with the use of supplementary aides and services, cannot be satisfactorily achieved. 34 C.F.R. § 300.114(a)(2). Schools are required to have available a continuum of educational placements for children with disabilities and make sure that supplementary services (such as a resource room or itinerant services) are available in conjunction with the regular class placement. 34 C.F.R. § 300.115.

Districts are required to ensure that the IEP team considers, at least annually, to what extent a child with a disability can be educated with non-disabled peers. 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb) and (cc); 34 C.F.R. § 300.116(b)(1). Children with disabilities are

not to be removed from age appropriate regular education classrooms solely because of needed modifications to the general education curriculum.  34 C.F.R. § 300.116(e). The requirement for maximum integration to the extent appropriate applies also to nonacademic settings and extracurricular activities, including meals and recess periods.  34 C.F.R. § 300.117.

IEP teams are only permitted to remove children from the regular education setting when they have considered and determined that a child could not participate in the general education setting with non-disabled peers with supports or services.  20 U.S.C. §§ 1414(d)(1)(A)(i)(IV)(bb) and (cc), 1414(d)(1)(A)(v); 34 C.F.R. § 300.116(a) and 34 C.F.R. § 300.114(a)(2).  In order to do so, districts must "ensure that the IEP team for each child with a disability includes . . .not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)."  20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a).

In this case, the District's low expectations narrowed its vision for Chloe to a point that it significantly limited her lesser restrictive educational opportunities.  In spite of the recommendations of several expert evaluators and the repeated urgings of the Gibsons, the District repeatedly refused to consider options for Chloe to have more interactions with non-disabled children.  The District was so rigid in its view of Chloe's future that its employees could not comprehend the relevance of a regular education teacher being present at Chloe's IEP meetings.  As a consequence of the District's actions and inaction, Chloe was denied the opportunity to even attempt educational opportunities in her least restrictive environment.

   1. **The District refused to meaningfully consider independent evaluations regarding Chloe's need for less restrictive environment options.**

When three experts who were not from the District recommended that Chloe have more learning opportunities in less restrictive environments including going out in the community, the District shut those experts and their recommendations out of Chloe's IEP meetings and transition

planning process. The District dismissed these evaluations as biased, despite their own expert's similar recommendations several years prior. The outside experts' recommendations were never incorporated into Chloe's IEP, thus depriving her of the opportunity to be educated in the least restrictive environment.

An evaluation conducted by professionals outside the school district is generally referred to as an independent educational evaluation (IEE). When an independent educational evaluation is obtained,[26] the results of the evaluation must be considered by the district in any decision made with respect to the provision of a FAPE to the child. 34 C.F.R. § 300.502(c)(1). In the course of conducting evaluations, the IEP team must consider, among other things, the child's present levels of academic achievement, the educational needs of the child, any information provided by the parent, and whether any additions or modifications to the special education and related services are needed to enable the child to meet measurable annual IEP goals "*and to participate, as appropriate, in the general education curriculum.*" 34 C.F.R. § 300.305 (emphasis added). Independent educational evaluations can be conducted regarding nearly any aspect of a child's education and provision of a FAPE, including the student's environment, programming, and transition to adulthood. Where an evaluation is conducted to review and make recommendations regarding a child's programming options, it naturally follows that the evaluation would involve the child's least restrictive environment which, in turn, has an impact on the child's provision of a FAPE.

The District did agree to allow outside evaluations, but once the outside evaluations were completed, the District refused to meaningfully consider the recommendations for Chloe's

---

[26] If a parent of a child with a disability disagrees with the district's evaluation, the parent may request and receive one independent educational evaluation from an outside expert at the district's expense. 34 C.F.R. §§ 300.502(b)(1) and (b)(5). This does not preclude the parent from obtaining additional evaluations at the parent's own expense. 34 C.F.R. § 300.502(c)(1). Regardless of the manner in which the evaluation is obtained, if the evaluation is presented to the IEP team, it must be considered by the district. *Id.*

educational program.  In an IEP meeting facilitated by Ohio Department of Education, the IEP

team agreed in March of 2008 to obtain outside evaluations to address the Gibsons' and the

District's disagreement about Chloe's needs and placement.  Ex. QQ, p. 43; Ex. O, p. 6.

Arrangements were made for Cincinnati Children's Hospital staff to observe Chloe and consult

with the IEP team about her educational programming and placement.  The Cincinnati Children's

Hospital evaluations were conducted by Dr. Melissa Foti-Hoff and Jane Gaspar, M.S., along with

an ongoing evaluation and recommendations by Dr. Matheis, Chloe's developmental

pediatrician.

The evaluation recommendations were a considerable departure from the District's status

quo for Chloe's instruction.  The evaluators made recommendations that Chloe be provided more

opportunities outside of Ms. Giesting's segregated classroom to increase her opportunities for

communication and social interaction with typical peers, and to increase her ability to transition

and generalize her skills in less restrictive settings.  Ex. JJ; Ex. II.  The outside evaluators also

recommended that Chloe be provided more time in general education settings and in the

community to help her in her transition to adulthood.  Ex. JJ; Ex. II.

In her report dated April of 2008, Dr. Foti-Hoff recommended that the team "consider

how Chloe's current programming can be expanded to teach the prerequisite skills necessary to

be successful in the more demanding educational environment."  Ex. JJ.  She stated that "[i]f the

goal was for Chloe to work up to competitive employment in a community setting then her

current programming should be expanded to include skills such as accepting change,

transitioning outside of the classroom and building, accepting corrective feedback on work, self-

regulation of behaviors, etc."  *Id.*  She advised the IEP team to consider making a list or

hierarchy of skills that Chloe needed to achieve in preparation for a program change.  Ex. JJ,

p. 3. Dr. Foti-Hoff recommended that Chloe's team should investigate ways for Chloe to be more involved in the school and community such as lunch or work jobs in the office or library, and move towards her leaving the building for activities such as walking the track and going to the park, grocery store and post office. She also noted that Chloe is very motivated by her peers, so the team should consider how to include peers to assist in this process. Ex. JJ, p. 2.

After reviewing Chloe's records for the past several years, evaluator Jane Gaspar's[27] consultation recommendations were for Chloe to receive more learning, vocational and communication opportunities, including eating lunch in the cafeteria, increasing her involvement in other nonacademic activities in the regular education environment, and participating in increasingly more complex community experiences to improve her vocational and communication skills. Ex. II, p. 4. She recommended that as part of Chloe's curriculum, the team should incorporate safety skills such as calling 911, asking for help, and other stranger/danger learning activities. Ex. II, p. 4.

Dr. Mattheis, Chloe's developmental pediatrician who works with Ms. Gaspar, advised the IEP team that he had noted Chloe was showing signs of adjustment disorder with depression over the time frame he had treated her. Ex. II. In his report he noted the restrictiveness of her current classroom environment, as well as the social regression from the previous skills in her educational records from middle school. *Id.* Both Dr. Mattheis and Ms. Gaspar recommended that the team focus on working toward a transition to a more socially active setting like her middle school classroom, and that she be provided with clear academic goals and objectives. *Id.*

Unfortunately, instead of allowing the IEP team to discuss these evaluations and incorporate the recommendations into Chloe's plan, the District advised the Gibsons that it did

---

[27] Ms. Gaspar, an educational consultant with Children's Hospital, was sent to do an educational evaluation consultation with Dr. Mattheis, Chloe's doctor from the Division of Developmental and Behavioral Pediatrics at Cincinnati Children's Hospital.

not agree with the evaluations, stating "[t]he school is concerned that some of the other professionals mentioned have indicated bias and preconceptions in their reports that could disrupt the transition planning process."  Ex. ZZ, p. 12.  The District did eventually state that it would "consider" the outside evaluations, but it is unlikely that the District intended to meaningfully consider the evaluations in light of its position that the reports were "highly biased," "extremely biased," and made "outrageous recommendations and comments without input from the school."  Tr. Vol. 3, p. 556-57.  Moreover, when the opportunity arose to consider the independent evaluation reports in the multi-factored evaluation IEP team meeting in June of 2009, the team did not even discuss the evaluations or reference them in the evaluation team report.[28]  Ex. D1.

The District's position was further demonstrated by its actions with regard to the Gibsons' efforts to include the evaluators in an IEP meeting.  When the Gibsons asked the District for the IEP team to meet with the evaluators and include them in the transition planning process, the District advised that it would not invite them to a meeting.  Ex. ZZ, p. 12.  Consequently, at the October 2009 transition meeting, the evaluators were not present and the District failed to discuss the recommendations of those evaluations.  Instead, the District responded in a letter stating that the school was "concerned" that the evaluators,[29] have "indicated bias and preconceptions in their reports that could disrupt the transition planning process."  Ex. ZZ, p. 12.

The District's vague disagreement and allegations of bias are difficult to understand

---

[28] A multi-factored evaluation (MFE) is a triennial review of available data and information from the district's observations and assessments, as well as input from the child's parents.  34 C.F.R. §§ 300.303 to 300.306.  An evaluation team report (ETR) is the result of the MFE, and summarizes the child's strengths and needs.  34 C.F.R. §§ 300.305 to 300.306.
[29] Except for Marcie Mendhelson, a consultant from Cincinnati Children's Hospital, whose input the District "welcomes." Ex. ZZ, p. 12.

where the District's own expert, Dr. Julie Rubin, made similar recommendations just five years

prior.  When Dr. Rubin evaluated Chloe in 2003, she suggested the team consider teaching Chloe

pre-vocational and vocational skills in order to prepare her for the world of work.  Ex. LL, p. 13.

She stated that Chloe should be taught skills that would allow her to take more care of herself at

home and in the community, and suggested that she be encouraged to try new things with

support such as going out to eat, spending time with peers in their homes and generally using the

community more.  *Id.* at p. 13.  When Dr. Rubin consulted the District again in 2006 as Chloe

was transitioning to high school, she stated that since Chloe responded well to the type of

program she received at her middle school, the high school team should meet with the old team

about "ways to work with her that have clearly been successful at Nagel Middle School."

Ex. LL, pp. 4-5.  The middle school classroom model where Chloe had done so well included

regular outings into the community, lunch in the cafeteria and participation in several regular

education electives such as art and gym.  Tr. Vol. 6, pp. 1016, 1041.  Dr. Rubin's 2003 and 2006

recommendations were not dissimilar to those made by the Cincinnati Children's Hospital

evaluators; nor were they inconsistent with the repeated requests by the Gibsons to reconsider

opportunities for Chloe to learn in a less restrictive setting.  Nevertheless, the District failed to

implement or even meaningfully consider the evaluation recommendations and as a result, Chloe

was not provided with learning opportunities in the least restrictive environment.

> **2.** **The District repeatedly failed to meaningfully consider the Gibsons'**
> **attempts to incorporate opportunities for Chloe to participate in less**
> **restrictive regular education settings.**

The IDEA clearly places the task of determining a child's least restrictive environment

squarely on the shoulders of the IEP team.  *See* 20 U.S.C. §§ 1414 (d)(1)(A)(i)(IV)(bb) and (cc);

20 U.S.C. § 1414(d)(1)(A)(i)(V); 34 C.F.R. §§ 300.116(a) and (b).  A determination of the extent

to which a child can participate in the regular education setting must be made each time the IEP

team drafts a new IEP, which is at least annually. 34 C.F.R. § 300.116(b)(1). The decision to restrict a child's setting must only be made where the child cannot be served with the proper services and supports in place. 34 C.F.R. § 300.116(e); 34 C.F.R. § 300.114(a)(2)(ii). Such decisions are to be made at IEP meetings with input from the parents, and based on the child's unique needs. 34 C.F.R. §§ 300.116(a)(2); (b); (d). In spite of these dictates and the recommendations of numerous evaluators, the District repeatedly failed to even discuss options for Chloe to be in a less restrictive environment for part of her school day. The District's inflexible approach to educating Chloe kept her in the same self-contained classroom for nearly the entire school day.

Chloe's participation in the regular education classes, as well as nonacademic and extracurricular activities had been predetermined by the classroom in which she was placed in; not based, as the IDEA requires, on her individual unique needs. Tr. Vol. 9, p. 1811. This was not for a lack of effort by the Gibsons. Although the Gibsons repeatedly requested that Chloe be given the opportunity to be in more regular education settings, they were not involved in making decisions about which classes she could attend. *Id.*

The District's position became apparent when Chloe began high school in 2006, but continued throughout her high school career. Since 2006, the Gibsons have asked the District to consider the opportunity for her to attend additional general education elective classes such as swimming, art, music, and library. Ex. JJJ, p. 1; Tr. Vol. 6, p. 1042-43; Tr. Vol. 9, P. 1724. They repeatedly requested that Chloe be permitted to attend lunch with her non-disabled peers in the school cafeteria, just like she had done in middle school. Ex. JJJ; Tr. Vol. 6, p. 1044. The Gibsons also requested that Chloe be provided with regular experiences out in the community. Ex. JJJ; Tr. Vol. 10, pp. 2023-24; Tr. Vol. 11, p. 2136. They asked that she be permitted to

attend regular education assemblies and field trips with non-disabled children.  Tr. Vol. 9, p. 1724;  Tr. Vol. 6, p. 1044; Tr. Vol. 14, pp. 2881-82.  Despite these specific requests, the only regular education class that Chloe was permitted to attend during all of her high school years was a dance class, and that class was chosen by District staff without input from the Gibsons.  Tr. Vol. 9, pp. 1810-11.

The District posed a myriad of excuses for its failure to provide least restrictive setting options.  The Gibsons' repeated requests for the team to consider ways for Chloe to be included in art and music and library were virtually ignored by the team.  Tr. Vol. 9, pp. 1810-12.  Chloe's teacher, Ms. Giesting, testified that she was not sure if these requests had actually been made.  Tr. Vol. 10, pp. 1898, 2023; *see also*, Ex. JJJ.  District staff explained that the IEP team did not have time to discuss other regular education classes because the Gibsons were always asking for different things at IEP meetings.  Tr. Vol. 10, pp. 2013, 2037-39.  However, it is not unreasonable for the Gibsons to try different approaches and make new suggestions in an attempt to advocate for their daughter's inclusion.  Chloe's least restrictive environment was, after all, required to be discussed by the IEP team every time a new IEP was developed.  34 C.F.R. § 300.116(a)(2).

Chloe took an interest in taking swimming classes through the District, but the District never provided her this opportunity.  All students at Anderson High School are allowed to take swimming class, and there are no eligibility requirements for registration.  Tr. Vol. 1, p. 45 (high school principal).  In fact, the District's superintendent testified that swimming was required for all ninth graders.  Tr. Vol. 7, p. 1084.  The Gibsons asked Chloe's teacher, Ms. Giesting, if arrangements could be made for Chloe to take swimming or swim in the high school pool.  Ms. Giesting responded "we are not swimming at school."  Ex. L, pp. 38-44; Tr. Vol. 9, p. 1729-30;

Tr. Vol. 14, p. 2881.  The Gibsons subsequently tried to register Chloe for a regular education swimming class, but it was not added to her schedule. Tr. Vol. 9, p. 1732-33; Ex. BBB.  The District did not respond to the request and Chloe did not ever get to participate in the elective swimming class.  Tr. Vol. 9 at p. 1733-35; Ex. C.  Again, the District failed to even consider whether Chloe could attend a swimming class with the proper supports in place.

The Gibsons also asked for Chloe to attend activities such as community "field trips" and assemblies with regular education peers, as she had done in elementary and middle school. Tr. Vol. 10, p. 2025 (Chloe's teacher, Ms. Giesting, testified that Chloe had gone out into the community in 7th and 8th grade); *see also*, Tr. Vol. 9, pp. 1704-1714, 1723-24.  Ms. Giesting advised the Gibsons that she does not do field trips in her class.  Ex. K, p. 8.  She stated that it is not part of her class curriculum for children to go into the community.  Ex. 18, p. 245.  This was concerning for the Gibsons because although Chloe had shown great improvement in middle school in going out into the community with her peers, she continued to have difficulty going out to the community with her parents.[30]  The Gibsons were concerned that Chloe would lose the momentum she had shown in transitioning into the community in middle school.  Despite the Gibsons' requests, it was not until her eleventh grade year that Chloe got to go out into the community again, and even then it was at one location chosen entirely by the District.  Tr. Vol. 13, pp. 2680-2682.

The Gibsons asked the team to allow Chloe to eat lunch in the cafeteria with typical peers as she had done in elementary school and middle school without a problem.  Ex. JJJ; Tr. Vol. 6, p. 1044; Tr. Vol. 9, pp. 1714-1719.  The Gibsons were simply informed that "Ms. Giesting's class does not eat in the cafeteria.  The class eats in the room."  Tr. Vol. 6, p. 1044-45.  Chloe's teacher, Ms. Giesting, testified that in her classroom, they did a "family style" lunch program

---

[30] The Gibsons shared these concerns with the District as noted in Dr. Rubin's 2006 evaluation Ex. 133, p. 916.

where they bring in typical student "peer partners" to eat lunch with the students in the segregated classroom.  Tr. Vol. 10, p. 1952.  While, Chloe's teacher did attempt to let her eat in the school cafeteria once, her reason for failing to try it again was that Chloe had thrown her lunch away prematurely.  Tr. Vol. 10, pp. 1953-54; Tr. Vol. 9, pp. 1717-19.  Rather than providing supports to work on successfully eating in the less restrictive environment, cafeteria lunch time was removed from Chloe's schedule.  The IEP team did not meet to collaborate on ways to help Chloe attend lunch in the cafeteria.  As a result, Chloe missed out on the opportunity to eat lunch in the general education setting with non-disabled peers, and was not able to experience what Ms. Giesting agreed could have been an important learning opportunity for her transition.  Tr. Vol. 10, pp. 1957-58.

The IHO determined that the Gibsons did not ask for additional inclusion in the IEP meetings.  IHO Decision, p. 13; *see also*, SLRO Decision, pp. 30-31.  This conclusion is clearly incorrect.  The Gibsons did ask for additional opportunities for inclusion, memorializing their requests in writing when the IEP team failed to have these discussions.  *See*, *e.g.*, Ex. AAA, p. 2.

The IHO and SLRO also characterized the Gibsons' requests as failed attempts to convince the team to put Chloe in a different placement.  IHO Decision, p. 20; SLRO Decision, p. 30.  But the Gibsons' actions were instead requests that the IEP team *have the IDEA-required discussions about whether and how Chloe could participate in more general education settings.* The District's error in this case was not just the failure to put Chloe in a less restrictive setting; it was the refusal to even engage in the discussion about least restrictive environment.

Certainly, the Gibsons' were not entitled to dictate what regular education classes and community experiences in which Chloe should participate.  However, the Gibsons were and Chloe was entitled to have a meaningful consideration by the IEP team of lesser restrictive

opportunities with the proper supports in place.  These considerations were to take place at least

annually in order to take into account the changes in Chloe's programming, unique needs, and

skills.  This is especially true in light of the Gibsons' repeated requests for these discussions and

the expert evaluators' clear recommendations that Chloe have more time outside of the self-

contained classroom.  Ex. II; Ex. JJ.

> **3.** **The District's failure to include a regular education teacher at IEP meetings prevented the team from meaningfully considering and discussing Chloe's least restrictive environment.**

Another example of the District's low expectations for Chloe which negatively affected

her access to the least restrictive setting was the District's failure to include a regular education

teacher in Chloe's IEP meetings.  "If the child is, or may be, participating in the regular

education environment," then the IEP team must include "not less than one regular education

teacher of such child."  20 U.S.C. § 1414(d)(1)(B).  Chloe's dance class was a regular education

environment and the Gibsons were seeking more participation in regular education settings.  IHO

Decision, p. 21; Tr. Vol. 10, p. 1896.  However, the District did not ensure the participation of a

regular education teacher in any of Chloe's IEP meetings during the time periods at issue in this

due process hearing.  Tr. Vol. 14, p. 2831-32;  Tr. Vol. 20, p. 3983.[31]

The IHO and SLRO incorrectly decided that this failure did not constitute a violation of

the IDEA.  The IHO concluded that because:

> [t]here was no need for specific discussion regarding that [dance]
> class, and since Student participates in every other aspect of her
> education in the self-contained multiple disabilities class, the
> requirement that a regular education physical education teacher
> attend meetings exalts form over substance and does not rise to the
> level of a violation of a FAPE.

---

[31] Under the 2004 amendments to the IDEA, districts must obtain a written excuse signed by the parents for the exclusion of any mandatory member of the IEP team.  20 U.S.C. § 1414(d)(1)(C); *see also*, Ohio Admin. Code 3301:51-07(I)(5).  This was never done for any of Chloe's IEP meetings.

IHO Decision, p. 21.  The SLRO agreed, stating that "[t]here is no evidence that the attendance of a regular education teacher at Student's IEP would have been relevant to her IEP." SLRO Decision, p. 30.  These decisions are incorrect as a matter of fact and of law.

The Supreme Court clearly recognized the importance of the IDEA's procedural requirements in ensuring that a student with disabilities receives a FAPE.  *Deal*, 392 F.3d at 860, referring to *Rowley*, 458 U.S. at 206 ("[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").  As noted by the Sixth Circuit in *Deal*,

> [t]he rationale for requiring the attendance of a regular education teacher is closely tied to Congress's 'least restrictive environment' mandate.  The input provided by a regular education teacher is vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might be met within that classroom.

*Deal*, 392 F.3d at 860.

In analyzing these issues, the *Deal* court noted that "one of the Deals' main objections to the . . . IEP developed for Zachary is that it did not provide for sufficient integration.  The absence of the unique perspective that could have been provided by a regular education teacher therefore had a real impact on the decision-making process."  *Deal*, 392 F.3d at p.860-61.  Here, Chloe was participating in one regular education dance class and her parents repeatedly asked the team to consider other possible general education elective classes for her so she could experience those educational opportunities outside the resource room with typical peers.  Had the District given serious consideration to Chloe's participation in the least restrictive environment, the IEP team would have included a regular education teacher to help determine what classes she might participate in and what supports she might need to do so.  The IEP team could have then

carefully considered Chloe's participation in other general education classes such as art or music, and had input from a teacher with knowledge of the regular education setting to discuss any needed supports or services to aide in her participation.

The District's failure to include a regular education teacher at any time during the years at issue left the IEP team without that valuable perspective and denied Chloe and her family the opportunity to have those discussions and increase Chloe's time in the regular education environment. The District's failure to include a regular education teacher also denied Chloe additional opportunities to participate in the general education setting with non-disabled peers. The failure to include a regular education teacher in the IEP meetings not only shows the District's disregard for the procedural requirements, but also an unwillingness to consider Chloe's least restrictive environment options. Consequently, the IHO and SLRO decisions are contrary to law and should be overturned.

**4.   The District's failure to consider and provide educational opportunities in the least restrictive environment negatively impacted Chloe's educational progress.**

As a result of the District's failure to meaningfully consider the least restrictive environment, Chloe missed out on participating in many of the different types of classes offered to all children in the District. She had limited chances to build on the general education nonacademic classes in which she had had success in the past. She missed out on opportunities to interact with non-disabled peers in an environment other than the self-contained classroom. She was denied the chance to experience and learn how to be part of the community and benefit from the unstructured social experiences that often take place in the general education settings. Unfortunately, and to Chloe's detriment, the District's narrow view and inflexibility limited Chloe's opportunities to be educated in the least restrictive environment during her entire high school career. This repeated failure to serve Chloe in her least restrictive environment resulted in

a denial of a FAPE.

    **D.**    **The District denied Chloe a FAPE by failing to provide her with an IEP reasonably calculated to provide her access to and progress in the general education curriculum to the maximum extent appropriate for her unique needs.**

The District failed to provide Chloe with any meaningful access to the general education curriculum, which it was required to modify as needed to allow her to make the maximum progress she can based on her unique needs.  Districts are required to include in the IEP academic and functional goals that are designed to meet the child's unique needs and to enable the child to be involved in and make progress in the general education curriculum.  20 U.S.C. §§ 1414(d)(1)(A)(i)(IV)(aa) and (bb); 34 C.F.R. § 300.320(a)(2); Ohio Admin. Code 3301:51-07(H)(c)(1).  The definition of FAPE under federal and state law requires that children with disabilities receive educational and related services that "meet the standards of the State Educational Agency," e.g., the general education curriculum.  20 U.S.C. § 1401(9)(B); Ohio Admin. Code 3301:51-01(B)(23)(b).  Ohio has aligned its academic content standards to the general education curriculum, thus ensuring the direct connection of what children must know and be able to do (testing standards) with what children are taught (the curriculum).  Ex. XX, p. 17, PR07 form guidance from ODE.  This alignment applies to all children, including those with severe disabilities.  *Id.*

For children with disabilities, this means that their IEP goals must be aligned to the grade level general education curriculum so they have access to that curriculum through those individualized goals.  This is true even where, as here, the curriculum may need to be modified significantly to allow access to the general education curriculum.  *Id.*  The IEP must also include a statement of the special education and related services and supplementary aids, modifications and supports, (which to the extent practicable should be based upon peer reviewed research), that

will be provided to the child to enable the child to advance toward attaining annual goals, and to be involved in and make progress in the general education curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4).

In addition to the general education content standards, schools are required to ensure that children with disabilities have access to a variety of the same types of programming and services available to all children in the district including art, music, industrial arts, consumer and homemaking education, and vocational education. 20 U.S.C. § 1413(a)(1); 34 C.F.R. § 300.110; Ohio Admin. Code 3301:51-02(J). As with access to the general education curriculum, an individual IEP must ensure that the child with a disability has access to these programs and services, with or without modifications and other supports. *Id.;* 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

The District failed to develop an individualized program for Chloe that would provide her with access to the general education curriculum as required. The District instead placed her in a leisure/recreational program rather than developing an IEP with individualized and measurable goals aligned with content standards in the areas she needed and her parents requested. This decision was unlawfully based upon the District's own assumptions about her abilities and low expectations for her potential to make progress on needed skills. As a result, she made no educational progress based on IEP-based goals or services and any progress she did make in vocational or other community-based skills occurred in middle school or through the efforts by her parents at home.

       **1.**       **The District's failure to ensure Chloe access to the general education curriculum prevented her from learning many of the skills and information that Ohio has determined all children need to learn as part of their education.**

The District did not dispute at the hearing below that it had an obligation to provide

Chloe access to the general education curriculum; however, the evidence demonstrates that it failed to do so. While the District may have labeled some of Chloe's goal or activities provided as math or social studies, these goals were not aligned to the standards to ensure Chloe has received the same kinds of instruction and subjects provided to all children. This failure in turn meant that Chloe was denied the ability to learn skills and information all children should learn as part of their education, such as health, history, social studies, etc.

As the District's own special education coordinator Ms. Ryan testified, Ohio's state content standards applied to all children including Chloe. Tr. Vol. 3, pp. 379-80. She further testified that the District is responsible for ensuring that the District provides children with disabilities access to the regular education curriculum. *Id.* To that end, The District has developed what they call a "life skills curriculum" that attempts to address the content standards for children with disabilities. Ex. AAAA. As explained by Ms.Gajus, this curriculum is based on the state content standards. Tr. Vol. 6, p. 913.

The testimony of Chloe's middle school teacher, Ms. Gajus, demonstrates that it is possible to modify the general education curriculum where necessary so that students with more challenging needs, like Chloe, can still access those skills and information to the maximum extent possible. Ms. Gajus testified extensively about how she modifies the general education curriculum for her students and takes steps to explain materials to her students in a way they can understand. Tr. Vol. 6, p. 923-26. She gave an example where one of her students with special needs had to take a general education health course several times to understand, but that this was something she did routinely to make sure her students understood the very important general education content. Tr. Vol. 6, pp. 924-25. Ms. Gajus also testified extensively about the many different kinds of activities she provided for her students, such as socialization and safety skills

or reviews of newspaper articles that are related to topics within the general education
curriculum but presented in a way that is meaningful for the students and with the goal for them
to become as independent as possible.  Tr. Vol. 6, pp. 919-26.

In contrast, in Ms. Giesting's classroom, Chloe did not receive any actual curriculum and
instruction related to the content standards that all children are required to receive.  Indeed, Ms.
Giesting, Chloe's high school teacher, testified that she does not take steps to determine what
grade level standards Chloe's typically developing peers are working on and modify it for Chloe.
Tr. Vol. 10, p. 1899-1900.  Consequently, there was no indication in Chloe's educational records
that she received any instruction in writing, science, government, or health curricula in high
school.  In fact, Ms. Gibson testified that she was specifically told by Ms. Giesting that they do
not do "academics" in her classroom.  Tr. Vol. 9, p. 1747.  Chloe's teacher did not use the life
skills curriculum aligned with the content standards.  Ex. AAAA.  In fact, when the parents
requested Chloe receive some instruction in the general education curriculum, the team laughed
at them.  Tr. Vol. 9, pp. 1814-15.  All of Chloe's completed schoolwork that was sent home
consisted of coloring book sheets, News 2 You handouts, typewritten sentences, and preschool
age crafts.  Ex. J; Ex. L; Ex. CCCC; Ex. DDDD; Ex. UU; Ex. VV.[32]  This type of work bears no
relation to necessary life skills, let alone the content standards that even the District concedes
apply to all children with disabilities.  *See* Tr. Vol. 3, pp. 379-80.  Notably, the District did not
provide any evidence of any coursework, instructional materials, or any other evidence that
Chloe received any instruction in any of the required content standards.

The Gibsons asked the District to take the necessary steps to teach Chloe the same kinds
of basic life information Ohio has determined that all children need to learn to become adults

---

[32] Ms. Giesting confirmed that this work was a sample of the work done in her classroom, but indicated that the
coloring was probably done as a leisure activity. Tr. Vol.11, p. 2367.

who can participate in the community.  *See* Ohio Rev. Code § 3313.60.  This information, which includes reading, math, writing, health, basic science, government and fine arts including music, can be taught to Chloe at her level, using the effective strategies once implemented for Chloe in middle school and currently being used by Ms. Gajus in her classroom.  The Gibsons specifically asked for Ms. Giesting to teach these same things to Chloe, *at her understanding level*, in the same way that Ms. Gajus testified she teaches her students, by modifying the standards.  Tr. Vol. 9, p. 1807.  However, the District has refused to individualize Chloe's instruction as requested and insisted on providing only the recreation/leisure program and activities described above.  And, as evident from the testimony about Chloe's lack of educational progress, the activities she has participated in for the past several years (coloring, crafts, etc.) have not helped Chloe learn the knowledge, and life and self-sufficiency skills she needs to be able to fully participate in her community as an adult.

This lack of instruction has limited her opportunities for employment and for obtaining independence in contradiction of Congress' stated purpose in amending the IDEA: to ensure that children with disabilities have the education and services necessary "to prepare them for further education, employment and independent living."  20 U.S.C. § 1400(d)(1).  The District has failed to do so for Chloe.

> ## 2.    The District denied Chloe a FAPE by providing her educational services based upon her placement, rather than her individual needs.

In addition to failing to ensure access to the general education curriculum, the District based its plan for providing Chloe educational services improperly upon the pre-determined program Ms. Giesting had for her classroom rather than upon Chloe's individual needs.  This contravenes federal and state laws that specifically require the IEP to include a statement of the measurable annual goals "designed to (i) *meet the child's needs that result from the disability* to

enable the child to be involved in and make progress in the general education curriculum; *and* (ii) meet *each* of the child's other educational needs that result from the child's disability." 34 C.F.R. § 300.320(a)(2)(i) (emphasis added); 20 U.S.C. § 1414(d)(1)(A)(i)(II) (emphasis added); Ohio Admin. Code 3301:51-07(H)(1)(c)(i). This requires an individualized education plan designed for the child; this mandate is not met by fitting a child into a pre-set program or classroom.[33]

Instead, Forest Hills developed programs and placed children into those programs based on its view of that child's future needs. As the assistant principal explained to Dr. Kopnick in 2007, "No one in this [Chloe's] classroom goes into the community because this is the way the program is planned/developed. If they go into the community, they are in Turpin. That is the way Forest Hills has it set up." Ex. ZZZ, p. 13; Tr. Vol. 8, p. 1489.

When Chloe was placed in Ms. Giesting's class, she was not permitted to continue going into the community which had been shown to be very motivation and successful for her, because as Ms. Giesting advised the parents, her class did not go into the community because of all of the children in the classroom who were in wheelchairs. Tr. Vol. 8, p. 1487.[34]

The District decided what Chloe would be provided based upon her classroom placement instead of her individual needs, both as to academics and as to her need for community outings. When Chloe transitioned to high school, the District's own records show that Chloe needed on-going community outings and was clearly benefitting from those outings. Ex. B6; Ex. LL, p. 5. Dr. Rubin specifically advised the District to continue with the type of programming she had

---

[33] Interestingly, Betsy Ryan testified that this is exactly what is still happening in the District and her testimony has been affirmed by Chloe's experiences. Ms. Ryan testified that "Chloe's IEP is based upon what Chloe does in school every day." Tr. Vol. 20, p. 4042. Ms. Giesting advised the Gibsons at the first IEP meeting when they requested community outings that Chloe was unable to go into the community because all the children in her class are in wheelchairs. Ex. T. She also made a similar statement to Dr. Kopnick during her observations. Tr. Vol. 8, p. 1487; Ex. ZZZ.

[34] Even in her testimony and notes she sent home to the Gibsons, Ms. Giesting discussed how the "dynamics of the classroom made it difficult to go into the community." Tr. Vol. 11, p. 2144; Ex. L, p. 2143.

received in middle school; i.e. regular community outings and regular involvement with typical peers in the general education settings.  Ex. LL, p. 5; Ex. B6.  Despite their own records, the District placed Chloe into a segregated, recreational leisure based classroom, in which the students are not taken out into the community and no community learning opportunities are made available to them.  The District did not take Chloe out into the community the first year at Anderson, or the second year; it was not until the end of her eleventh grade year that the District finally agreed to take her out in the actual community (Steinmart).  The District did not provide Chloe any community training opportunities for over 2 and 1/2 years despite her previous success in those settings and the Gibsons requests for these community experiences.  Tr. Vol. 13, pp. 2675, 2680-82; Tr. Vol 10, pp. 2023-24.

Because that's the way the District has set up its programs, it refused to provide Chloe the opportunities she needed to build on her previous progress in the community, to continue becoming acclimated to and comfortable with the community stores and different businesses and their functions, to be able to explore the potential, jobs she might like, and to get the repeated experiences and instruction she needs, to learn shopping, community safety, purchasing, ordering, self-advocacy and vocational skills.  Year after year, these opportunities, which are required to enable Chloe to make progress towards independence and employment, were refused for Chloe.

The same lack of individualization of educational programming also holds true for the academic curriculum the District provided for Chloe.  Instead of providing Chloe with an individualized educational opportunities that built on her previous successes in developing money skills, math, reading and functional life skills, the District provided Chloe with a predetermined program.

Instead of developing an individualized program based on Chloe's needs, the District chose to develop her goals to fit the type of program in which Chloe was placed, which was a classroom in which she spent the majority of her day doing leisure activities, free time, sensory time, coloring, craft projects, watching Disney and other children's videos, dancing in the classroom, eating lunch in the classroom, participating in random grooming activities she has done since middle school, and doing the same "work" activities she has done since sixth grade. Ex. BBBB; Tr. Vol. 10, p. 1915-50.  No attempts were made to increase her skill level with these tasks:  the activities provided for Chloe were simply the same activities for all students in the recreation/leisure program.  Ex. BBBB; Tr. Vol. 10, pp. 1915-50 Vol. 8, pp. 1498-99.  This is not sufficient for FAPE.

A district court in Alabama came to a similar conclusion where a school district, based upon its own assumptions that the student was incapable of progressing towards self-sufficiency, developed a program, "the chief function of which was to occupy [the student's] time in as pleasant a manner as possible" rather than deal with the difficulties that must necessarily accompany his challenges.  *Campbell v. Talladega County Bd. of Educ.*, 518 F. Supp. 47, 55 (N.D. Ala. 1981) (holding that the district had failed to provide a FAPE in the least restrictive environment).  As the court stated, this program "does little more than to occupy his time with activities devoid of educational justification … [and] it is ill-suited to impart … any skills which might, to whatever degree, increase his independence." *Id.* at p. 54.  As a result, the court found the school district had denied the child a FAPE.

The court also found that the district needed to ensure the student's time was spent on tasks that would actually lead him to learning the functional and communicative skills he needed to increase his self-sufficiency as much as possible. *Id.* at p.54-56.  The court believed this was

106

particularly true when a child has a cognitive disability because "it is vital that time be usefully spent, that approaches which persistently fail be dropped and that achievements be built upon" because it is difficult for that student to acquire a skill. *Id.* at 51. An IEP must at least embody the objectives and purposes of the Act as detailed in its legislative history,[35] i.e. to provide services and instruction that will enable a child to attain the level of self-sufficiency which they are able to obtain. *Id.* at 54.

As with the student in *Campbell*, the District was required to develop an individualized program for Chloe that ensured her time was spent on tasks that would lead her to learning the functional and communicative skills she needed to increase her self-sufficiency as much as possible. The program, that the District placed Chloe in, however, focused on leisure activities and the work Chloe was given often involved a repetition of skills she had already mastered. Tr. Vol. 26, p. 5293.

A review of her daily communication sheets, copies of "work" sent home and testimony shows Chloe spent much of the day performing tasks such as coloring, puzzles, shredding, playing games such as "Ants in the Pants" and watching Disney and other children's movies. Ex. J(2009-2010 Daily Communication Sheets); Ex. L(2006-2007 Daily Communication Sheets); Ex. CCCC; Tr. Vol. 9, pp. 1791-96; Tr. Vol. 11 , p. 2366-67. Ms. Giesting testified that Chloe received over two full hours of leisure and free time every day which included doing puzzles and hanging out on the carpet. Tr. Vol. 10, pp. 1915 (45 minutes free choice), Vol. 10, p. 1981 (45-60 minutes leisure time), Vol. 10, p. 2018 (sensory-40 minutes per day). Chloe also had a daily enrichment period which is a 40-minute period spent on arts and crafts or music and other varied

---

[35] "With proper education services, many 'handicapped children' would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society. *Campbell*, 518 F. Supp. at 54, quoting S. Rep. No. 94-168 (1975), reprinted in 1975 U.S.C.C.A.N. 1425, 1433.

activities.  IHO Decision, p. 10.

The teacher's testimony and other evidence in the record, make it clear that much of Chloe's day was focused on recreation and leisure and was not designed to enable her to improve her self-sufficiency and make educational progress.  In fact, the teacher specifically testified that "a big part of the room is going to be a social and recreational part.  Those are skills that you need to have in life. You need to learn to take turns and be together and share things that make you happy."  Tr. Vol. 21, pp. 4171-72.  The similarity to the leisure program rejected by the *Campbell* court is striking.

Moreover, much of Chloe's time was spent on activities that she had already mastered and had been doing for several years.  Tr. Vol. 11, pp. 2323-24; (Chloe has been doing shredding for four years in Ms. Geisting's classroom );  Tr. Vol. 11, p. 2294 (bilateral coordination goals).  The IHO also found that the goals and objectives in Chloe's IEPs for the 2007, 2008 and 2009 school years had not moved her forward or allowed her to make educational progress.  IHO Decision, p. 16, ¶¶ 19-20.[36]

Guidance from the Ohio Department of Education (ODE) requires IEP goals to be objectively measurable and to be written so that a child can reasonably master the goal by the end of the year.  Ex. XXX, p. 19.  In marked contrast to ODE guidance and the lesson of *Campbell*, Chloe's goals are written such that her teacher testified that she expects Chloe to be working on the same goals until she leaves Anderson High school.  Tr. Vol. 11, p. 2294.

---

[36] The Gibsons provided additional evidence in the form of a chart taken directly from the daily communication sheets sent home by the teacher. Ex. BBBB. The data taken from Chloe's daily communication sheets for 80 days show the types of activities Chloe engaged in each day, although the teacher testified that it may not show all the activities.  Tr. Vol. 10, p. 2053.  Out of an 80-day period, Chloe participated in: "job" tasks, 80 times; games and/or movies, 64 times; words, 54 times; dancing in classroom, 47 times; coloring/crafts, 19 times; computer, 19 times; cooking, 13 times; deliveries, 12 times; in-school purchases, 12 times; going to the library, 11 times; sensory beans, 11 times; reading, ten times; gym, ten times; using a ball, eight times; stringing beads, six times; walk around school, four times; buy lunch in cafeteria, four times; trips to Steinmart, two times; math, zero times and writing, zero times.

But Chloe needs a curriculum designed to teach her the skills necessary for her future as an adult. Chloe's educational program for the past several years was inappropriate and did little more than to occupy her time with activities devoid of educational justification. Her lack of progress and independence is the result. Failing to develop an individualized program to meet Chloe's unique needs denied Chloe a FAPE.

**3.    The District's low expectations for Chloe resulted in an education that failed to address her unique needs and potential.**

The District had such low expectations for Chloe that it did not even attempt to teach her skills she needs and that other children have access to in the general education curriculum. The IDEA requires that students with disabilities receive meaningful educational benefit from their IEP, and this must be gauged in relation to the child's potential. *Deal*, 392 F.3d at 862. Educational programs must be based upon a comprehensive evaluation of a child's needs and abilities, and continually updated to ensure the child is making meaningful progress. 34 C.F.R. § 300.301; 34 C.F.R. § 300.303. Courts must consider the child's "capabilities and potentialities" in deciding whether the services the child was provided allowed her to meaningfully progress. *Deal* 392 F.3d at 864.

Decisions about a child's capabilities and potentialities should, likewise, be based on objective evaluations, not subjective opinions and unsupported ideas of what a child with a particular disability can do. As the Sixth Circuit stated, "[i]n conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children." *Deal*, 392 F.2d 862; *B.H. v. West Clermont Bd. of Educ*., 788 F. Supp. 2d 682, 697 (S.D. Ohio 2011). Indeed, it is a denial of FAPE to assume, as the school district did in *Campbell*, that because the student was diagnosed with severe mental retardation, he was capable of little progress toward self-sufficiency. The IDEA requires schools to help the child make

progress towards attaining the level of self-sufficiency to which the child is capable of achieving. *Campbell,* 518 F. Supp. at 54.

As in *Campbell*, the District placed Chloe in a recreational/leisure program based on its low expectations for her and its view that Chloe's future was going to be in "a supportive / assisted living environment" where "she would be successful and happy participating in a small group recreation/leisure environment (segregated adult program) where she would have opportunities to interact socially with other adults and enjoy activities that are related to such interests as music, dance, magazines/books, movies, art, cooking and exercising." *See the District's vision statement for Chloe in Future Planning Section*, Ex. B1, p. 2. But that is not the goal Chloe and her parents have for her future, and a placement based on antiquated assumptions about the low abilities of students with significant disabilities is contrary to law.

IEPs are designed to move the student forward, to provide the student with meaningful progress. Making a decision to refuse to teach the goal because you think the child, due to her intellectual disability, will never be able to do a task independently, does not comport with the purpose of the IDEA. Decisions on what is possible for a child should take into account the unique learning style of each child with a disability and the response to efforts to teach skills in a way the individual has shown he or she can learn. This is the lesson of *Campbell* and the requirement of the IDEA. Unfortunately for Chloe, the District failed to follow the law.

Because the District had such low expectations based on its assumptions about Chloe's potential, it refused to develop goals to address the skills identified by her parents as areas of need and which were related to skills the Ohio content standards require for all students, albeit modified for Chloe's needs. Ms. Giesting admitted that the team did not, in the four years Chloe attended Anderson High School, set as a priority or develop a measurable goal or objective

110

addressing any of the needs or skills the Gibsons wanted Chloe to learn.  Tr. Vol. 11, p. 2298-

2304.  The District did not develop a measurable goal or objective to address developing

keyboarding skills (vocational).  *Id*.  The District did not develop a measurable goal or objective

to teach her to identify or count money (math).  *Id*.  The District did not develop a measurable

goal or objective to teach her to make a sandwich (homemaking).  *Id*.  The District did not even

develop a measurable goal or objective to teach her to safely cross the street (independence).[37]

As Ms. Giesting testified, "No, we don't cross the street . . . there are so many other things I

would be working on for her safety wise than crossing the street."  Tr. Vol. 10, 1979-80.

    As in *Campbell*, because of assumptions about Chloe's low IQ and her potential, the

District refused to write goals to help Chloe become more "self-sufficient."  In fact, the District

did not believe Chloe could accomplish goals, and thus chose not to set any meaningful ones.

When asked how the team could know when Chloe mastered her goals given the way they are

written, Ms. Giesting testified, "Well, I don't [think] that we'll ever say that she would master

something independent of help in doing something."  Tr. Vol. 11, p. 2285.  Because the District

cannot envision Chloe as ever becoming independent, it chose not to develop goals to work

towards self-sufficiency.

    The District held fast to these assumptions even in the face of overwhelming evidence to

the contrary about Chloe's abilities and potential.  For example, as the District's and the

Gibson's experts testified, there are ways to teach Chloe independence and to address her prompt

dependency.  Tr. Vol. 23, p. 4535-36; Tr. Vol. 8, pp. 1399-1402, 1505-1510.

    Similarly, many of the goals proposed by the Gibsons were skills Chloe had previously

exhibited in eighth grade but no longer exhibited, or were goals that would move Chloe to the

---

[37] Ms. Giesting testified that she was not "breaking down skills for Chloe to cross the street because we do not cross the street."  Tr. Vol. 10, p. 1980.  When asked if she planned to do that she stated "no I do not."  *Id*.

next level in that skill and increase her independence.  Tr. Vol. 9, pp. 1739-40.  As Ms. Gibson

testified, they were just asking for goals that would help Chloe maintain the skills she had

learned in elementary and middle school and to develop goals to take her to the next step in those

skills.  Tr. Vol. 9, p. 1749.  For example, staff refused to write a goal to help Chloe learn to

grocery shop because as Ms. Ryan explained, this was not realistic or purposeful for her because

she will not ever be able to grocery shop without supports.  Tr. Vol. 3, pp. 530-33.  But the

evidence provided by the parents shows that Chloe is able to shop with supports (Ex.VVV;  Tr.

Vol. 6, pp. 1011-12) and is able to become more independent with repeated experience.  Tr. Vol.

5, pp. 802-808; Tr. Vol. 2, pp. 258-59, 336.  In fact, the District's own records show she was able

to go into the community and make purchases in eighth grade.  Ex. B5 ("Chloe is currently

working on identifying coins and using money to purchase items in her school and in the

community. Chloe knows all the coins and shows one by pointing to the word for the coin or

stating the coin. Chloe is also making purchases with assistance. She will get out the right

amount of money (visual cues) then request an item (with one v.c.) give the money and then wait

for the change, and at times say thank you.")

There was testimony that the District thought Chloe incapable of counting money to

make purchases, (Tr. Vol. 21, p. 4112), even though the District's own records show Chloe was

able to identify numbers up to 100 by sixth grade, (Ex. B8, p. 1), knew all of her coins in eighth

grade, (Ex. B6, p. 1), was able to make purchases with assistance getting out the right amount of

money, to independently request an item, give the money, wait for change and, at times, say

thank you.  *Id.*  Moreover, Dr. Rubin (the District's expert) assessed Chloe in 2003 and noted

that she was able to count and expressively identify numbers.  Ex. 132, p. 6.  And Dr. Kopnick

noted that when she observed Chloe during her assessment in 2009, Chloe was able to take the

money out of her wallet by herself, paid by herself, and put her money back into her wallet to complete the purchase. Tr. Vol. 8, p. 1514. While Chloe clearly still has needs in this area, her parents would like her to continue to work on improving these skills as they are important for her future independence.

Similarly, staff testified that they believed it was not functional or possible for Chloe to learn stranger danger, to tell time to the hour or half hour or use the telephone because there were too many prerequisites for her to learn that skill or understand the concept. Tr. Vol. 22, p. 4361; Vol. 10, pp. 2076-80; Vol. 4, pp. 604-12. But Dr. Rubin, in her 2006 assessment, specifically noted that "Chloe understands the function of the telephone and will talk to a familiar person on it…" and "understands the function of money and of the clock." Ex. 133, evaluation dated May 16, 2006, p. 2.[38] The District, however, did not provide a goal to help Chloe learn to improve her skills at telling time or using the telephone to call 911 during her time in high school. Tr. Vol. 11, pp. 2298-99, 2359; Vol. 10, pp. 2078-80.

The Gibsons asked the District to provide goals on stranger danger and to teach Chloe to say and write personal information such as her address and phone number. District staff testified that it was "not functional" for the school to work on teaching Chloe stranger danger skills, Tr. Vol. 4, pp. 604-612, writing or keyboarding, and to write and/or say her personal information such as address and phone number. Tr. Vol. 11, pp. 2301-02; Vol. 10, pp. 2043-44. Yet the District's records show that Chloe had mastered independently writing her first and last name in 4th grade. Ex. I, p. 5. The Gibsons presented testimony and a video showing that Chloe was

---

[38] The IHO determined that given Chloe's cognitive limitations and lack of math skills, it is unlikely that she will be able to be effectively taught to grasp the concept of time beyond reading numbers on a digital clock. IHO Decision, p. 7.

able to be taught to say her address and phone number in three weeks using their home ABA[39]
program.  Ex. VVV; Tr. Vol. 2, pp. 276-77.

In addition, while Dr. Rubin initially testified that using the telephone was not a
functional skill for Chloe because she could not understand the concept of a telephone, (Tr. Vol.
25, pp.5116, 5120), she later changed her testimony and said she did consider using the
telephone a functional skill for Chloe.  Tr. Vol.25, p. 5120.  She stated that Chloe could be taught
to call 911, but she wasn't sure if Chloe would understand when to make that call.  Tr. Vol. 25,
p. 5119.  Betsy Ryan testified that the District does not understand the purpose or function of
teaching Chloe to use the phone in an emergency.  Tr. Vol. 4, pp. 606-08, but Ms. Giesting
testified that using the phone would be a functional goal for Chloe to call relatives and friends.
Tr. Vol. 11, pp. 2357-60.  She indicated that Chloe also could probably be taught to call 911 but
she might not talk when they answered.  *Id*.

Notwithstanding this substantial evidence, the IHO determined that at this juncture,
having Chloe write her personal information was not as important "since it is unlikely she will be
left alone and can carry that information on an ID card in the unlikely event she is alone and
needs help."  IHO Decision, p. 7, ¶ 9.[40]  Regardless of how it is ultimately taught, Chloe needs
and has an educational right to be taught the skills necessary for her to achieve greater
independence.  Basic stranger danger skills and how to call 911 are certainly skills necessary to
independence.  To assert that there is no need to teach her as she will never be alone is to ignore
the requirements of the IDEA and reality.  As noted by Dr. Kopnick, using the telephone in an

---

[39] ABA, or applied behavioral analysis, is a method of teaching skills, particularly to students with autism, using discrete trials, repetition and positive reinforcement.
[40] Ironically, the parents and the district agreed that Chloe needed to learn to carry an identification card and learn when to present it, and this was written into the needs section of her IEP, but a goal was never developed by the District to address that need.  Exhibit B9, p. 8.  The need for Goal 3 states, "Chloe needs to understand stranger safety.  She needs to be able to find people to help and provide an ID or "help" card for assistance."  The goal and objectives for that need do not address these skills.  *Id*.

emergency is an important skill for everyone to learn. Tr. Vol. 8, p. 1562. She testified that there are ways to teach individuals with cognitive disabilities like Chloe these important functional skills. Tr. Vol. 8, pp. 1562-63.

Testimony throughout the due process hearing refutes the District's contention that Chloe's significant disability prevents her from benefiting from instruction in skills tailored to lead her toward greater independence. For Chloe to actively participate in her community, she will need to have a basic understanding of time, when to go to work, when to meet a friend, or when to take any needed medications. The District's position that she would not benefit from such instruction is unsupportable.

Rather than being based on any objective analysis of Chloe's potential, the District's position is based on the assumption that Chloe would not benefit from instruction in such skills because of her disability. Such an assumption is not only incorrect as a factual matter, it violates the letter and the spirit of the law, which requires educational goals to be based upon individualized evaluations that include a variety of assessment tools and strategies to gather relevant functional, developmental and academic information, including information provided by the parents. 20 U.S.C. § 1414(b)(2). It was precisely this issue - low societal expectations regarding the abilities of people with disabilities - which Congress was trying to address in amending the IDEA requirements to ensure that *all* students receive an IEP to help prepare them for further education, employment and independent living. 20 U.S.C. § 1400(d)(1)(A).

The District's failure to provide Chloe with an education in compliance with these requirements denied her a FAPE and caused her educational harm. Apparently the IHO agreed, as she found that the goals on Chloe's IEPs for the 2007, 2008 and 2009 school years were inappropriate and denied her a FAPE. She concluded that the goals relating to bilateral hand

coordination and maneuvering around the school were mastered and were not sufficiently

challenging to move Chloe forward.  IHO Decision, p. 16, ¶ 19.  She noted that the "math goal in

2007-2008 was vague and unclear and there was no math goal at all for 2009-2010."  IHO

Decision, p. 16, ¶ 20.  She also determined that Chloe was denied a FAPE in reading and math

because of low expectations, and it did not appear that the District had made sufficient effort to

push Chloe beyond her current academic levels.  IHO Decision, p. 19.  A review of Chloe's IEPs

for this time period shows that all of the goals discussed as inadequate by the IHO were,

basically all of the goals on Chloe's IEPs.  Unfortunately, the IHO failed to order a complete

remedy to address these deficiencies, and Chloe must now seek that remedy from this Court.

> **4.** **Any progress made by Chloe was not conferred on her by an IEP but rather from services she received in her home ABA program or outside of the school setting.**

Because of the District's failings with respect to Chloe's education, any progress she

made did not come from the school and her 2007, 2008, or 2009 IEPs, but was either acquired

during middle school or from her home ABA program initiated by her parents.  The IEP is the

cornerstone of a child's educational program.  In determining if a child's IEP is reasonably

calculated to provide a FAPE, courts must look to the document itself.  *Knable,* 238 F.3d at 768,

citing *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1525-26.  Thus, only the services identified or

described in the IEP should be considered when evaluating the appropriateness of the program

offered for a child with a disability.  *Id.*  This Court, then, must determine if the IEPs, which

detailed the services provided to Chloe by the District, were the vehicles through which Chloe

received educational benefit.  This question must be answered in the negative.

The District cannot dispute that the IEP goals were insufficient, as the IHO determined

that Chloe's IEPs for 2007, 2008 and 2009 were not designed to enable her to make educational

progress.  Indeed, the IHO found that the District had denied Chloe a FAPE for the two school

years prior to the due process hearing as Chloe's IEPs were not designed to move her towards progress as none of her goals was found to push her towards progress.  In particular, her transition goals (bilateral coordination and maneuvering around the school) were not designed to measure anything but whether she used two hands or made it safely to destinations around the school, making it impossible to make any determination of her success in the specific skills needed for her to successfully transition.

At the same time, and seemingly in direct contradiction, the IHO stated that transition, socialization, behavior and vocational skills were areas of significant improvement for Chloe, (IHO Decision, p. 24), and the SLRO agreed with this conclusion.  The decisions do not detail specific time frames when Chloe made this progress or point to any documentation of progress in the District's data for those school years.  They simply rely on the subjective opinion of Chloe's teacher, Ms. Giesting, and the opinion of the District's expert, Dr. Rubin.[41]  IHO Decision, p. 7; *see also,* Tr. Vol. 25, pp. 4997-5001.  Evidence presented at the due process hearing was based on its IEPs and progress reports and the subjective opinions of staff.  This "progress" was not in fact progress because the goals were for activities Chloe had already mastered and some goals included criteria for progress that was lower than her current present levels.  Ex, B1(goal 3, obj. 3.1); Ex. B9 (bilateral goals); Ex. CCC, p. 12;Ex. B 1 ( obj. 1.1).  This was noted by the IHO at page 19 of her decision and was also noted by ODE in Ex. W, p. 17-18.  Much of the progress the District reported for Chloe occurred either during her middle school years when she had access to regular education and the community, or through her home ABA program that her parents initiated in December 2009/January 2010, a month after filing for a due process hearing.

As an initial matter, Dr. Rubin did not review the appropriate documentation to determine

---

[41] The SLRO found that "Chloe has shown improvement in all deficit areas during her education at the District" SLRO Decision, p. 9, and cites as evidence all 807 pages of the District's witnesses testimony at pp. 4170-4977.

if Chloe had made progress during the 2007, 2008 or 2009 school years.  While Dr. Rubin refers to changes Chloe has made since elementary and middle school, she does not provide any specific information about progress Chloe made in the two years that are the subject of this due process hearing.  In fact, when describing further how she arrived at these observations, Dr. Rubin stated that she was basing her testimony about Chloe's progress on her previous assessments of Chloe in sixth grade and a review of Chloe's past two IEPs.  She admitted that she did not know when Chloe's progress or particular skills had been accomplished and did not know if Chloe had already made the progress when she was in middle school.  Tr. Vol. 25, pp. 5110-11, 5124-25, 5137-39, 5141; Tr. Vol. 26, p. 5353-54.

When looking at the testimony about Chloe's progress during middle school, it becomes clear that any progress made in school occurred at that time, not after she arrived in Ms. Geisting's classroom in ninth grade.  For example, while Chloe did exhibit some behaviors when she started middle school, Tr. Vol. 1, pp. 181-183, her middle school teacher Ms. Gajus testified that Chloe's negative behaviors had already decreased by eighth grade with the behavior plan and behavior goals.  Tr. Vol. 1, p. 181-83.  Ms. Gajus testified that the behavior plan and behavior goal were very effective and that Chloe interacted appropriately with peers and adults. Tr. Vol. 1, p. 183.  Chloe's behavior improved during middle school and that her behavior goals were mastered by the end of the 2006-2007 school year.  Tr. Vol. 1p. 182-83; Tr. Vol. 11, p. 2195-96; Ex. CCC, p.11.

Ms. Gajus also testified that Chloe's social interactions improved in eighth grade, Tr. Vol.1, p. 175-76, and that Chloe enjoyed being around her friends.  Tr.Vol.1, p. 176; Ex. B6. Ms. Gajus wrote in her eighth grade IEP that "Chloe talks each morning to her friends", Ex. B6; Tr. Vol. 1, p. 184, and  as noted by Ms. Gibson, "went out shopping with her peers/friends at

school, like regular girlfriends do." Tr. Vol 6, p. 1011-12.  So while her communication level did not improve at school, her socialization had already improved by the time she completed eighth grade.

Dr. Rubin affirmed her progress and emerging skills and recommended that Chloe continue to be provided the same type of experiences, outings, and services she had been receiving throughout middle school.  Ex. LL, p. 5.  Unfortunately, this did not occur and as a result Chloe failed to make meaningful progress in school.  It is not enough that the District provided appropriate IEPs in middle school.  Students with disabilities are to be provided an IEP *each year* that is reasonably calculated to provide them a meaningful benefit for that school year, and the District did not do that here.

Instead, Chloe's parents provided Chloe with community outings through outside providers, and initiated a home ABA program to address some of Chloe's need for socialization and community-based vocational skills to aid her independence and self-sufficiency.  Tr. Vol. 5, p. 782; Vol. 2, pp. 242-44, 248-51.  The ABA program started in December 2009/January 2010 shortly after the parents had also resorted to filing the due process request because of the District's failure to address their serious concerns.  Before the Gibsons began the ABA program with Chloe, she had a difficult time going out into the community with her parents and others. After a couple of months of the program, she had made significant progress including excursions into the community where she was able to participate in community outings and activities with less difficulty.  Tr. Vol. 2, p. 246.  As Sarah Handerman testified, "Stephen, our consult, came in and taught us . . . how to teach Chloe really, and how to make her a compliant learner.  And that's when things really started turning around. And we've had a lot of success based on that." *Id.*  In a few months time with the home ABA program, Chloe moved from reading sight words

119

on a card to reading four paragraphs, counting out several items, and learned to say her phone number.  Tr. Vol. 2, p. 256-57.  She is also working on becoming more independent in the community and home staff noted progress and some generalization of her skills in many different community settings with different people.  Tr. Vol. 2, p. 258-60.  They've also noted a decrease in refusals for "work" tasks, Tr. Vol. 2, p. 263-64, and an increase in her communication.  Tr. Vol. 2, p. 271.

Notably, Dr. Rubin's testimony confirms this progress.  While Dr. Rubin's testimony fails to link the progress Chloe has made to services or instruction provided by the District, she testified extensively about the progress she observed from Chloe that was documented on a videotape the Gibsons made a couple of months after initiating the ABA program.  Ex. VVV. This videotape includes Chloe's community experiences provided by home-based ABA staff. Tr. Vol. 25, p. 4954.  Dr. Rubin made the following observations about Chloe's progress:

> Chloe's made considerable progress and will continue to make progress. She's learning, she's growing, she's a much more mature individual.  She's out in the community, we have evidence of that. When I observed her and talked to Mrs. Gibson at the age of 12 , she wasn't going into the community hardly at all. Now she's very happily going into the community.

*Id.*

> We see a young woman who goes into the community, who I saw functioning very nicely in the Anderson community on some tapes I saw. She's functioning in a church community, at Chick-fil-A, at home. . . .  I watched a recording of her reading and she continues to be able to read, which is certainly a skill that she has learned and has maintained over the years.  Show' s accomplishing vocational tasks, social skills. We see considerable progress for Chloe.

Tr. Vol. 25, p. 4977-78.

As this testimony and the evidence regarding Chloe's skill-level during middle school demonstrate, Chloe's progress noted by testimony shows the progress occurred would have

occurred before the time periods at issue in the due process hearing or through the home ABA and community based program, not through the insufficient IEP goals for 2007, 2008 and 2009.

While Dr. Rubin testified that it appeared Chloe had made great progress on the videos of her home activities in the community, she also noted continued problems with Chloe transitioning those skills to the school environment. She testified that "Chloe stopped at each of the intersections she needed to cross and hesitated, but did not look both ways to assess for cars until given the verbal prompts to do so." Tr. Vol. 25, p. 4968. This same problem was noted by Dr. Kopnick when she testified about her observation on the school outing. Tr. Vol. 8, pp.1536-37. She noted there was no planning or objectives in terms of what Chloe would be taught on the trips to Steinmart so it was not meaningful to enable Chloe to learn the actual skills. Tr. Vol. 8, p. 1537. She noted that Chloe was not taught skills to safely cross the street in a way she could learn; she was provided no visual supports and no data was taken on the tasks targeted. Tr. Vol. 8, p. 1536-37. As Dr. Kopnick noted, teaching Chloe these skills would require many trips and a plan to help her learn specific skills. Tr. Vol. 8, pp. 1535-1539; 1542-43.

The District did not provide the repeated, purposeful community experiences needed to teach Chloe these skills. The trips into the communities were not initiated until the end of Chloe's 11th grade year, Tr. Vol. 9, pp. 1699-1700, shortly before the due process was filed. Thus for almost three full school years, the District failed to provide any community training for Chloe even though the parents requested it every year. Tr. Vol. 9, p. 1703. The District refused to provide these experiences despite the fact that Chloe's educational records show that Chloe was most successful in middle school where she had regular community activities to help her learn these important skills. Tr. Vol. 9, pp. 1701-02.

Chloe's continued difficulty transitioning in the community was also documented in the

121

anecdotal notes of the District staff.  They noted that Chloe often required maximum prompts

and some staff noted that Chloe couldn't even open the door when she went to the store.  Ex. U;

Tr. Vol. 5 pp. 769-770.  There was documentation and much testimony that Chloe's challenges

regarding transitioning to the community, initiating communication and socialization remained a

great need for her.  Tr. Vol. 5, pp. 726-27; Ex. B1; Ex. B3; Tr. Vol. 8, pp. 1531-32.  While Chloe

has begun to show improvement in transitioning because of the frequent and regular community

experiences she is receiving as part of her home program, she continues to need appropriate

instruction and regular and varied community experiences to increase her ability to transition and

interact with others in the community.  Tr. Vol. 8, p. 1533-34. Her continued inability to utilize

these skills in the school environment further supports the conclusion that any progress made

was not as a result of school-based services as detailed on her IEPs but rather from the home

based ABA program her parents supplied.

Based upon a review of Chloe's IEPs for 2007, 2008 and 2009, this Court should find

that Chloe was not provided a FAPE because the District failed to set meaningful goals intended

to build or improve skills or provide services to aid Chloe in making progress.  Evidence at the

due process hearing supports such a finding, and that the progress she did achieve was during her

middle school years when she had access to regular education and the community and through

her home provided program.

      **E.**    **The District failed to ensure that the Gibsons were afforded the opportunity
to meaningfully participate in the educational process for their daughter with
respect to her evaluation, educational placement and the provision of FAPE.**

The District predetermined Chloe's educational placement in 2006 and has refused to

meaningfully discuss alternate options for Chloe's placement and goals and services for every

school year since.  This included refusing to reschedule an important evaluation meeting,

refusing to discuss or consider alternate placements options, failing to allow the Gibsons to

discuss their proposed goals with the IEP team and failing to develop measurable goals that addressed any of the parents' concerns and requests for their daughter.

Among the most important procedural safeguards are those that protect parents' rights to be involved in the development of their child's educational program. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001); *Rowley*, 458 U.S. 176 at 208. The IDEA sets forth very detailed procedures that districts must follow to make sure that parents of children with disabilities are equal partners in deciding what services and supports their children will be provided. Meaningful parental participation in the IEP process requires that districts follow the delineated procedures in developing a child's IEP starting from evaluation and eligibility of the child, through the development of the IEP and placement determination, as well as periodic and annual review and revisions of the IEP. Parental participation at all of these stages is vital to the development of an IEP designed to result in educational progress.[42]

The federal regulations implementing the IDEA state that "parents of a child with a disability are expected to be equal participants along with school personnel, in developing, reviewing, and revising the child's IEP." *Dong ex rel. Dong*, 197 F. 3d at 802, n 8, citing 34 C.F.R. § 300, App. C,(1997). Parental participation is vital to the development of an IEP for a child with a disability because not only do the parents advocate for their child in the IEP development process; they also provide critical information about the child. Consequently, procedural inadequacies that seriously infringe upon the parents' opportunity to participate in the IEP formulation process result in the denial of a FAPE because they undermine the very essence

---

[42] The procedural rules include the parents' right to: request an evaluation 34 C.F.R. § 300.301(b); be provided with notices of procedural safeguards, 34 C.F.R. § 300.504; receive prior written notice of actions taken or refused by districts, 34 C.F.R. § 300.503; provide informed consent for certain actions, 34 C.F.R. § 300.300 as defined in 34 C.F.R. § 300.9; have IEP meetings scheduled at a mutually agreed upon time and place, 34 C.F.R. § 300.322(a); have their child receive an independent educational evaluation, 34 C.F.R. § 300.502; and request an impartial due process hearing, 34 C.F.R. § 300.507.

of the IDEA.  *Knable*, 238 F 3d at 765.  See also, *Roland M. v. Concord Sch. Comm.*, 910 F.2d

983, 994 (1st Cir. 1990); *Hall v. Vance County Bd. of Education*, 774 F.2d 629, 635 (6th Cir.

1985); *W.G. v. Board of Trustees of Target Range School Dist*. No. 23, 960 F.2d at 1483 (9th

Cir. 1992).

    While it is not a violation for IEP team members from the district to come to a meeting

prepared and with an opinion, they are not allowed to come to the meeting with a completed IEP

and refuse to meaningfully consider the parents' suggestions or otherwise force the completed

IEP upon the parents.  *N.L. v. Knox County Schs.*, 315 F.3d 688, 694 (6th Cir. 2003).  Parents

must be provided an opportunity to make suggestions and objections, and these suggestions and

objections must be taken seriously by the team.  As the Sixth Circuit noted, "this participation

must be more than mere form; it must be meaningful."  *Deal v. Hamilton County Bd. of Educ.*,

392 F. 3d at 858.  The IDEA requires that the mandatory members of the IEP team meet and

collaborate as equal partners together to develop the IEP each school year.[43]  34 C.F.R. §

300.321; 34 C.F.R. § 300.324(b)(1); *Target Range*, 960 F.2d at 1483, citing 20 U.S.C. §

1401(a)(19).  Parents are required members of the team and districts must take necessary steps to

ensure their opportunity to participate.  34 C.F.R. § 300.321(a)(1); 34 C.F.R. § 300.322(a).  This

collaboration entails going through the required comprehensive processes detailed in the IDEA

in order to ensure that the child with a disability has an individualized education program

designed to confer an educational benefit.

    Although the team must meet no less than annually, there are also additional times during

---

[43] The IDEA requires the IEP team include in every IEP meeting a special education teacher, a regular education teacher if the child is or may be participating in regular education environment, the parent, a district representative who can supervise the provision of services and who is aware of the regular education curriculum and resources of the district, and someone who can interpret results of testing. 34 C.F.R. § 300.321.  The parent can excuse or agree that one of the mandatory members of the team will not attend but this agreement must be in writing. 34 C.F.R. § 300.321(e).

a school year in which the IEP team may need to meet in order to review or revise a child's IEP. Districts must meet to plan for and review triennial multi-factored evaluations, review other evaluations, address information about the child that was provided to or from the parents, or to revise the IEP to address a child's lack of progress.  34 C.F.R. § 300.324(b).  There should be as many IEP meetings as necessary to develop an IEP.  The legislative history of Pub. L. No. 94-142 makes it clear that there should be as many meetings a year as any one child may need (121 Cong. Rec. S20428-29 (Nov. 19, 1975) (remarks of Senator Stafford)).

>    1.    **The District refused to meaningfully collaborate with the Gibsons regarding Chloe's IEP goals, services, and needs.**

There is no dispute that Chloe's IEP team had many meetings during her four years at Anderson High School.  The team met on several occasions over the 5 years Chloe attended high school.  However, the school members of the IEP team did not meaningfully collaborate with Chloe's parents to develop Chloe's IEPs for any of those school years.

The IHO and the SLRO both concluded that the Gibsons had been provided with meaningful participation because they attended several IEP meetings and presented their concerns to the IEP team.  IHO Decision, p. 13; SLRO Decision, p.29.  But the Sixth Circuit has held that it is erroneous to assume that merely because the parents were present and spoke at the various IEP meetings, they were afforded an adequate opportunity to participate.  *Deal*, 392 F.3d 840, 858 (6th Cir. 2004); see also *N.L. v Knox County Sch.*, 315 F.3d at 694-95.  Rather, school officials must be willing to listen to the parents and must have open minds.  That did not happen here.  By definition, an IEP is a written statement for a child with a disability developed in a meeting by mandatory IEP members, which includes the parents and a regular education teacher. *Target Range*, 960 F.2d at 1483, citing 20 U.S.C. § 1401(a)(19).  Chloe's IEPs were written outside this process.

During the time Chloe was in high school at Anderson High School, the Gibsons were not asked about what they wanted for Chloe's IEP each school year, but were instead just provided with completed "draft" IEPs that had already been written and developed by the district staff before the IEP meeting had even begun. Tr. Vol. 13, p. 2614-15. Ms. Ryan, the district's special education coordinator, conceded that the district never went to an IEP meeting with a blank document so the IEP team could write the IEP together at the meeting. Tr. Vol. 1, p. 216-17. Instead, the "drafts" were presented to the parents with virtually all the sections filled in, including Chloe's present levels, specific goals and objectives, "criteria" for mastery of the goals and objectives, specific types and amounts of related services and specific placements. Ex. AA; Tr. Vol. 9, p. 1783.

An example of the District's practice is the "draft" IEP sent to the Gibsons on October 31, 2008, to prepare for an upcoming IEP meeting on November 5, 2008. Ex. AA. Essentially all of the IEP sections had been filled in, including Chloe's educational placement. *Id*., pp. 7 and 12. The document expressly indicated that the district had concluded that was no need for a functional vocational assessment. *Id*., p.12. The special factors section that the team was supposed to have "discussed" in developing Chloe's IEP had already been marked. *Id*., p.11. The "draft" had been completed before the Gibsons had even seen the document, let alone participated in any meetings with the school members of Chloe's IEP team.

Since the IEP goals and virtually all of the other sections of the IEP were already drafted by District staff, Chloe's IEP team members did not collaborate to write and develop the goals together with the Gibsons. Tr. Vol. 13, p. 2615-2616. This left the Gibsons with the onerous task of requesting that changes be made to the District's completed IEP in an attempt to include some of the things they wanted for their daughter in her educational program. Tr. Vol. 9, p.

1692.  Tr. Vol. 9, p. 1782.  Unfortunately, when the Gibsons attempted to suggest alternate goals or suggest ways to make a goal more measurable, District staff became defensive and suggested that the Gibsons just needed to trust them.  Tr. Vol. 9, p. 1781.  See, also, Tr. Vol. 10, pp. 2012, 2043-44.  At one meeting, Chloe's teacher, Ms. Giesting, specifically told the Gibsons that she would not change a goal because she had worked for hours on it prior to the meeting.  Tr. Vol. 9, p. 1777.

Rather than having the team discuss the Gibsons' proposals for their daughter's IEP goals, staff would ask the Gibsons to put their requests in writing.  Tr. Vol. 13, p. 2620; Tr. Vol. 9, p. 1700.  Even when the Gibsons provided the District with proposed goals at the District's request, the District failed to ensure the that IEP team met to discuss the proposed goals or incorporate them into Chloe's IEPs.  Ex. RRR; Tr. Vol. 9, p. 1819; Tr. Vol. 9 pp. 1712-1713.

When the Gibsons provided the team with proposed goals at the District's request, Chloe's teacher was apparently so distraught that she wrote "I quit" right on the document.  Ex. RRR, p. 1.  Her comment to the Gibsons' proposed goals clearly reflects the District's response to the Gibsons' efforts to meaningfully collaborate with the team.  Ex. RRR  Ms. Giesting testified that she and other District IEP team members had reviewed the proposed goals outside of the IEP meeting, but she was unable to recall whether the IEP team had actually discussed the proposed goals with the Gibsons at a formal IEP meeting.  Tr. Vol. 11, pp. 2271-2272.  Ms. Gibson testified that the IEP team never discussed their proposed goals.  Tr. Vol. 9, pp. 1712-1713.

There is no dispute that the District did not incorporate the Gibsons' proposed goals into any of Chloe's IEPs.  Chloe's teacher, Ms. Giesting, admitted that the IEP team did not develop measurable goals to address any of the Gibsons' requests even though these were the same types

127

of goals the Gibsons continued to request for several years.  Tr. Vol. 11, pp. 2298-2303.  The refusal to even discuss and consider goals proposed by the parents prevented the Gibsons from participating in a discussion with the IEP team and denied them the opportunity to hear firsthand any concerns from the team members and ask questions and to interact directly with other team members about their specific requests.

The District's refusal to consider the Gibsons' goal suggestions was not an isolated incident.  The Gibsons again attempted to provide suggestions for transition goals and activities for Chloe for discussion in 2009.  Ex. V.  The District did not respond to the proposals, discuss them as a team, or even acknowledge that they had received them. Tr. Vol. 9, p. 1821.  Chloe's teacher, Ms. Giesting, testified that she "just breezed through them," "looked at some of it" and stated that the team did not discuss them in a meeting either. Tr. Vol. 11, pp. 2275-2277.  Needless to say, these goals were never incorporated into Chloe's IEPs and the Gibsons were again denied the opportunity to discuss these proposals with the team to see if any part of them could have been implemented for Chloe.  It is not meaningful participation for the parents to be relegated to sharing their proposed ideas in writing, without being permitted to have the necessary discussions or to talk directly with the team about their suggestions for their daughter's IEP.

The District's objections to discussing the Gibsons' proposals were fueled by the District staff's low expectations for Chloe's abilities.  *See, e.g.*, Tr. Vol. 10, pp. 1964-1965, 2008-2011.  Ms. Giesting, Chloe's teacher, explained that the IEP team could not include the Gibsons' goals into the IEP because they believed they were unrealistic (Tr. Vol. 10, p. 1999 and pp. 2008-2009) and the things they were asking for the team to work on didn't match her present levels. Tr. Vol. 10, p. 2008.  She explained, "[w]ell,  I think we're just on a different playing field here.

128

I think that you think she's going to master those things. I don't think that she's going to." Tr. Vol. 10, p. 1964-65. But as Ms. Gibson explained, many of their requests were to maintain or continue building on skills that Chloe had worked on in previous years. Tr. Vol. 9, p. 1749. Unfortunately, the District was not open to the Gibsons' requests. The District failed to ensure that the Gibsons were able to meet with the IEP team to discuss their proposed goals, thus denying them the opportunity to ask questions and explain their concerns to the IEP team. As Ms. Gibson testified, "It was as if we never submitted anything to them." Tr. Vol. 9, p. 1713.

In addition to the District's failure to even acknowledge the Gibsons' proposed goals, the District failed to take any of the requests by the Gibsons seriously. In fact, when the Gibsons asked the District to provide Chloe with some instruction in the general education curriculum at her understanding level, the staff literally laughed at them. Tr. Vol. 9, p. 1814. When the Gibsons asked that Chloe be invited to attend her IEP meeting, District staff laughed again. Tr. Vol. 9, pp.1813-14. Even during the hearing when Chloe's teacher was asked about Chloe being taught the district's life skills curriculum (as described in Ex. AAAA), the teacher laughed at the question as it related to voting. Tr. Vol.11, pp. 2351-52. She stated "I think some things would be more appropriate for other students and their cognitive ability.." *Id*.

Because of its very limited view of Chloe's capabilities, the District refused to even consider these goals or activities as possibilities for Chloe when they were aware these goals and activities are very important for Chloe and her family. The Gibsons know that Chloe is more capable than the district staff believe because her previous school records show that she was able to do many of these things in the past and the goals in her IEPs are often targeting things she has already been able to do. Tr. Vol. 26, p. 5293. Moreover, Chloe has shown that she is able to learn when given the appropriate supports and instruction and reinforcement. Chloe has been

able to cross the street with supports, (Ex. VVV) learn her address and phone number, (Ex. VVV; Tr. Vol. 2, p. 257), learn to round up to the next dollar, (Tr. Vol. 26, pp. 5313-5314; Tr. Vol. 14, p. 2934) and tell time to the hour.  Ex. ZZ, p. 6.  The Gibsons simply wanted the District to address regression of her skills and take Chloe to the next step for the skills she had shown she was able to perform.  Tr. Vol. 9, p. 1749.  Because these requests were dismissed by the District as being too unrealistic or nonfunctional for Chloe, Chloe was denied the opportunity to make progress and learn new skills that would help her be more independent as an adult.  The failure to seriously consider the Gibsons' requests by having the IEP team discuss them denied the Gibsons meaningful participation in their daughter's education.

That the Gibsons and the school have different expectations for Chloe is clear.  In this case, the Gibsons tried everything they could think of to get the school to provide educational opportunities and help their daughter become more independent to no avail.  When there was no way that anything the Gibsons said, or any data they produced, could have changed the District's determination of what they considered appropriate services for Chloe, it becomes apparent that the Gibsons' participation is nothing more than after-the-fact involvement that violates the IDEA.  *Deal v. Hamilton County Board of Educ*., 392 F.3d 840 at 858, referring to *Spielberg*, 853 F.2d at 259.  By writing complete drafts and refusing to meaningfully alter them and failing to discuss and incorporate the Gibsons' input, the District effectively precluded the Gibsons from involvement in the process Congress developed to ensure parents meaningful participation in their child's education, violating both the language and spirit of the IDEA.  The Gibsons were never afforded team membership status by the District and were thus denied meaningful participation in the process.

### 2. The District failed to schedule meetings at a mutually agreeable time and date.

The District refused to reschedule a meeting to plan for Chloe's 2009 multi-factored evaluation and transition assessment for a date that would allow the Gibsons the opportunity to attend.  Because the parents were unable to attend, they were prevented from meaningfully participating in the development of Chloe's transition services and plan.

Districts are required to take the necessary steps to ensure that parents have the opportunity to participate in every IEP meeting by notifying them of a meeting within a reasonable time frame and scheduling the meeting at a mutually agreed upon time and place.  34 C.F.R. § 300.322(a).  Parents must be afforded the opportunity to participate in any meeting regarding the identification, evaluation, and educational placement or provision of FAPE to their child.  34 C.F.R. § 300.501(b)  While a district can go forward with an IEP meeting without the parents if it can show that it tried but was unable to convince the parents that they should attend, it cannot meet without the parents if the parents want to attend but can only do so on an alternate date or time.  34 C.F.R. § 300.322(d); *Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F. 3d 1072, 1078 (9th Cir. 2003).  If the school refuses to reschedule when a request is made, the school district simply has prioritized its representatives' schedules over those of the parents.  *Id*. Refusing to reschedule an IEP meeting at the parent's request represents a significant procedural defect.  *J.N. v. District of Columbia*, 677 F. Supp 2d 314, 321 (D.D.C. 2010).

Here, the Gibsons did not refuse to attend the April 21, 2009 meeting, but simply asked the team to reschedule at a time they could attend.  District Ex. P, p. 11; Ex. P, p. 16; Ex. CCC, p. 14; Ex. CCC, p. 14.  On February 20, 2009, the District sent an invitation to the Gibsons, scheduling a meeting for February 26, 2009 to plan for Chloe's 2009 triennial multi-factored evaluation.  Ex. P.  The email sent by the District indicated that since it recently completed a

number of assessments the previous spring,[44] it would consider that information as part of the evaluation team report. Special Education Director Ryan also stated that the District planned to add related services and transition information in the report "as that was not included in the spring evaluation." Ex. P, pp. 11-12. The Gibsons responded on February 23, 2009 with alternative dates as they were unavailable on the February 26 date set by the District. Ex. P, p. 11. They also asked the District to clarify why it did not believe the spring assessments included transition information, and if they were going to include these evaluations in the multi-factored evaluation and consider them for Chloe's transition planning. *Id*.; Ex. CCC, p. 14.[45]

The District responded on February 26, 2009, by referring to its counsel's letter regarding the outside experts, and offered alternate dates for the meeting. Before the Gibsons could respond, the District chose a meeting date of April 21, 2009 and provided the Gibsons with a date and planning form that included inviting their own expert, Jennifer Bullock, but not the outside evaluators chosen by the parents. Ex. P, pp. 2-3; 16-17. The Gibsons advised the District by email and letter that they were not available on that date, and proposed alternate dates. Ex. P, p. 16; Ex. CCC, p. 14.

The Gibsons asked the District again to discuss whether it was planning to incorporate the outside evaluations into Chloe's multi-factored evaluation. The District said it would "consider" the information provided, but would not reschedule the meeting at a time the Gibsons

---

[44] The parties had agreed in spring of 2008, as part of a facilitated IEP meeting, to have outside evaluators from Cincinnati Children's Hospital observe and consult with the team to help them develop appropriate goals for Chloe, and to provide information and recommendations regarding her education and transition planning. Ex. BB. The Gibsons provided the reports to the District and asked for the IEP team to meet with the evaluators to discuss their recommendations and concerns. The District indicated that it would invite them to a transition meeting, but then did not invite them. The Gibsons asked several times for the school to invite them. After numerous requests with no response, the Gibsons wrote two letters to the school requesting a meeting in October of 2008 (Ex. ZZ, p. 2), and in December of 2008 (Ex. ZZ, p. 9). It was not until February of 2009 that the District sent a letter explaining that it felt the reports were biased and the evaluators would "disrupt the transition planning process." Ex. ZZ, p. 12.

[45] The Gibsons had requested a transition meeting to discuss with outside evaluators their recommendations for Chloe as those recommendations relate to her transition plan. Ex. ZZ, pp. 1-2 (Oct. 13, 2008), p. 9 (Dec. 1, 2008). The transition meeting was not scheduled until approximately one year later.

and outside evaluators could attend.  Ex. P, p. 16.  The Gibsons sent a letter advising the District

again that they were not available on April 21, 2009, but that they wished to participate in the

multi-factored evaluation planning meeting.  Ex. CCC, p. 14.  The District went forward with the

multi-factored evaluation planning meeting without the presence of the Gibsons and included, as

their transition planning assessment, information only from the District's own evaluators and

staff records.  Ex. P, pp. 1-8.

      The District's refusals to schedule these discussions at a time and date that was mutually

convenient prevented the Gibsons from meaningfully participating in the IEP process for their

daughter.  The Gibsons were essentially shut out of the transition planning and multi-factored

evaluation process.  The evaluators which the Gibsons wanted to include in the meetings were

never even invited.  This had a detrimental impact on the Gibsons' ability to participate as IEP

team members since they were not provided the time or opportunity to discuss these outside

recommendations, the need for additional vocational assessments, or how they might impact

Chloe's needs and transition goals.

      **3.**     **The District predetermined Chloe's placement and repeatedly refused to discuss or consider any other options.**

      The IHO found that the Gibsons were provided meaningful participation because they

"vociferously articulated their opinions, recommendations and opinions at numerous meetings",

but were just unable to convince the district to place Chloe in the program they wanted for her.

IHO Decision, p. 20.  In fact, the District in this case pre-determined Chloe's placement in 9th

grade and has refused to even discuss or consider alternate options for Chloe in any of the

subsequent school years.  This continued refusal to discuss or consider alternate options for

Chloe's placement denied the Gibsons the ability to meaningfully participate in their daughter's

IEP.

When a school district pre-determines a child's placement, it is a procedural violation of the IDEA. *Spielberg v. Henrico County Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988). A district may think about or discuss appropriate placements but they are required to come to the IEP meeting with an open mind. *Doyle v. Arlington County Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992). A District's failure to adequately discuss and consider an inclusion placement is a clear reflection that the district had come to a conclusion about the type of placement prior to an IEP meeting. Placement and LRE for a child must be considered annually. 34 C.F.R. § 300.116(b). When a District comes to an IEP meeting with a closed mind as to placement and refuses to consider alternatives placements and LRE, this seriously infringes on a parent's meaningful participation in the development of their child's educational placement. *In re Las Virgenes United Sch. Dist.*, 44 IDELR 201; 105 LRP 50330(Ca. State Educ. Agency 2005).

The District violated the IDEA when it pre-determined Chloe's placement. In 2006, the District independently determined Chloe's placement and concluded that the self-contained classroom at Anderson High School was the only appropriate option available to her. As Ms. Ryan testified, "no other options were – were [sic] considered in terms of being the most appropriate for Chloe." Tr. Vol. 1, p. 210.[46] Ms. Ryan testified quite emphatically that the District did not consider any placement options other than the one that they proposed:

> …*we didn't present it as options*. What we have – our responsibility is to ensure that the student can move to one of our high schools in the least restrictive environment that's most appropriate for that child and we believe that child can make meaningful benefit and educational benefit and progress. And the classroom at Anderson High School was the one that the team

---

[46] When asked if the team discussed any other options for Chloe, Ms. Ryan stated, "I don't believe so." Tr. Vol. 1, p. 214; Turpin (the life skills program) was not discussed as an option. Tr. Vol. 1, pp. 210-211. Amy Baker, who attended a meeting with the Gibsons, testified that she felt that the decision was already made before the meeting, she did not feel the District was willing to consider other placement options and there were no other options for Chloe. Tr. Vol. 7, p. 1130. Even when the family asked for Chloe to attend the Turpin program part-time or have some involvement with the children in that classroom, the district was unable to accommodate that request. *Id.*

> believed would meet that need for Chloe.  At that time, the social
> communication classroom was nonexistent.  That came about a
> couple of years later, I believe.  And as I think to that, I don't
> believe that would have been considered either.  (emphasis added).

Tr. Vol. 1, pp. 211-212.

For each of the following years, no matter what the Gibsons asked for and no matter what
Chloe's current level of functioning was, the only option made available was Susie Giesting's
segregated recreation/leisure classroom.  Every time the team met to develop an IEP, the Gibsons
asked for the team to consider a different placement and specifically asked for increased time in
regular education classes and in activities in which children without disabilities participate.  Tr.
Vol. 9, pp. 1752-56, 1759; Ex. JJJ, p. 1; Tr. Vol. 6, pp. 1042-45.  There was never a
consideration or discussion by the IEP team of other possible options for Chloe.  Tr. Vol. 1, pp.
211-12, 215.  When asked if the team had actually taken any steps to look at other options for
Chloe, Ms. Ryan stated, "I think I've answered that.  The team has always felt very confident in
the classroom placement at Anderson and that was the placement they had recommended and
had been discussing."  Tr. Vol. 1, p. 215.

The District's refusal to annually consider LRE and placement for Chloe with the parents
through the IEP process is best illustrated in the District's response to the Gibsons' request at
Chloe's multi-factored evaluation meeting on June 1, 2009.  The team met to discuss the recent
multi-factored evaluation, the need for extended school year services and the provision of
compensatory education that the Ohio Department of Education had ordered the District to
provide to Chloe.  Ex. E1.  The Gibsons requested that the IEP team consider alternative less
restrictive placements for Chloe for the 2009-2010 school year.  Ex. E1, p. 5.  Special Education
Director Ryan advised the Gibsons that Chloe's current classroom was her least restrictive
environment, and the "IEP team" had determined she would remain in Susie Giesting's

classroom. *Id.* There was no discussion by the IEP team as to Chloe's least restrictive environment and placement, the predetermined decision as to Chloe's LRE for the 2009-2010 school year was simply relayed to the parents. Tr. Vol. 9, pp. 1756, 1758-59.

The June 1, 2009 meeting was immediately followed by a prior written notice from the District advising the Gibsons that the IEP team had determined Chloe's least restrictive environment to be her current classroom. Ex. CCC, pp. 4, 5, 9; Prior Written Notice to Parents, Attachment 2. There was no IEP meeting between the declaration by Ms. Ryan and the prior written notice. The IEP team was never provided the opportunity to discuss or consider alternate placements, even though this was a new school year and the team needed to develop a new IEP for the 2009-2010 school year. Tr. Vol. 9, p. 1756.

The Sixth Circuit has held that parental attendance and discussion at an IEP alone does not mean that parents were afforded an adequate opportunity to participate in the meeting. *B.H. v. West Clermont*, 788 F. Supp. 682, 696,(citing *Deal v. Hamilton Cty. Board of Educ.*, 392 F.3d 840, 862 (6th Cir 2004). Where the district has predetermined a program for the child, *and no alternatives are considered at the IEP meeting*, the district has failed to allow parental participation in the meeting as required. *Id.* Predetermination of placement by a school district amounts to a violation of the IDEA, causes substantive harm and deprives a child of a FAPE where "the parents are effectively deprived of meaningful participation in the IEP process." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006). The district does not have to come to the IEP meeting with a "blank mind" as to placement, but it must come with an "open mind." *Doyle v. Arlington County Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992).

After the fact IEPs--IEPs developed retrospectively to fit an already made placement decision--, violate the IDEA because the placement has to be based on the IEP. *Spielberg*, 853

F.2d at 259, cert denied, 489 U.S.1016 (1989).  When a district predetermines placement prior to the IEP meeting it has committed a procedural violation of the IDEA.  *Id.*  The decision to place a child at a particular school or setting before developing an IEP upon which to base that placement violates this regulation…it also violates the spirit and intent of the IDEA which emphasizes parental involvement.  *Id.*

Because the District did not ensure the IEP team, including the parents, considered placement and LRE annually, the Gibsons were prevented from having a discussion with the team about alternate placements each year, and no other options were considered by the IEP team.  The Districts' predetermination of Chloe's placement for the 2007, 2008 and 2009 school years denied Chloe a FAPE in the least restrictive environment, and prevented the Gibsons from meaningfully participating in the development of her educational program.

### 4.     The IHO and SLRO decisions that the Gibsons were provided meaningful participation are not supported by the evidence.

The IHO and SLRO held that the District did meaningfully consider the Gibsons' requests because the District provided Chloe with community outings, addressed the Gibsons' concerns regarding spreading peanut butter, and added a goal for bilateral coordination, all at the request of the Gibson's.  IHO Decision, pp.10-11, 13; SLRO Decision, p. 30.  The District's response to requests regarding the bilateral coordination was incomplete at best and the District completely disregarded the parents' requests for community outings and other significant requests for most of the school years at issue in this due process.

The IEP team had noted Chloe's difficulty with bilateral hand coordination in the 2006 MFE (Ex. D2) and on her 2007-2008 IEP.  Ex. B3, p. 2; Tr. Vol.13, p. 2727.  As part of that need noted by the team, the Gibsons asked the District to develop a goal to teach Chloe the skill of making a sandwich since she had had difficulty with twisting off the lid on the jar and spreading

the mayonnaise or peanut butter. Tr. Vol. 13, pp. 2727-2730. While Chloe's teacher, Ms. Giesting, said she would work on spreading peanut butter, a goal was not developed to teach the skills. Tr. Vol. 10, pp. 1970-71; Tr. Vol. 11, p. 2302. The District did create a bilateral hand coordination goal for Chloe. Unfortunately, the goal as written, only measured whether Chloe used two hands, and did not address teaching Chloe the appropriate way to make a sandwich. The outcome of this effort did not result in Chloe learning a skill leading her towards greater independence. Instead, Chloe worked on fragments of a skill which never coalesced into a meaningful outcome. Tr. Vol. 13, pp. 2727-2730.

With regard to the Gibsons' request for community outings, the record shows that the District did not provide community outings at the request of the parents as suggested by the IHO and SLRO. In actuality, it took well over two full years of requests and complaints to the Office for Civil Rights and the Ohio Department of Education to get the District to agree to develop a plan to take Chloe into the community. Tr. Vol. 13, pp. 2675, 2679-82; Tr. Vol. 10, pp. 2023-2035. The Gibsons originally made this request in October of 2006, Ex. JJJ, and were told that children in Chloe's class do not go into the community because many of the children are in wheelchairs. Ex. JJJ, p. 5; Tr. Vol. 9, p. 1702; Tr. Vol. 6, p. 1045.[47] Nevertheless, the Gibsons continued to make these requests. Tr. Vol. 10, p. 2024; Tr. Vol. 9, p. 1703.

Even though a community plan was written and offered to the Gibsons in the fall of 2008, Chloe did not actually get into the community, according to the testimony of her teacher, until sometime after May of 2009, (Tr. Vol. 11, pp. 2111-2112), and then the only outing she received

---

[47] The teacher testified that she "doubted" she said Chloe couldn't go out in the community because the children in her classroom were in wheelchairs. Tr. Vol.11, p. 2141, but testified she might have said other children couldn't go out because of their medical conditions. *Id.* Dr. Kopnick testified that during her 2007 observation of Chloe, Ms. Giesting told her that children in her class did not go into the community because of their wheelchairs and that this statement was confirmed by an assistant principal at Anderson High School. Tr. Vol. 8, p. 1487.

was to go to Steinmart, a store right next to the school.  Tr. Vol. 13, pp. 2680-81.[48]

While the Gibsons were pleased the District had finally agreed to take her into the community, they were given no input into where she would go, there were no measurable goals written for skills she would work on and no information was provided as to how often she would be given actual community experiences.  Ex. Y, p. 22; Tr. Vol. 13, pp. 2680-2682; Tr. Vol. 11, p. 2178.  When the Gibsons signed a separate consent for the District to take Chloe into the community, the teacher told them they had to sign the District's community plan *as written* or Chloe would not get any community outings at all.  Tr.Vol. 11, pp. 2177-2179.  They eventually signed the plan with objections so Chloe could get some experience in the community.  Ex. 63.

The Gibsons never received the opportunity to meaningfully participate in Chloe's educational services or outcomes.  Requiring parents to document their requests for years, and file complaints with the U.S. Dept. of Education, Office for Civil Rights and the Ohio Department of Education to get what their child needs is not the kind of meaningful collaboration and participation required under the IDEA.

Moreover, the District refused to consider the Gibson's input into placement, general education opportunities or IEP goals.  The District predetermined Chloe's placements every year and refused to even consider other options at the parents' requests.  The Gibsons were not given input into what classes Chloe would take, the amount of time she spent in general education, or her participation in non-academic activities at school.  They were handed completed IEPs and then were unable to get the District to even discuss and consider their requests for their daughter's IEP goals.  They were not given input into how her goals would be measured and, consequently, were unable to determine if she made any progress at all.  The Gibsons asked the

---

[48] Ms. Gibson testified that she thought the community trip to Steinmart started in the middle or towards the end of 11th grade.  Tr. Vol. 13, p. 2680.

IEP team to work on independence skills for Chloe by providing her community based experiences and instruction, but this was denied for two and a half of the years she attended high school at Anderson.  For these reasons, this Court should reject the IHO and SLRO decisions and determine that the Gibsons were denied meaningful participation in the educational process in violation of the IDEA.

> **5.      The IHO and SLRO decisions to find fault with the Gibsons for their efforts to obtain a FAPE for their daughter are contrary to the purposes of the IDEA.**

The IHO seemed to place the blame for the difficult IEP meetings on the Gibsons because she determined that their demands were "numerous and unpredictable," and "created tension among staff."  IHO Decision, p. 25.  The SLRO stated that the IEP process was made more difficult because the Gibsons' conduct was "to oppose any sense of 'team' but rather to set up an 'us vs. them' posture."  SLRO Decision, p. 29.  However, the Gibsons' requests reflect just the opposite; they were trying to be part of Chloe's IEP team and wanted the IEP team to actually discuss their concerns together.  Nor did the Gibsons' persistent requests for goals and services prevent the District from providing Chloe with a FAPE as suggested by the IHO.  IHO decision, pp. 24-25.  It was up to the District to ensure Chloe's IEPs were calculated to confer on her a meaningful educational benefit; the District failed to do this despite, not because of, the parent's requests to do so.

It is not inappropriate for the Gibsons to continue to try to seek what their child needs through the process set out by Congress in enacting the IDEA.  Congress specifically created this procedural system with the knowledge that parents would be directly involved to assure appropriate services are provided to their disabled child.  *Rowley*, 458 U.S. at 183 ("Parents and guardians will not lack ardor in seeking to ensure that handicapped children receive all the benefits to which they are entitled by the Act.").  While the IDEA mandates that public educational agencies review and

revise annually an eligible child's IEP, "[n]either the IDEA nor its implementing regulations condition this—or any other—duty expressly imposed on a state or local educational agency upon parental cooperation or acquiescence in the agency's preferred course of action." *Anchorage Sch. Dist. v. M.P.*, No. 10-36065, 2012 U.S. App. LEXIS 14791, *2 (9th Cir. July 9, 2012). The fact that the Gibsons persistently sought to ensure that Chloe received an appropriate education using the procedures and remedies provided by the IDEA does not negate the District's obligations to provide a FAPE and develop an IEP that was designed for her to receive a meaningful educational benefit. *Warren G. v. Cumberland County Sch. Dist.*, 190 F. 3d 80, 86 (3rd Cir. 1999) ("Vigorous advocacy is an anticipated by-product of a policy encouraging parental involvement.").

Because of the District's repeated refusals to address their input for their daughter, the Gibsons had to repeat the same kinds of requests each school year. They had to document these requests through letters because they were getting no response to their verbal requests from the IEP team. In fact, the District asked the Gibsons to put their requests in writing instead of discussing them during the meetings. Tr. Vol. 9, p. 1700. As a result of the Gibsons' persistence, the District accused them of being hostile and harassing. Tr. Vol. 4, p. 646. However, when asked to explain what they meant by "hostile," Ms. Ryan explained that the Gibsons made comments such as, the team was not considering what Chloe needed or not following the law. Tr. Vol. 4, p. 647. Likewise, while Ms. Giesting testified that she was afraid of the Gibsons, when asked why, she stated that she feels the "adversarial relationship" and noted that it was because of the "stare down, shaking of their heads and the body language." Tr. Vol. 10, p. 2005. Notably, when asked if anyone had threatened her, she stated, "not in verbal terms." Tr. Vol. 10, p. 2006.

Admittedly, the Gibsons were frustrated with the unfruitful IEP meetings they had with the District.  They were frustrated when they were repeatedly met with comments from the District such as "[t]his is the IEP; if you don't like it, sue us."  Tr. Vol. 9, p. 1823.  They did seek legal assistance after the District brought in legal counsel to their IEP meetings.  They did continue to make requests because they felt that they had an obligation to their daughter to try to get her an appropriate education.  The Gibsons tried to have discussions, wrote letters and filed a complaint with the Ohio Department of Education to try to get the District to work with them.  Tr. Vol. 13, p. 2732.  They brought in outside experts.  Ex II, JJ.

The Gibsons did express their frustration at meetings, ask the team to follow the law, and got upset when the District refused to consider anything they wanted for their daughter.  Tr. Vol. 26, p. 5310.  They did ask for data to be provided and goals to be objectively measurable, as required under the IDEA.  Tr. Vol. 9, pp. 1795, 1808-09.  The Gibsons did not, however, threaten anyone.  Tr. Vol. 13, p. 2731.  They did not throw a fit or yell at people.  Tr. Vol. 13, p. 2730.  They tried to bring in outside agencies to help with the situation.  Tr. Vol. 13, p. 2732.  They simply were very persistent and kept trying to get what their daughter needed through the procedures set up for that purpose.

It made Chloe's teacher, Ms. Giesting, upset when her decisions were questioned.  Tr. Vol. 10, p. 2013.  It made her frustrated because lawyers were at the meetings.  Tr. Vol. 10, pp. 2004-2007.  Ms. Giesting may have felt that the Gibsons did not value what she was doing.  Tr. Vol. 10, pp. 2012-2015.  She may have felt that the Gibsons didn't appreciate her experience and skills.  *Id.*  The Gibsons simply kept asking for what they wanted for Chloe.  That is their responsibility as parents.

Further, while the IHO placed blame on the Gibsons, she concluded that the Gibsons

were correct in many of their assertions regarding the appropriateness of Chloe's IEP goals from 2007 to 2009. She specifically found that the goals written by the District were not sufficient to move Chloe forward. IHO Decision, p. 16, ¶. 19. She agreed that the District had kept objectives that Chloe had already clearly met. IHO Decision, p. 19. She agreed that the math goals were vague and unclear or in some cases not addressed at all, and ordered a math goal that addressed money skills, counting coins and skills for making purchases. IHO Decision p. 16, ¶. 20; p. 17, ¶ 2. She agreed with the Gibsons' assertions that Chloe was prompt dependent and that this was an impediment to her independence and ordered the district to develop a goal to address this in all areas of her education. IHO Decision, p.16, ¶. 21. She agreed with the parents that Chloe could read at a higher level than her reading goals indicated, IHO Decision, p. 14, ¶.8, and ordered that Chloe receive a structured reading program and a goal designed to increase her reading fluency. IHO Decision, p. 16, ¶ 1.

She ordered the District to revise Chloe's goals to increase the skills demanded and to include specific safety instruction and increase her physical stamina and strength. IHO Decision, p. 17, ¶ 4. She agreed that Chloe needed an assistive technology evaluation and related IEP goals, objective and related services to increase peer initiation and output based upon the result of that assessment. IHO Decision, p.17, ¶ 6. She agreed that the District had not done a thorough vocational assessment and ordered them to provide one. Tr. Vol. 6, p 898. These are all things the Gibsons had been asking for each school year for Chloe, to no avail. Certainly the Gibsons should not be faulted for failing to sit idly by while the District continually presented immeasurable goals that failed to move Chloe forward in her education.

It should also be noted that the District's repeated refusal to collaborate with the Gibsons caused the Gibson family considerable stress. Tr. Vol. 14, p. 2879. As a result of their efforts to get Chloe a meaningful education, they were treated differently than other parents. Tr. Vol. 14,

pp. 2897-2912. They were restricted from coming to the classroom. Tr. Vol. 14, p. 2899.

Rather than receiving notices in the same manner as other parents, the District began providing

the Gibsons with all notices by mail, certified mail and hand delivery to their home each time

they sent something. Tr. Vol. 20, pp. 4047-4049. The Gibsons were subjected to District staff

laughing at them when they requested services for their daughter. Tr. Vol. 9, p. 1814. They

were told that these requests were unrealistic, (Tr. Vol. 10, pp. 2010-2012), and that they were

just "frustrated with the cards they were dealt." Tr. Vol. 22, p. 4399. They were told their

daughter was too low functioning or it was not purposeful or meaningful for their daughter to be

taught basic skills, even though they knew this was not true. Tr. Vol. 14, pp. 2894-2895. They

had to struggle to get their daughter to go to school every day because she did not want to go to

the program at Anderson. Tr. Vol. 6, pp. 1046-1047.[49] They had to watch as Chloe regressed in

her skills (Tr. Vol. 9, p. 1748), and had to try to provide input to a District that did not have any

real expectations for Chloe.

The fact that the parents persistently sought to ensure their daughter got an appropriate

education using the procedures and remedies provided by the IDEA does not negate the district's

obligations to provide Chloe a FAPE, and develop an IEP that is designed for her to make

meaningful educational benefit. *Warren G.,* 190 F.3d at 86. It was up to the District to ensure

Chloe's IEPs were calculated to confer on her a meaningful educational benefit and this it did not

---

[49] Chloe was not happy in her segregated classroom at Anderson and was having problems with transitions between classes and activities. Tr. Vol. 9, p. 1705. As noted by Dr. Mattheis, Chloe has exhibited symptoms of depression related to this move to the Anderson classroom. Ex. II, p. 1. The parents provided this information to the team, but they did not even discuss this diagnosis or concern. Tr. Vol. 14, p. 2861. Marvel Slaughter noted that she appeared motivated to learn and try new things when she was in the community settings, Ex. SSSS, p. 6, and kept her head up. Tr. Vol. 26, p. 5204. Dr. Kopnick noted she presented like a different child when she was in the community and working on home activities where she was able to learn new things. Tr. Vol. 8, pp. 1512-1513. Even Dr. Foti-Hoff and Jane Gaspar noted that Chloe had a flat affect during the classroom activities they observed. Ex. II, p. 6 (Chloe had her head down and did not talk to anyone.), Ex. JJ, p. 2 (Chloe's affect was flat/lethargic and she displayed little spoken language but would respond to direct questions).

do.

**F.    The Gibsons should be granted prevailing party status with regard to the claims on which they prevailed at the IHO and SLRO level.**

The IDEA permits the discretionary award of reasonable attorney's fees to the parent of a child with a disability who is the prevailing party.  20 U.S.C. § 1415(i)(3)(B).  A plaintiff prevails when the "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."  *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992).  A "prevailing party" is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *Tompkins ex rel. A.T. v. Troy Sch. Dist.*, 199 Fed. Appx. 463, 465 (6th Cir. 2006), citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  In this case, as a result of the IHO decision, the District was forced to materially alter significant portions of the IEP, provide two assessments for Chloe and provide 480 hours of compensatory education.  The SLRO did not review the issues on which the Gibsons prevailed.  *See*, ECF No. 20, Order Granting Motion to Dismiss.

The IHO concluded that due to the many IEP deficiencies, Chloe had been denied a FAPE in the two years preceding the due process complaint filing.  IHO Decision, p. 16, ¶. 22.  In support of this conclusion, the IHO ordered the creation of a new prompt dependency goal that was to be incorporated into all aspects of Chloe's education.  IHO Decision, p. 17, ¶. 3.  The IHO determined that Chloe appeared capable of reading beyond the teacher-created word lists which were being utilized.  Consequently, she ordered that Chloe be provided with a structured reading program, a revised IEP goal, a minimum of 40 minutes of reading instruction per school day, and 240 hours of compensatory reading instruction.  IHO Decision, p. 14, ¶. 8; p. 16 ¶. 1; p.17 ¶. 5.

The IHO found that the IEP math goals were unclear and vague, and thus ordered IEP revision, a minimum of 40 minutes of math instruction per school day, and 240 hours of compensatory math instruction. IHO Decision, p. 17, ¶¶. 2,5. The decision held that Chloe's bilateral coordination and maneuvering were insufficient for Chloe to make progress and ordered the revision of those goals to increase the skills demanded and include specific safety instruction and increase stamina and strength. IHO Decision, p. 17, ¶. 4. The IHO found that the requested vocational assessment had not been provided and ordered that one be provided by the District. IHO Decision, p. 15, ¶. 16. Finally, the IHO ordered that the District provide an augmentative communication assessment and that goals, objectives, and related services be provided to increase speech initiation and output based upon the results of the assessment. IHO Decision, p.13, ¶. 6; p. 17, ¶. 6.

Since, as a result of the IHO's decision in the Gibsons' favor, the District had to materially change its position with regard to the provision of special education and related services, there should be no dispute that the Gibsons were the prevailing party with regard to these issues. They asked the IHO to determine their daughter did not receive a FAPE for the two years preceding the Due Process compliant and the IHO made that determination. IHO decision at p. 16. Virtually all of the relief ordered by the IHO addressed the specific requests the Gibsons made in their due process complaint. The Gibsons' due process request addressed an assistive technology evaluation, and vocational assessments, included claims related to Chloe's reading and math, counting and money, asked for a research based reading program, raised the issue of addressing Chloe's prompt dependency, and asked for measurable goals related to several of the areas ordered by the IHO (i.e. stranger danger, safety, communication goals). Ex. A, Due Process Complaint. Consequently, the Gibsons succeeded on these very significant

issues.

Although the IHO opined that the Gibsons were not entitled to be considered a prevailing party because of their vigorous and persistent advocacy, the mere fact that parents did not acquiesce to the District and used the procedures under the IDEA to challenge them does not prohibit their recovery of fees. *See, e.g., Bd. of Educ. of the County of Cabell v. Dienelt*, 843 F.2d 813, 815 (4th Cir. 1988). It is this very advocacy that the Supreme Court recognized as a necessary component of the IDEA procedures to ensure that children with disabilities, like Chloe, received the benefits and services Congress intended. See, *Rowley,* 458 U.S. at p.183.

The IHO herself found the IEPs were not designed to further Chloe's progress and held that the 2007-2008, 2008-2009 and 2009-2010 IEPs denied Chloe a FAPE. Despite the Gibsons' requests, the District stood firm with their IEPs and refused to allow the parents to have meaningful input into Chloe's education as required under the IDEA. Denying the Gibsons prevailing party status for doing exactly what Congress intended defeats the purposes of the IDEA and would serve an injustice in this case, especially where, as here, the Gibsons were justified, as concerned parents facing poor services from their child's school district in challenging the deficient IEPs being provided for their daughter.

**VII.    RELIEF REQUESTED**

Though Chloe's special education has been negatively affected since she began high school, the statute of limitations in cases under the IDEA only extends back two years from the filing of the due process complaint. 20 U.S.C. § 1415(b)(6)(B). Because the Gibsons filed the original due process complaint on December 14, 2009, Chloe's claims extend back to December 14, 2007. Chloe attended school in the District from 2007 through the end of the 2010 – 2011 school year, which is when the due process hearing and SLRO appeal took place.

At the beginning of the 2012 school year, the Gibsons opted out of the District school to

place Chloe in the Autism Scholarship Program[50] through the Ohio Department of Education. Since that time, Chloe has received her special education programming at the Autry Learning Center in Cincinnati, Ohio. However, when Chloe turns twenty-two years of age on December 16, 2012, her special education services through the Autry Learning Center will be discontinued as she will no longer be a student of an age  eligible  for special education services under the 20 U.S.C. § 1412(a)(1)(A) (FAPE must be available to children with disabilities age 3 through 21).

Chloe can, however, be awarded prospective compensatory education past the age of twenty-two.  Compensatory services can be made available to a student even after the age of twenty-two because they are intended to make up for what a school district did not provide during the time it was required to do so.  *Lester H. v. Gilhool*, 916 F.2d 865, 872-73 (3rd Cir. 1990), cert. denied, 499 U.S. 923 (1991).  *See also, Bd. of Educ. of Strongsville City Sch. Dist. v. Theado*, 566 N.E.2d 667, 668 (1991) ("We agree with the United States Court of Appeals in [*Lester H. v. Gilhool]* which held that *Honig* does not preclude an award of compensatory education beyond the age of entitlement for the denial of an appropriate education before age twenty-two") (internal citations omitted).  To hold otherwise would prevent students from receiving the services they need and allow schools to delay the process until the child "aged out" of special education to avoid having to compensate the child.  As the Court in *Cremeans* explained, "[s]ince the review process can be lengthy, this rationale would afford parents . . . a pyrrhic victory because if compensatory education is not allowed, [the] right to a free appropriate public education would be illusory."  *Cremeans v. Fairland Lo-Cal Sch. Dist. Bd. of Educ.*, 633 N.E.2d 570, 583 (4th Dist. 1993).

Compensatory education is appropriate in this case in order to make up for the special

---

[50] The Autism Scholarship Program gives parents of qualified children with autism $20,000 to send the child to a special education program other than that operated by the district of residence.  *See*, Ohio Department of Education website at http://www.ode.state.oh.us, keyword "autism scholarship;" *see also*, Ohio Rev. Code § 3310.41.

education services of which Chloe was deprived by the District. Compensatory education is an appropriate relief in the context of the IDEA because such an order "merely requires [the district] to belatedly pay expenses that it should have paid all along." *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986), *citing Burlington*, 471 U.S. 359; *see also, Big Beaver Falls Area Sch. Dist. v. Jackson*, 615 A.2d 910, 915 (Pa. 1992). Compensatory educational services may be awarded prospectively to compensate for a past deficient educational program under the IDEA. *Reid ex rel. Reid v. District of Columbia,* 401 F.3d 516, 522 (D.C. Cir. 2005); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). "Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. ex rel. R.G. v. Fort Bragg Dependent Sch*., 343 F.3d 295, 309 (4th Cir. 2003).

The Court has broad discretion to construct relief as it finds appropriate in this case. 20 U.S.C. § 1415(i)(2)(C)(iii); *Burlington*, 471 U.S. at 369, 374; *Draper v. Atlanta Indep. Sch. Sys.,* 480 F. Supp. 2d 1331, 1352-53 (N.D. Ga. 2007). Appropriate relief is designed to ensure that the student is appropriately educated within the meaning of the IDEA and to provide the educational benefits the school district should have supplied in the first place. *Reid*, 401 F.3d at 524. There is no equitable limitation on compensatory education. *Penn Trafford Sch. Dist. v. C.F.*, No. 04-1395, 2006 U.S. Dist. LEXIS 13581, *18-19 (W.D. Penn. March 28, 2006). "[N]o court addressing the issue of compensatory education has precluded this remedy solely because of the 'good faith' of a school district which nonetheless failed in its statutorily mandated duty to provide a [FAPE]." *Cremeans v. Fairland Local Sch. Dist. Bd. of Educ.*, 91 Ohio App. 668; 633 N.E.2d 570, 583 (Ohio Ct. App., Lawrence County 1993), citing *Burr v. Ambach*, 863 F.2d 1071,

1078 (2d Cir. 1988).

Accordingly, and for the foregoing reasons, the Gibsons respectfully request the following relief and findings:

**A.     Communication and assistive technology evaluations.**

The District denied Chloe a FAPE by inadequately addressing her communication needs and failing to provide an augmentative communication (assistive technology) evaluation and assistive technology service.  By failing to conduct the proper evaluation, the accompanying services, devices, and interventions to address her needs were never provided for Chloe. The Gibsons ask the Court to order the District to provide a comprehensive augmentative communication evaluation for Chloe, as was ordered by the IHO below.  They ask the Court to order that the evaluation be provided by a qualified independent evaluator, such as the Cincinnati Children's Hospital Perlman Center, and include actual use and trials of a variety of assistive technology devices and/or software programs designed to improve Chloe's verbal output and initiation difficulties, increase the length and depth of her communications, and remediate her prompt dependency, until a specific device and/or software or other devices/programs are found which prove beneficial to Chloe.  In order to compensate Chloe for services the District did not provide her from December 14, 2007 through June of 2011, the Gibsons ask the Court to order the District to cover all costs related to the evaluation, including: a) direct instruction in the use of the assistive technology; b) services and training for Chloe, the Gibsons and service providers; and c) the chosen devices and/or programs that will be provided to Chloe.

The Gibsons also ask the Court to order the District to provide compensatory speech and language services by an qualified independent provider, such as Cincinnati Children's Hospital Perlman Center,  to compensate Chloe for the years the District's speech program failed to help her make any progress in her communication skills.  The speech and language provider could

develop goals to address Chloe's issues with sentence length, initiation of communication, volume, and incorporate any other communication needs identified by the augmentative communication evaluation. The Gibsons request that the Court order that these compensatory speech and language services must be provided by the District two times per week for 30 minutes for the time period in which Chloe did not receive adequate speech services, which results in a total of 108 hours of speech services for Chloe: (One hour per week (180 day school year, divided by 5 days of school per week = 36 weeks per year x 3 years = 108). The Gibsons ask the Court to order that those services must begin by January 7th, 2013, and the District must provide transportation for Chloe to and from these services.

**B.**      **Transition and least restrictive environment.**

The District denied Chloe a FAPE when it failed to provide her with transition plans with appropriate goals that were based on an age-appropriate transition assessment. As a result of the District's failures regarding transition, Chloe missed important vocational skills development, vocational exploration, self-discovery of her preferences, interests and talents, and self-advocacy opportunities to help Chloe learn to make decisions about her own life relating to her future living, employment and community involvement. Because Chloe was not provided regular opportunities to interact with non-disabled peers in the general education settings to the maximum extent appropriate and she was not provided the necessary community based opportunities to learn and practice these skills, she needs to be provided community training opportunities which will help her to learn and model important social mores and rules of society, develop social skills in the community, enable her to model and practice socially acceptable peer and adult behaviors in the community, and provide her with opportunities to become integrated into and comfortable in the community. As discussed by Dr. Kopnick, in order for Chloe to become comfortable and integrated into the community vocationally and socially, she

needs to learn and practice these skills in the types of settings where she will be using the skills as an adult.

The Gibsons request that the Court order the District to provide Chloe with an extended community-based transition assessment (*See*, Ex. SSSS), develop a comprehensive transition plan to teach vocational skills, and provide her with extended vocational exploration and job-specific training to enable her to reach her vocational goals.  The Gibsons ask the Court to order that this evaluation and plan be provided by a qualified independent evaluator with expertise in vocational services for individuals with disabilities, and that the evaluator be agreed upon by the Gibsons, such as Goodwill Industries.  *See*, Ex. SSSS and TTTT  (Recommendations of Goodwill Industries).  The Gibsons ask the Court to order the District to ensure that the transition plan is based on the transition assessment and include site-specific extended job trials and direct instruction of adult life skills related to employment with qualified staff, and  also include goals for Chloe to learn the independence skills she needs to be ready to enter the Starfire U. program. *See*, Ex. FFFF.

For community training, the Gibsons ask the Court to order the District to provide educational resources such as curriculum, lessons, social stories, visual aids, charts, and video modeling, which would enable Chloe  to move toward  self-sufficiency or independence  in functional life skills to the degree that she is able within the community.  The Gibsons are asking the Court to Order the District to ensure the compensatory transition plan and services provided are consistent with the recommendations of Dr. Kopnick (Ex. ZZZ) and the Goodwill Industries recommendation which includes systematic teaching skills, collection and review of data based on objectives, and work to decrease prompt dependency and increase environmental awareness (crossing the street and other safety skills).

The Gibsons ask the Court to order the District to collaborate with the Gibsons, an expert (such as Dr. Kopnick), and a provider (such as Autry Learning Center), as agreed upon by the Gibsons, to determine and provide the number of compensatory education hours to be provided for Chloe to enable her to make the progress she would have made had she been provided the transition services she needed from December 14, 2007 to June 2011.  The Gibsons request the Court to order a minimum of 3 days per week, 3 hours per day for community and vocational training, for the three years that the District did not provide this education to Chloe.  The Gibsons request that the Court order the District to ensure that the compensatory services begin by January 15, 2013, and that transportation be provided by the District for Chloe to and from these services.

###### C.    Access to the general education curriculum.

Chloe was not provided a FAPE because the District failed to set meaningful goals aligned with the regular education curriculum.  She was not provided with an IEP that was reasonably calculated to provide an educational benefit that enabled her to make progress in the general education curriculum to the maximum extent appropriate.  Moreover, her educational services were based on her placement rather than her unique needs.

The Gibsons request that the Court order the District to provide compensatory educational services in the form of direct instruction that utilizes research-based methods to provide Chloe with access to the general education content standards that all children receive. The Gibsons request the Court to order the District to provide a special education instructor to teach Chloe the academic content standards consistent with the Turpin Life Skills Curriculum as described in Ex. AAAA.

In order to address the lack of  instruction in the general education content standards from 2007 to 2010, the Gibsons ask to Court to order the District to obtain an educational consultant

(such as Dr. Konick), agreed to by the Gibsons, who can consult with the compensatory special education instructor and the Gibsons, in order to construct objectively measurable goals and objectives that are intended to produce progress and aligned with the regular education curriculum (except for reading and math, since Chloe is currently receiving this compensatory instruction by the District's special education teacher, Michelle Dewhurst).  The consultant, the instructor and the Gibsons can determine the amount and frequency of services required to enable Chloe to be taught the curriculum and meet the goals and objectives.  The Gibsons request that the Court Order these services to begin by January 15, 2013, and that transportation be provided by the District for Chloe to and from these services.

> **D.** **Meaningful parental participation and training on the IDEA.**

Prior to and over the course of this litigation, the District has demonstrated a consistent lack of regard for the IDEA's meaningful participation requirement.  The District failed to allow the IEP team to meaningfully consider the recommendations of independent evaluators and adequately address the Gibson's concerns in the IEP process.  Since the Gibsons have been denied meaningful input into IEP development, the Court should order that they be given the opportunity to meaningfully participate in the development of the compensatory services and evaluations outlined above.

The Gibsons also request that the Court order that the District's staff be required to participate in additional training from the Ohio Department of Education regarding meaningful parental participation, transition services for individuals with disabilities, and the procedural requirements of the IDEA.

> **E.** **Attorney's fees.**

The Gibsons have done everything they could to obtain necessary services in order to meet Chloe's educational needs since 2006.  The Gibsons sought legal assistance from the Ohio

Legal Rights Service after the District retained their own counsel to attend IEP meetings.  The

Gibsons' repeated efforts to participate in their daughter's education and to ensure she received a

FAPE were thwarted at every step by the District.  They spent many years trying to work with

the District by attempting to bring in outside experts and utilizing the remedies under the IDEA

to try to resolve their concerns about Chloe's education amicably and collaboratively.  When

nothing else worked, they filed this due process complaint and spent twenty-six days in hearings

to detail the District's denial of a FAPE for their daughter.  They ultimately were successful in

the due process, as the IHO determined that all of Chloe's IEPs were inadequate and denied her a

FAPE.  While they were not successful on every claim in the administrative hearings, they did

receive substantial relief and changed the legal relationship with the District.  The Gibsons

should be awarded reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3) for the

significant issues on which they prevailed at the IHO and SLRO level.  In addition, if the

Gibsons prevail in this action they are also entitled to attorney's fees under 20 U.S.C. §

1415(i)(3) for the fees and costs incurred in this action.  The Gibsons ask the Court to order

reasonable fees and costs upon the submission of a fee application pursuant to S. D. Ohio Civ. R.

54.2.

**VIII.   CONCLUSION**

       For the foregoing reasons, the Gibsons respectfully ask that this Court grant them the

relief requested.

Respectfully submitted,

s/ Virginia Wilson
Virginia Wilson (0040466)
Trial Counsel for Plaintiffs
gwilson@olrs.state.oh.us
Jason C. Boylan (0082409)
jboylan@olrs.state.oh.us
**OHIO LEGAL RIGHTS SERVICE**

50 W. Broad Street, Suite 1400
Columbus, Ohio 43215-5923
(614) 466-7264  (Telephone)
(614) 644-1888  (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Plaintiffs' Merit Brief was served to counsel for all parties by operation of the Court's electronic filing system, on August 17, 2012.

s/ Virginia Wilson
Virginia Wilson (0040466)