IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jim and Laurie Gibson, as next friends of    :
Chloe Gibson,    :    Case No. 1:11-cv-329
   :
      Plaintiffs,    :    Chief Judge Susan J. Dlott
   :
      v.    :    Order Affirming in Part and
   :    Reversing in Part the Final Decision
Forest Hills School District Board of    :    of the State Level Review Officer
Education,    :
   :
      Defendant.    :

At all times relevant hereto, Chloe Gibson (DOB 12/16/1990) qualified as a student with disabilities as defined by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, *et seq.* Plaintiffs Jim and Laurie Gibson are her parents and legal guardians. Defendant Forest Hills School District ("Forest Hills"), a board of education organized under the laws of Ohio, is required to provide special education and related services to children with disabilities pursuant to Ohio Revised Code Chapter 3323. The Gibsons reside within the Forest Hills district.

On December 14, 2009, the Gibsons filed an administrative due process complaint with the Ohio Department of Education against Forest Hills alleging that the school district had failed to provide Chloe with a free appropriate public education. An independent hearing officer ("IHO"), and then a state level review officer ("SLRO") upon administrative appeal, found in favor of the Gibsons on some grounds, but against the Gibsons on other grounds. The Gibsons then initiated these judicial review proceedings of the SLRO Final Decision. The Gibsons seek the Court to provide them additional substantive relief and to award them attorney fees.

1

For the reasons that follow, the Court will **AFFIRM IN PART AND REVERSE IN PART** the SLRO Final Decision.

## I.    IDEA OVERVIEW

The IDEA provides federal funds to help states educate disabled students.  20 U.S.C. § 1411.  To qualify for federal funding, the IDEA requires states to provide "a free appropriate public education ... to all children with disabilities residing in the State between the ages of 3 and 21, inclusive."  *Id*. § 1412(a)(1)(A).  The IDEA also requires school districts to provide a written "individualized education program" ("IEP") for each eligible child with a disability.  *Id.* § 1414(d).  Finally, the IDEA requires that each child be educated in the "least restrictive environment" possible.  *Id*. § 1412(a)(5)(A).

The IDEA requirements are designed "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  *Id.* §1400(d)(1)(A).  The duty to provide a student with a "free appropriate public education" is often referred to as the duty to provide the student with a "FAPE."  The Supreme Court explained the manner by which a school district generally can satisfy this requirement:

> [I]t satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.  In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203–04 (1982).

In order to provide a FAPE, the state's local educational agencies—typically, the local school district—must create an IEP addressing each disabled child's particular needs. 20 U.S.C. § 1414(d). In addition, all participating educational agencies are required to "establish and maintain" certain "procedural safeguards" to ensure that all disabled children receive a FAPE. *Id.* § 1415(a). "An IEP provides a free appropriate public education if (1) the state has complied with the procedures set forth in the IDEA and (2) the IEP developed through the procedures is reasonably calculated to enable the child to receive educational benefits." *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999). The IEP must confer a "meaningful educational benefit" upon the disabled child "gauged in relation to the potential of the child at issue." *Woods v. Northport Pub. Schs.*, 487 F. App'x 968, 974–75 (6th Cir. 2012) (citing *Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840, 862 (6th Cir. 2004)).

The IDEA requires that each IEP must contain a specific statement of the child's current levels of academic achievement and functional performance, the child's measurable annual goals, including academic and functional goals, the proposed educational and supplementary aids and services to be provided, and appropriate measurable postsecondary goals and transition services beginning when the child turns sixteen. 20 U.S.C. § 1414(d)(1)(A). The school district must then review the IEP on at least an annual basis to make necessary adjustments and revisions. *Id.* § 1414(d)(4). The Court must evaluate the IEP based on the terms of the written IEP document and what the school district promised to provide in the written document, not what the school district might have provided or had the capacity to provide. *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001).

3

## II.    FACTUAL BACKGROUND

The SLRO provided comprehensive Findings of Facts in her Final Decision (No. 1:11-cv-628, Doc. 2-5) which the Court has verified and now reiterates below.  Any changes or additions to the SLRO's Findings of Facts are noted in brackets.[1]

[Chloe Gibson was born on December 16, 1990.] There is no dispute that [she] at the time of the Due Process Hearing was a twenty-year old child who had been eligible for special education services under federal and state law as a result of being a student with multiple disabilities.  (P.Ex. B1 at 29).  This disability was generally accepted to be based on the following diagnoses:  severe seizure disorder, mental retardation, and possible Pervasive Developmental Disorder, Not Otherwise Specified ("PDD NOS").  (Tr. 980; P.Ex. D1 at 19, 22; D.Ex 4 at 129).  Student exhibits characteristics of autism, such as her restricted and intense interests and difficulties handling changes in routine.  She exhibits significant delays in cognitive development and adaptive behavior skills.  (P.Ex. B1 at 19; [D.Ex. 12 at 283]).

The facts pertinent to the due process hearing took place in the 2007–2008, 2008–2009, 2009–2010 school years.  By way of background the following summary is helpful.

**Student's disability/functioning**

Student has required special education and related services to help her learn since she started school.  (Tr. 991).  She entered the District in 1998 when she was in the first grade.  She has attended school in the District continuously since that time and has attended high school at Anderson High School (AHS) since the 2006–2007 school year.  (Tr. 190 and [4126]).  Student's severe seizure disorder was diagnosed early on in her life and has been a significant medical issue and a significant influence on her educational progress, resulting in absences from school for significant portions of the school year.  (Tr. 4881; P.Ex. D1 at 19, 22).  In 2000, Student underwent brain surgery which resulted in a substantial decrease in the frequency of the seizures.  (Tr. 995,1023).  Seizures decreased to approximately once per month.  (P.Ex. D1 at 22).  At the time of the hearing, Student was reported to have experienced [less than one seizure per month].  (Tr. 1023 and 2738–41).  Student's performance in the classroom was described as inconsistent over the course of her educational experience, in part related to the seizures.  (Tr.115, 284; D.Ex. 12 at 282 and P.Ex. VVV #1, 2).  This is due in great part to the onset of the seizures and the recoupment from the seizure since Student experiences a period of lethargy and loses skills learned prior to the seizure, requiring re-teaching of those skills. (Tr. 115, 284, and D.Ex. l2).

---

[1]  Minor spelling, punctuation, and formatting changes have not been marked in brackets.

Student's deficits have been gross motor, fine motor, adaptive, and cognitive delays. (P.Ex. D2). Standardized assessments have been difficult based on Student's inability to complete standardized testing. The evaluations that have been done place Student's I.Q. in the moderate mental retardation range. (Tr. 4893–94, 4916–18, 4924; D.Ex. 74 at 664). Her adaptive skills have been estimated on the Vineland Adaptive Behavior Scale to be within the three to five age range. (Tr. 4929; D.Ex. 74 at 662). Student also has significant communication deficits, particularly with expressive language. Her vocabulary is limited, she speaks in three to five word phrases, she usually speaks in a low voice, and rarely initiates conversation. (Tr. 512; P.Ex. VVV #1–3). Student demonstrates limited strength and stamina. (Tr. 4737, 4828[–30]; D.Ex. 12 at 282). She is physically big, and her walking pace is generally slow, but she can walk quickly when sufficiently motivated by the destination or purpose, such as shopping or to eat. (Tr. 126, 4737, 4829–30 and 4846).

Up until the time of the hearing, part of Student's educational program has involved help with grooming and other self-care issues. She is assisted with hair, tooth brushing and toileting, although she has shown increased independence in these areas over the years. [Tr. 4759–61; D.Ex. 11 at 220; D.Ex. 12 at 258; D.Ex. 13 at 286].

Student exhibited behaviors which included severe difficulty with transitions, refusals, and aggressive behaviors including hitting and scratching, in the home and school. Typically, she wears a helmet when in public or in the school, outside of the classroom for safety in the event of a seizure. She must always be accompanied by an adult for purposes of safety due to possible seizures as well as her inability to problem solve due to her cognitive limitations. Student is largely prompt dependent in many tasks, but her need for prompts varies from day to day. (Tr. 4180–81, 4663, 4760; D.Ex. 12 at 258).

Academically, Student has deficits across the board. Parents have consistently been concerned, particularly about her reading and math skills. She reads at approximately a pre-primer level. (Tr. 392, 4661). In sixth grade, she was taught reading using the Edmark reading program, a sight word reading approach. She completed the second level of that program, which placed her on a second or third grade reading level. (Tr. 1005). Parents have consistently requested that student be taught a research based reading program like Edmark in an attempt to increase reading fluency, while the District has maintained that their reading program is appropriate and that Student should be taught to read words that are meaningful to her environment to help her to navigate daily living. (Tr. 437, 690–96).

In math, Student has limited math skills. She can count to 10, and to 20 only with substantial prompts. (P.Ex. VVV #2, 3). While she has made some progress in recognition of coins, she does not have mastery of their values, cannot

add coins, and cannot independently problem solve to determine how much money is required to make a purchase.  (Tr. 4969; P.Ex. VVV #2).

Student had a history of difficulty in managing her environment, difficulty maneuvering around obstacles in her environment, and using both hands on tasks (bilateral coordination).  Student has shown much improvement in these areas, but these skills are still prompt dependent and inconsistent based upon fatigue and seizures cycles.  (D.Ex. 12 at [281–]82; P.Ex. VVV #l, 2).  The OT still works on these skills, but as Student improves, the OT changes the objectives up a bit to make the skill more complex and higher requirements for mastery.  (Tr. 4741).  Student has shown improvement in all deficit areas during her education at the District, but the numerous evaluations that have been done of Student from an early age show that the fundamentals of the deficits have remained constant since she was a very young age.  (Tr. 5025; P.Exs. D1, D2; D.Ex. 4).

The relationship between the Parents and the District has been difficult and acrimonious, particularly after Student's placement at Anderson H.S.  (Tr. 2388, 3258–60).  Much of the acrimony in this relationship arises from the different visions that the parties have considering Student's capabilities and future.  Parents have been consistent advocates for their daughter, advocating that Student receive an educational program involving increased academically challenging work for Student.  They more recently have contemplated a future of her attendance at a post-secondary university, Starfire U., for children with disabilities, and after that, competitive work.  (P.Exs. B1, B2, B3, B4, D1, D2; D.Ex. 4 at 124; D.Ex. 13).  The District promotes an educational program that will give Student functional skills arising from a vision for Student to work in a recreational/leisure setting and live with others.  (P.Exs. B1, B2, B3, B4, Dl, D2; D.Ex. 13).

The history is one of numerous long IEP meetings, many including the attendance of counsel for both parties and occasionally other advocates for Parents.  Parents called for many of the meetings.  Parents have made progress difficult by making numerous and ever-changing demands and by raising new topics in meetings so that the planned agenda could not be completed in the time allotted.  (Tr. 1772–75, [1952], 2013–2014, and 3248–3260).  In addition to the team meetings, Parents and or their counsel, sent letters between meetings requesting additions and modifications of the IEPs.  The relationship between Parents and the District resulted in special education services being furnished Student without any consent of the Parents.  Although one or both of the Parents participated in the IEP teams, they repeatedly refused to sign the section marked "consent for services."  (Tr. 2295, 3252–53; D.Ex. 9, 10, 11, 13).  It is difficult to ascertain which aspects of the IEPs Parents disagree with over the years as they have not attached any document to the IEPs indicating their area of disagreement.

Student's special education teacher felt threatened and intimidated by Parents.  The IHO noted in her findings that Father glared at witnesses and often

appeared angry when District employees testified. Mother testified that . . . District witness [lied] and described [ ] District employees as despicable and malicious. (IHO Finding 8, p.8; Tr. 2808, 2844–57, 2883–84 and 3088[–89]). The following is a summary of Student's recent educational programming.

**Elementary School**

Student attended a life skills classroom at Nagel Middle School for the eighth grade. This classroom involved many trips out into the community in which students obtained functional life skills, and developed peer relationships. Student was re-evaluated by the District for special education services in March, 2006, while an 8th grader at Nagel Elementary. (P.Ex. D2). The Evaluation Team Report (ETR) completed in March 2006, noted that Student continues to meet the criteria for multiple disabilities due to her deficits in communication, adaptive skills, gross motor, sensory needs, pre-academic skills, and pre-vocational skills that require specialized instruction for all areas. (*Id.*).

According to this ETR, Student has a functional curriculum including food preparation, personal hygiene, functional writing, sight-word recognition, a primer level reading program, calendar activities and counting/sorting/ environmental math tasks. Student participates in community-based educational activities, outings, and tasks. A vocational assessment was done as part of the ETR. (Tr. l46). In addition, Student receives Occupational Therapy (OT), Physical Therapy (PT), and Speech/Language Therapy (S/LT) to address fine motor control, tactile defensiveness/strength, gross motor control/bilateral coordination/strength, and eye contact/device use/social and academic scripts respectively. Student was also noted to participate in some pre-vocational training tasks with fewer prompts and with more endurance. The ETR mentioned a trial that had occurred with a communication device called the Black Hawk, borrowed from another student. The teacher stated that Student seemed to enjoy the device, but during the trial she missed a week of school due to a seizure and during other times the device was left at home so the team could not assess her use of the device and summarized that it was unclear if Student would continue to be motivated by the device or tire of it.

In the classroom, Student has a daily sensory diet that includes age appropriate activities such as art and gym classes year around, keyboarding, and use of the sensory room. Student was noted to respond and perform well in a familiar environment and with a routine/schedule. She requires advanced notice about change, and participated in individual or small group instruction. The team concluded that her adaptive skills are most impacted by her lower level of expressive vocabulary, prompt dependency, need for repeated exposure to concepts, difficulties problem-solving and entering new situations. (*Id.*).

Based on this ETR, an IEP team meeting occurred in April, 2006 to plan for Student's services from May 26, 2006 to May 26, 2007. Five goals were

outlined in this IEP including completing academic and pre-vocational tasks, identifying and organizing objects to use the [objects] functionally, increasing her reading skills, interacting appropriately with peers and adults throughout her school day, and increasing her life skills. A number of benchmarks or short term objectives were outlined to assist in reaching these goals. A behavior support plan was included in this IEP. (P.Ex. B5). The IEP mentions the "talker" that was recently introduced. Placement for Student was in the AHS multi-handicapped classroom, with OT and PT services for 120 minutes a month, SL services for 240 minutes a month, (direct and collaborative, individual, small or large group) with sensory diet provided throughout the day, social stories and verbal, picture posture cues. (*Id.*).

In the life skills section of the IEP, it is noted that Student had been more responsible about wearing her helmet, she followed a picture self-care checklist daily and independently completed all items except she still needed physical assistance to brush her teeth and hair appropriately. With prompts she was observed to get her own snacks, she knew her way around the building, can open doors and will at times keep it open for a friend. She continued to work on deficits in the social/behavior area, math, gross and fine motor, reading, and communication. She was still observed to say no or swat people with her hand if she felt like it. She showed improvement on raising her head, taking turns and using eye contact with peers. Her skills were inconsistent. (P.Ex. B5 at 2).

In June, 2007, Parents filed a complaint with the Ohio Department of Education (ODE) [alleging that Forest Hills denied Chloe a free appropriate public education ("FAPE") in numerous areas.] (P.Ex. III). That complaint was processed and, as a result, the District was ordered to provide compensatory educational services.

**2006–2007 & 2007–2008 School Years**

Student transitioned to AHS from Nagel Middle School. (Tr. 150). She was placed in the multidisabilities self-contained class of special education teacher, Susie Giesting, and three fulltime aides. (Tr. 4153). Parents disagreed with the placement of Student at AHS. (Tr. 174). Parents preferred that their daughter be placed in the Turpin High School life skills classroom, a program that was in its developmental stages at the time of Student's transition to high school. (Tr. 213). The District did not agree with this placement and believed that the placement in the multidisabilities class at AHS was the appropriate placement for Student. (Tr. 150, 209). The class also includes an active peer-partner program in which typically developing students volunteer to assist in the class in lieu of a study hall. (Tr. 4154–56).

Student's educational program was governed by the IEP that had been drafted at the end of the eighth grade. (P.Ex. B5). Student's transition to 9th grade was difficult and Student engaged in aggressive behavior and was resistant

8

to work. [Tr. 1191, 2025–29, 2084, 2109]. Student continued in the multidisabilities classroom at AHS in the 10th grade, pursuant to an IEP that was modified several times during the year. (P.Exs. B2, B3, B4). The three goals outlined in [the final] IEP addressed Student's need to increase appropriate interactions with peers and adults, to increase her sight word/functional vocabulary by reading selected texts for pleasure, and to initiate and demonstrate a variety of daily living and self-help activities to promote functional independence. (D.Ex. 10). The measurable annual goals were identified as: (A.) following a structured special activity and a verbal prompt, Student will share an event with a peer or adult through various communicative methods (verbal and written), three out of five opportunities weekly, (B.) Student will increase her sight word/functional vocabulary and communication skills for safety, socialization, functional living and recreation, at 75% accuracy and (C.) when presented with daily opportunities to participate in a selected, purposeful, or functional activity throughout the school day, Student will complete the task 100% of her opportunities. The three goals were supported by a number of benchmarks or short-term objectives. Related services of PT and OT were provided for. At Parents' request, a goal related to bilateral coordination was added to the 2007–2008 IEP. (P.Ex. AAA at 2; Tr. 2204–10). As previously, a full-time adult aide throughout her 6.5 hour school day was provided. (D.Ex. 10 at 211).

The IEP addressed transition services for Student. (D.Ex. 10 at 213). She was to participate in in-school, work-based, learning experiences with supervision and support, daily functional activities with support throughout her school day to promote personal care and independence, and recreational/leisure activities for enjoyment and pleasure with support. A functional behavior assessment was conducted due to Student's physical aggression and obstinance in the classroom. A goal was outlined that she would participate throughout her school day with decreased refusals and aggressive behavior, utilizing effective behavior, utilizing effective anger management strategies to decrease instances of aggression towards others.

Parents requested an augmentative communication assessment (also called an assistive technology assessment) from the District in December, 2007. (P.Ex. AAA, p.2). Parents also claim that the IEP team determined, by the end of the eighth grade, that Student should be provided an assistive technology assessment. [The SLRO concluded that this was] inaccurate. [However, the IEP with a meeting date of April 6, 2006 stated that Chloe had begun using a talker or communicative device in the eighth grade and that Chloe "seem[ed] to benefit from the verbal output."] (P.Ex. B5 at [1–2, 8]).

[At the hearing before the IHO,] District personnel, including S/L therapist, stated that they did not believe that she would benefit from such a device because "her voice was her primary communication mode" and "she is understood" so the value of the assessment was not seen. (Tr. 513, 753). Betsy

Ryan, the director of student services for Forest Hills, stated that after Chloe had tried the talker in the eighth grade, she became "more verbal with her voice" and there was "obviously concern about substituting that verbal language with the use of a device." (Tr. 514.)  The District did look into providing such an assessment, however, but Parents said that they were pursuing it on a private basis. (Tr. 513–14.)  The District was subsequently contacted by Cincinnati Children's Hospital regarding such an evaluation.  After completing the requested paperwork, the District heard nothing further regarding the evaluation. (Tr. 514, 4217).  Such an assessment would be of value to determine if there are strategies or devices which could increase Student's initiation of and participation in conversation and the expression of her needs and desires. (Tr. 4217, 5019).  This assessment had not been done as of the time of the hearing, which led the IHO to order one.

**2008–2009 School Year**

Student continued her 2008–2009 school year (11th grade) in Ms. Geisting's multidisabilities resource room at AHS for the 11th grade under an IEP. (P.Ex. B9).  Goal No. 1 of Student's 2008–2009 IEP addresses the use of both of her hands in various work-related and daily living activities. (D.Ex. 11 at 222).  At Parent's request, a community involvement goal was added to her IEP in October of 2008, which was approved by the IEP team due to Student's noted progress in transitioning from one activity to the other and her becoming more flexible and willing to alter her routine. (P.Ex. B9 at 3, 33).  Student was continuing to work on her functional math goals, consisting of being able to purchase items at a vending machine or selected community sites, with assistance.  Goal 4 of her IEP was her math goal.  It provided that she match money cards to make purchases with 90% accuracy and that she would continue to work on purchasing items up to $5.00. (*Id.* at 10).

A re-evaluation of Student's progress was done near the end of the year, concluding June 1st, 2009. (P.Ex. D1).  Parents participated and agreed she has a disability and is eligible for special education but disagreed with the assessment. (*Id.* at 29).  This ETR assessed Student's functioning in the following areas: functional academic skills and performance, communication skills, social-emotional behavior, sensorimotor functioning, adaptive behavior, and vocational skills/transition planning.  She could now recognize functional vocabulary/safety words of 149 with a 93% accuracy, she could respond to a peer or adult greeting or question with a 93% average on 4 out of 5 trials, she could recognize 23 new words (from 6–23 between the second and fourth quarter).  She was using a computer word program, her communication skills had improved, particularly when humor was involved, enjoyed being around people and she respond well within her highly structured setting.

In terms of behavior, she had shown improvement and the behavior plan had not been used during the 11th grade.  She was becoming more flexible in her schedule to decrease her repetitive behaviors.  She was willing to accept an

alternative if the repetitive item was removed.  In terms of gross motor activity she was noted to fatigue quickly but showed improvement in navigating through the school hallways, participating in regular dance class twice a week with aide support.  She also engaged in adaptive physical education.  She was improving in her fine motor activities making use of office equipment in the classroom, preparing snacks, and using a computer mouse and language master.  She still exhibited lower level of expressive vocabulary, prompt dependency, and difficulty problem solving.  She still needed assistance with grooming activities.

At the end of the 11th grade she still needed a velcro picture schedule to assist her in following her routine, waited for assistance, needed prompting, and positive reinforcement for smooth transitions before, during, and after all activities.  Her endurance and degree of participation varied day to day.  Based on Parents' request, Student had developed a community plan which was implemented to increase her stamina and pace in transition.  This involved walking the high school track and exercising, walking to the community administration building to deliver mail, walking out in the community to stores.  She did not, however, understand safety issues while en route to and from the store.

A cognitive assessment was performed using a modified assessment designed for much younger children.  Student was noted to continue to demonstrate significant delays in cognitive development and adaptive behavior skills, with one assessment resulting in an age equivalent of 3.4 years.  The delays adversely affect the rate and complexity of what she learns, her level of independence, and her interactions with peers and adults.  These delays in cognitive, social-emotional, communication, motor functioning, and daily living skills are compounded by her seizure disorder and the characteristics of autism that she displays.  (P.Ex. D1 at 19).  Educational recommendations were to continue to require specialized instruction that focuses on functional life skills, opportunities to interact with typically developing peers, continued participation in the dance class, allowing her to explore jobs within the school campus that would allow her to get exercise, interact with others, and have a meaningful job, such as delivering things to administration.  The school psychologist also recommended that Parents should increase Student's structure and expectations in the home with specific recommendations on those types of things.  (*Id.*).  In the home, Student was observed to get rewards without having to work for them.  (Tr. 1393–94).

During the summer of 2009, Student was provided compensatory educational services by the District pursuant to the order of the ODE in response to Parents' complaint.  These services were withdrawn by the District during the summer as a result of inappropriate requests by Laurie Gibson [to] the District paraprofessional, Pat Gilden, resulting in Ms. Gilden's request that she be removed from a portion of her duties.  (Tr. 1644–66; P.Ex. YYY).  One request

Laurie Gibson made was for Gilden to write a letter stating that Forest Hills was not providing the correct services to Chloe.  (Tr. 1659).

**2009–2010 School Year**

An IEP meeting was held on October 27, 2009.  (D.Ex. 13).  In the "future planning" section, Parents envisioned Student living and working in a supported environment, improving on math and reading skills, engaging in new activities, learning from her experiences, adapting to changes, and socializing with others. In terms of future planning, Parents indicated that they would like to see her attend Starfire U., a post-secondary program through HCDDS (formerly MRDD), and they wanted her to learn the skills in the l2th grade so that she can attend the Starfire U.  In contrast, the District envisions Student living in a supportive/assisted living environment.  The District believes she will be successful and happy participating in the small group recreational/leisure environment (i.e. adult program) where she would have opportunities to interact socially with other adults and enjoy activities that are related to such interests as music, dance, magazines/books, movies, art, cooking, and exercising.  The IEP indicated that this disagreement related to the future planning-vision.  (*Id.* at 285).

According to this IEP, Student continued to show increasing improvement in socialization, independence, and behavior control.  It was recommended that the same type of supports should continue to be offered to her.  In terms of transition, due to her age, the IEP indicated that [alternate] assessments had occurred, particularly referencing the ETR at the end of the previous year.  (*Id.* at 287).  The focus was again on Student's acquisition of essential life skills and a functional academic curriculum.  She was receiving direct instruction in all academic content areas.  Further, she was continuing to participate in work-based learning tasks with adult support and supervision.  Again, her level of participation varied from day to day due to her stamina and energy issues.

The transition goals outlined were for Student to participate in a supported-assisted adult programs, and, in terms of employment, to participate in a supported volunteer/non-competitive activity and to live in a supportive living environment.  Transition services and activities were outlined under each transition goal.  Other non-transition goals in the area of reading/language arts/expressive language, adaptive skills/writing, and science/social studies continued to be addressed, including increasing her functional vocabulary and communication skills to 250 words for socialization, safety, and functional living that she recognizes and uses with 80% accuracy.  In the adaptive skills area, Student when given work-based, self-care, and/or recreational tasks will use bilateral coordination to complete the task 80% of the time.  In the science/social studies goal, Student will travel in her environment managing materials/ equipment avoiding obstacles (people, objects, cars) and navigate safely to promote healthy living and exercise at least 50% of the time.  Each of these three goals had measurable objectives and benchmarks listed.  Student was to continue

to receive OT (90 minutes per [month]) to address her fine motor, bilateral coordination, sensory needs, and functional in life skill tasks, and speech and language services to provide models/prompts to initiate and respond to conversations, answer questions, and provide reading assistance (120 minutes per month).  (*Id.* at 293).

The goal of "bilateral coordination" remained in the 2009–2010 IEP as a result of the Parents' request.  (*Id.* at 291).  When Student does any activity, she still tends to use only her left hand and she will keep her right hand down.  (Tr. 4713).  Goal No. 2 addresses her bilateral coordination in terms of her use of both hands together when performing various self-care, and work related or recreational activities.  (Tr. 4740–41; D.Ex. 13 at 291).  This goal was expanded this year by increasing the number of and type of two-handed activities, and by decreasing the prompts needed in using both hands in the activities.  (D.Ex. l3 at 291).

The IEP further provided for assistive technology in the form of Touchscreen computer monitors, visual aides, schedule, and specialized writing computer software.  [(*Id.* at 293).]  It also provided that Student would transition to the adult services coordinator through HCDDS.  [(*Id.* at 294).]  Student would continue to participate in the regular ed dance class and would interact with non-disabled peers throughout her school day in her resource room and on the school campus.  [(*Id.* at 292, 295).]  Attached to the IEP was the community involvement summary indicating what she had been doing in terms of community experiences.  Student was turning eighteen in this school year, on December 6, and a form transitioning the rights to the Student was signed by both Parents and also attached to the IEP.  There was no goal for math skills in the written IEP.

Student had made significant progress in transitioning, functional independence, daily living skills and community skills.  ([*E.g.*,] Tr. 4170–97).  Parents have over the years requested that Student be taught to memorize her personal information, stranger danger concepts, and that she be taught to tell time.  There is no evidence that she will ever be able to be left alone, so that knowing stranger danger concepts is not a big priority and, given her cognitive limitations, teaching her to grasp the concept of time beyond reading numbers on a digital clock is not functional for her in light of all of her other academic and functional needs.  [(Tr. 4193–96.)]

The District contracted with a transition specialist through HCDDS to develop a transition plan for Student.  Jack Darland has observed Student and made recommendations for transition after high school.  (Tr. 4795–4822).  He recommended that she transition to a non-vocational adult program with a work component.  (Tr. 4810–11).  Parents disagree with that recommendation and prefer that Student attend Starfire U.  (P.Ex. RRRR; D.Ex.13).  Student is unlikely able to cognitively understand the concept of transition to life beyond school or to express her preferences and desires for her future.

13

> The vocational assessment completed by Goodwill Industries indicates that while Student is capable of work and appears to enjoy working, she requires substantial supervision and prompting and is unable to work independently. Further, her work pace is substantially slower than competitive times on all job tasks assessed. (P.Exs. SSSS, TTTT, UUUU). Student would be most appropriately placed in a non-vocational adult program with a work component, as recommended by the District. (Tr. 5025–27).

(No. 1:11-cv-628, Doc. 2-5 at 155–70.)

## III. PROCEDURAL HISTORY

### A. State Administrative Proceedings

#### 1. Independent Hearing Officer

On December 14, 2009, the Gibsons filed a written request for a due process hearing before the Ohio Department of Education pursuant to Ohio Administrative Code 3301-51-05. (No. 1:11-cv-628, Doc. 2-1.) The due process hearing took place before an IHO, Tobie Braverman, over the course of more than twenty non-consecutive days from May 3, 2010 through December 6, 2010. (No. 1:11-cv-628, Doc. 2-2 at 36.) On April 4, 2011, the IHO issued the IHO Decision. (*Id.*)

The IHO determined that Forest Hills had denied Chloe a free appropriate public education ("FAPE") for the two years preceding the request for due process because of deficiencies in her IEPs. She ordered that Forest Hills had to provide Chloe with 240 hours compensatory education in both reading and math to remediate the denial of FAPE. (*Id.* at 50–51.) Further, Forest Hills also had to provide Chloe with IEP goals to increase her reading fluency and math skills. The IEP goals for reading had to be "designed to increase reading fluency based upon a structured reading program" and a math goal had to be "designed to increase number and money skills including counting, recognition of coins and skills for making

14

purchases." (*Id.*)  She ordered that Forest Hills provide Chloe with an IEP goal "to decrease prompt dependency in all aspects of her education." (*Id.*)

The IHO also concluded that Chloe's placement in the Anderson H.S. multiple disabilities classroom was an appropriate least restrictive environment ("LRE"). (*Id.* at 47.)  She found that the Turpin H.S. life skills program was not an appropriate LRE for Chloe. (*Id.*)  The IHO ordered that an assistive technology assessment be conducted for Chloe and that Forest Hills had to provide "goals, objectives and related services to increase [her] speech initiation and output based upon the results of the assessment." (*Id.*)

Next, the IHO found that the Gibsons were not denied participation in the IEP process. (*Id.* at 47.)  She found that the Gibsons "failed to present evidence to demonstrate the necessity for a behavior plan or need for a goal for transitions." (*Id.*)  Finally, the IHO held that the Gibsons were not prevailing parties, despite the finding that Forest Hills had denied Chloe a FAPE in some areas, because, in simplified terms, "[t]hey bear some of the responsibility for [Forest Hills'] difficulty in creating an IEP and providing services to [Chloe]." (*Id.* at 58–59.)

### 2.    State Level Review Officer

On or about May 19, 2011, the Gibsons filed a timely appeal of the IHO Decision with the Ohio Department of Education.  (No. 1:11-cv-628, Doc. 2-3.)  Monica R. Bohlen was appointed as the SLRO to review the IHO Decision.  Forest Hills did not file a separate notice of appeal of the IHO Decision.  Nonetheless, Forest Hills argued to the SLRO that "the IHO's finding that Forest Hills had failed to provide [Chloe] a free appropriate public education . . . was not supported by the evidence."  (No. 1:11-cv-628, Doc. 1 at 8–9.)[1]  Forest Hills further argued

---

[1] Neither party filed a copy of Forest Hills's brief to the SLRO with this Court.  However, the Gibsons do not challenge Forest Hills's allegation that it made this argument in their brief to the SLRO.

that the SLRO should reverse the portion of the IHO Decision requiring Forest Hills to provide Chloe with IEP goals for, and compensatory education in, reading and math. (*Id.*)

The SLRO issued the SLRO Final Decision on August 15, 2011 affirming in part and modifying in part the IHO Decision. (No. 1:11-cv-628, Doc. 2-5.) The SLRO determined that Forest Hills had offered Chloe a FAPE during the relevant time period except in the areas of reading and math. (*Id.* 183–85.) She determined that Chloe's placement in the self-contained classroom at Anderson H.S. had been educationally appropriate. (*Id.* at 183.)

The SLRO concluded that Chloe had "received appropriate communication services during the two years prior to filing the due process request" and that the Forest Hills's failure to conduct an assistive technology assessment did not constitute a denial of FAPE. (*Id.* at 174.) The SLRO noted that there had been no finding of fact that an assistive technology device would benefit Chloe. (*Id.*)

The SLRO also determined that the IHO had erred to the extent that she had found that Forest Hills had to provide Chloe with a vocational assessment. (*Id.* at 174.) She determined that Forest Hills had complied with the Ohio Administrative Code 3301-51-07(H)(2)(b)(i) requirement to provide appropriate measurable post-secondary transition goals. (*Id.* at 175.) She stated that "[a]ll of the pertinent IEPs have included appropriate measurable post-secondary goals based upon age-appropriate transition assessments" and that the "appropriateness of the IEP team's goals in this area have been borne out by both Mr. Darland's assessment and that of Goodwill Industries." (*Id.*)

In regards to other services, the SLRO concluded that the IHO had erred when she concluded that the IEPs failed to provide sufficiently challenging physical therapy and occupational therapy goals. (*Id.* at 176.) The IHO had determined that Chloe had mastered

goals related to bilateral coordination and traveling in her environment while managing materials and equipment.  (*Id.*)  The SLRO found that Chloe had made progress in those areas, but still showed inconsistency.  "Each year the objectives for these goals had been appropriately updated and made more challenging to move [Chloe] forward."  (*Id.*)  Therefore, the SLRO concluded that Chloe had not been denied FAPE in the areas of physical therapy and occupational therapy.

Turning to the issue of parental participation in the IEP process, the SLRO determined that there was "overwhelming" evidence that the Gibsons had meaningful participation on the IEP team.  (*Id.* at 178.)  The SLRO characterized the parents as adopting an "us vs. them" posture and as making "multiple and ever-changing requests."  (*Id.* at 178–79.)  The SLRO also pointed out that the IEP teams had adopted the Gibsons' requests to add goals to the IEPs for community experience, bilateral coordination, and spreading activities.  (*Id.* at 179.)  Next, the SLRO disagreed with the Gibsons' related contention that the IEP team should have included a regular education teacher.  (*Id.* at 179.)  She stated that there was no procedural violation because participation of a regular education teacher "would [not] have been relevant to [Chloe's] IEP" given that she only took one regular education class, the dance class.  (*Id.*)

The SLRO also determined that Forest Hills had not denied Chloe a FAPE insofar as decreasing prompt dependency was not included as an express goal on her IEPs.  (*Id.* at 184.)  The SLRO concluded that the evidence demonstrated that Chloe was prompt dependent, but that her prompt dependency "had been substantially reduced over the years."  (*Id.*)  She added that "[d]ecreasing prompt dependency was a part of [Chloe's] educational program across all areas."  (*Id.*)

Finally, the SLRO agreed that the Gibsons were not prevailing parties for the purpose of awarding attorney fees.  (*Id.* at 182–83.)  However, the SLRO did not reverse the IHO's order

17

requiring Forest Hills to include specific reading and math goals in Chloe's future IEPs and requiring Forest Hills to provide Chloe with compensatory education in reading and math. (*Id.* at 172, 183.) The SLRO stated in relevant part that "[Forest Hills] also disputes the factual findings and conclusions of law of the IHO in finding any violation of FAPE and in ordering any compensatory educational services, but [Forest Hills] chose not to appeal the IHO decision and, thus, these assertions will not be reviewed." (*Id.* at 172.)

**B.     Federal Court Proceedings**

The Gibsons filed a Complaint for Attorneys Fees (No. 1:11-cv-329, Doc. 3) on June 7, 2011, after the IHO Decision was issued, but before the SLRO Final Decision was issued. The Gibsons asserted that they are prevailing parties and are entitled to attorney fees pursuant to the IDEA, 20 U.S.C. § 1415(i)(3)(B)(i).

On September 13, 2011, Forest Hills initiated a separate suit by filing a Complaint/Notice of Appeal (No. 1:11-cv-628, Doc. 1) asserting that it was an aggrieved party entitled to judicial review pursuant to the IDEA, 20 U.S.C. § 1415(i)(2)(A).[2] Forest Hills asserted that the SLRO had erred when she held that the IEPs which Forest Hills had implemented for Chloe were deficient in the areas of reading and math and when she awarded Chloe compensatory education

---

[2]  The IDEA provides for the right to federal judicial review of the state administrative decision:

> (2) Right to bring civil action
> (A) In general
> Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1315(i)(2)(A).

in those subjects.  (No. 1:11-cv-628, Doc. 1 at 10.)  The Gibsons responded by filing a Motion to

Dismiss (No. 1:11-cv-628, Doc. 2) on the basis of failure to exhaust administrative remedies.

The Gibsons also filed a Counterclaim (No. 1:11-cv-628, Doc. 3) against Forest Hills.

The Gibsons alleged in five counterclaims that the SLRO had erred to the extent that she did not

require Forest Hills to provide Chloe with compensatory relief related to the following areas:

(1) assistive technology; (2) transition services; (3) least restrictive environment; (4) denial of

FAPE; and (5) denial of meaningful parental participation.  (*Id.*)  The Gibsons also alleged that

the SLRO had erred by not determining that they were entitled to attorney fees as the prevailing

parties.  (*Id.* at 212.)[3]  The Court consolidated Case No. 1:11-cv-329 and Case No. 1:11-cv-628

on December 5, 2011.  (Doc. 17.)

On April 10, 2012, the Court granted the Gibsons' Motion to Dismiss filed in Case

No. 1:11-cv-628.  The Court held that Forest Hills had failed to exhaust its administrative

remedies by failing to appeal to the SLRO the reading and math issues decided in Chloe's favor

by the IHO.  (Doc. 20 at 86.)  The Court, accordingly, dismissed Forest Hills's claims against the

Gibsons.  (*Id.* at 87.)

The claims asserted by the Gibsons against Forest Hills remain pending.  The Court has

reviewed the briefs submitted by the parties as well as the twenty-six volume administrative

transcript.

## IV.    STANDARD OF REVIEW

The IDEA permits the party aggrieved by the decision of an SLRO to seek federal

judicial review of that decision.  20 U.S.C. § 1415(i)(2)(A).  In conducting the review, the

---

[3]  All page numbers to electronically-filed court documents in these consolidated cases are the
"PAGEID" numbers added to the documents by the CM/ECF system.  The state administrative
proceeding files were not filed electronically.  Page numbers for those documents are those
printed on the face of the documents.

district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party, and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

Courts should "strictly review" an IEP for procedural violations, but "technical deviations will not render an IEP invalid." *Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 609 (6th Cir. 2006). The Sixth Circuit instructed that "[o]nly if we find that a procedural violation has resulted in such substantive harm, and thus constituted a denial of [the child's] right to a FAPE, may we grant such relief as the court deems appropriate." *Kings Loc. Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 732 (6th Cir. 2003) (citation omitted).

The party challenging the substance of an IEP must prove that the IEP was inadequate by a preponderance of the evidence. *Woods*, 487 F. App'x at 974; *Deal*, 392 F.3d at 854. In reviewing the substance of the IEP, the district court "should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." *Deal*, 392 F.3d at 849 (citing *Rowley*, 458 U.S. at 206). "In applying this 'modified de novo' standard of review, district courts may not 'simply adopt the state administrative findings without an independent re-examination of the evidence,' nor may they 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Woods*, 487 F. App'x at 973 (quoting *Deal*, 392 F.3d at 849). The Sixth Circuit has held that where there is a two-tiered process, as Ohio has, the "federal courts are required to defer to the *final decision* of the state authorities." *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (emphasis added); *see also Kenton Cty. Sch. Dist. v. Hunt*, 384 F.3d 269, 283 (6th Cir. 2004) (same principle). Therefore, the decision of the SLRO, not the IHO, is given deference. *Id.*

The amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant . . . [and m]ore weight is due to an agency's determinations on matters for which educational expertise is relevant." *Id.* "If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." *Nack*, 454 F.3d at 610 (citation omitted). In sum, a district court "may set aside administrative findings in an IDEA case only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 312–13 (6th Cir. 2007) (internal quotation and citation omitted).

## V.     ANALYSIS

The Gibsons have asserted six claims for relief. They assert five separate claims for denial of FAPE in the areas of (1) assistive technology, (2) transition services, (3) least restrictive environment, (4) a general claim for denial of FAPE, and (5) meaningful parental participation in the development of IEPs. Their sixth claim is for attorney fees. The Court will address each claim separately below.

### A.     Assistive Technology

The Gibsons make two related arguments in this claim. First, they allege that Forest Hills failed to conduct a required assistive technology assessment. Second, they argue that Forest Hills failed to address Chloe's documented communication deficits. The Court will address in this section only whether the failure to conduct an assistive technology assessment resulted in a

denial of FAPE.  The Court will address separately whether Forest Hills otherwise provided

Chloe with a FAPE in regards to her communication needs in a separate section below.

The IDEA requires school districts to conduct comprehensive evaluations which

determine whether the child has a disability and whether the child needs special education and

related services.  20 U.S.C. § 1414(a)(1)(A) & (C).  Additionally, IEP teams are required to

determine as part of the annual IEP process whether the student needs assistive technology

devices and services.  *Id.* § 1414(d)(3)(B)(v) (assistive technology requirement); *Id.*

§ 1414(d)(4)(A) (annual requirement).  An "assistive technology device" means "any item, piece

of equipment, or product system, whether acquired commercially off the shelf, modified, or

customized, that is used to increase, maintain, or improve functional capabilities of a child with a

disability."  20 U.S.C. § 1401(1)(A).  If a school district refuses to provide a required evaluation

of a child, then the school district must provide the parents of the student with a written notice

explaining the basis for its refusal.  34 C.F.R. § 300.503.

The IHO found that Chloe had "significant" communication needs.  She ordered that an

assistive technology assessment be conducted and that Chloe "be provided with goals, objectives

and related services to increase speech initiation and output based on results of that assessment."

(No. 1:11-cv-628, Doc. 2-2 at 47.)  Nonetheless, the IHO determined that Forest Hills's failure to

provide prior written notice of its failure to conduct the assessment was "de minimis"  because it

was "based upon [Forest Hills's] erroneous assumption that [the Gibsons] had undertaken an

assessment on their own."  (*Id.* at 49.)  The SLRO stated that an assessment "would be of value

to determine if there are strategies or devices to increase [Chloe's] initiation of participation in

conversation and the expression of her needs and desires."  (No. 1:11-cv-628, Doc. 2-5 at 164.)

However, she stated that there was "no definitive finding" that Chloe would benefit from an

assistive technology device and "no basis to conclude that the failure to conduct the assessment was a denial of FAPE." (No. 1:11-cv-628, Doc. 2-5 at 174.)

The Gibsons allege that Forest Hills failed to evaluate Chloe's assistive technology needs and failed to provide written notice of its refusal to do so. The Gibsons requested that an assistive technology assessment be performed in written letters dated December 17, 2007 and February 13, 2008. (P.Ex. AAA at 2, 7.) Laurie Gibson again raised the assistive technology issue at a June 1, 2009 IEP meeting. (P.Ex. E1.) Forest Hills concedes that it did not conduct an assessment. (Tr. 513–17, 3990.) Betsy Ryan, the director of student services for Forest Hills, testified that Forest Hills received a "significant amount of referral information" indicating that the Gibsons were pursuing a private assessment through Children's Hospital or another private organization. (Tr. 514.) Susie Giesting, Chloe's teacher at Anderson H.S., testified that she and Nicole Ponting had filled out a lengthy questionnaire from Children's Hospital, but that she understood that the Gibsons had not taken Chloe in for the assessment. (Tr. 4217.) Laurie Gibson stated that she did get a consultation from Children's Hospital, but that a full assessment was not conducted. (Tr. 3135.) Ryan testified that when the assessment issue was raised again, she offered a date to meet and discuss it, but that the parents did not respond. (Tr. 515.) Finally, she indicated that Forest Hills remained willing to conduct an assessment. (*Id.*)

The preponderance of the evidence indicates that Forest Hills was willing to provide an assessment. Forest Hills reasonably did not conduct the assessment when it first appeared that the Gibsons were seeking a private assessment through Children's Hospital and then after the Gibsons did not respond to Ryan's request to meet to discuss the assessment. The Court concludes that Chloe was not denied a FAPE based solely on Forest Hills's failure to conduct the assistive technology assessment.

The Gibsons ask this Court to order that Forest Hills provide the assistive technology assessment as a remedy for the failure to provide FAPE. (Doc. 28 at 269.) The Court has held that Forest Hills did not deny Chloe a FAPE in regards to this assessment, so it cannot order a remedy on this basis. Nonetheless, the Court acknowledges that the IHO ordered Forest Hills to provide an assistive technology assessment for Chloe. (No. 1:11-cv-628, Doc. 2-2 at 51.) Forest Hills did not timely challenge that aspect of the IHO Decision to the SLRO. The SLRO did not purport to overturn the IHO's order for Forest Hills to provide the assessment, but rather assumed that Forest Hills would comply with the IHO's order. (No. 1:11-cv-628, Doc. 2-5 at 174.) The IHO's order to provide the assistive technology assessment stands.

## B.  Transition Services

The IDEA requires school districts to annually provide, beginning when the student turns sixteen, "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" and "transition services (including courses of study) needed to assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) & (bb). Federal and state regulations require the school district to invite the student to IEP team meetings when the team will be discussing postsecondary goals and the transition services needed to reach those goals. 34 C.F.R. § 300.321(b)(1); Ohio Admin. Code 3301-51-07(I)(2)(a). The school district must take other steps to ensure that the student's preferences and interests are considered "[i]f the child does not attend the IEP Team meeting." 34 C.F.R. § 300.321(b)(2); Ohio Admin. Code 3301-51-07(I)(2)(b).[4]

---

[4]  Relatedly, school districts must provide students with notice that their IDEA rights transfer to them on their eighteenth birthdays at least one year before they turn eighteen. 34 C.F.R. § 300.320(c). Forest Hills did not specifically discuss the transfer of rights with Chloe when she

Chloe turned sixteen years old in December 2007 and was in the ninth grade at Anderson H.S.  The facts are undisputed that Forest Hills did not invite Chloe to participate in IEP team meetings where transition services were discussed.  (Tr. 493–94, 2312–13.)  Forest Hills did not consider asking Chloe to the meetings because her parents never invited her, the meetings were long and adversarial, and Susie Giesting thought they would be frightening for Chloe and above her level of comprehension.  (Tr. 493–94, 2312–15, 4249–51, 4254.)  However, Giesting admitted that she could have helped Chloe prepare to attend a meeting and that the IEP team could have modified or structured the meeting to make her attendance easier.  (Tr. 4250–51.)  IDEA and Ohio regulations explicitly state that the school district "must invite" the student to IEP team meetings when postsecondary goals will be discussed.  34 C.F.R. § 300.321(b)(1); Ohio Admin. Code 3301-51-07(I)(2)(a).  Forest Hills violated this mandatory requirement.  The tougher question is whether this procedural violation resulted in a substantive harm and a denial of FAPE.  *See Zelazny*, 325 F.3d at 732.

The procedural violation did not result in substantive harm if Forest Hills took other steps to ensure that Chloe's preferences and interests were considered.  *See* 34 C.F.R. § 300.321(b)(2); Ohio Admin. Code 3301-51-07(I)(2)(b).  Giesting testified that Chloe's interests were considered "based on the knowledge that [Giesting] had of [Chloe] and what she likes to do and her interests at school."  (Tr. 4252; *see also* Tr. 2315.)  Giesting also stated that she talked to Chloe about jobs in the classroom and gave her choices about what she wanted to do.  (*Id.*)  This informal approach to determining Chloe's postsecondary preferences and interests was not sufficient.

---

turned seventeen.  (Tr. 494–95, 2313–14.)  The evidence suggests that Forest Hills did not think it was necessary given that her parents indicated that they would seek guardianship, and in fact did seek guardianship, of Chloe when she turned eighteen.  (*Id.*)  This procedural violation did not result in substantive harm.

To begin, transition services are generally not provided by the regular special education teacher. The Ohio Administrative Code requires that transition services for the student are to be provided by "individuals who have the competencies, experiences, and training required to meet the individual student's transition services needs, and may include job training coordinators, vocational special education coordinators, career assessment specialists, work-study coordinators or other qualified individuals." Ohio Admin. Code 3301-51-01(B)(63)(a)(iii). Giesting and Betsy Ryan testified that Chloe could not answer direct questions about her postsecondary interests the way a person without cognitive disabilities could. (Tr. 494–96, 2312, 2314, 4252.) However, Ryan agreed that they could have talked to Chloe on her level about the jobs people do and could have taken her to shadow or assist a person like a librarian at their job. (Tr. 494–97.) However, Ryan, qualified her statement by adding that she did not think that Chloe would fully understand the role and duties of the position of librarian. (*Id.* at 497.) Giesting and Jack Darland, the Forest Hills transition coordinator, agreed that Chloe could perform at some job settings with support. (Tr. 2333, Tr. 4811–12.) Giesting testified that providing Chloe job-training through Anderson H.S. would have taken away from other activities at school. (Tr. 2333.) Giesting's focus away from job-training is consistent with Forest Hill's belief that Chloe would participate in a recreational/leisure environment after leaving Anderson H.S., not a supported work environment. (D.Ex. 13 at 285.) At school, Chloe engaged in the same type of work-related activities in the classroom year after year while at Anderson H.S.—for example, stapling, shredding documents, folding napkins, emptying the dishwasher, wiping tables, stuffing envelopes, pushing a cart—reducing the value of the conclusions about Chloe's skills and interests that could be based on the small sample. (D.Ex. 10 at 210; D.Ex. 11 at 222; D.Ex. 13 at 291.)

Moreover, Forest Hills did not have age-appropriate assessments related to postsecondary goals completed for Chloe.  *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa) & (bb) (stating IEP requirement to include postsecondary goals based on age-based assessments).  Chloe had not had a formal transition/vocational assessment at the time the due process hearing began.  (Tr. 884, 891.)  Betsy Ryan testified that a work-study specialist last had worked directly with Chloe when she was fifteen years old and in the eighth grade.  (Tr. 479–80.)  Jack Darland, the transition coordinator, did an informal observation and assessment of Chloe, but not until the 2009–2010 school year.  (Tr. 4814–15.)  The IHO ordered that "thorough" vocational assessment be completed during the due process hearing on May 19, 2010.  (Tr. 898.)  Chloe participated in a vocational assessment with Goodwill Industries in the late summer and fall of 2010.  (P.Ex. SSSS; P.Ex. TTTT.)  Goodwill concluded that although Chloe was "not able to meet competitive standards for quality and pace," she did show "a willingness to learn and to try new things." (P.Ex. SSSS at 5.)  Goodwill recommended that if Chloe was interested in supported employment in a community setting, then Chloe would need to "participate in site specific, extended Community Based Assessments that would allow for Chloe to fully identify interests, assess stamina over time, [and] allow the team to see if repetition would improve pace and quality."  (*Id.*)  Forest Hills's failure to obtain more complete transition assessments about Chloe yearly beginning in December 2007 when she turned sixteen eliminated the opportunity for Forest Hills to provide transition services to her consistent with those assessments.

The Court concludes that Forest Hills failed to invite Chloe to meetings to discuss postsecondary goals and failed to otherwise fully consider her interests and preferences.  This

resulted in substantive harm and a denial of FAPE.[5]  The Gibsons request that the Court order

Forest Hills to collaborate with them, an expert, and a provider to determine the appropriate

remedy, which would include "a minimum of 3 days per week, 3 hours per day for community

and vocational training, for . . . three years."  (Doc. 28 at 272.)  The Court does not have

sufficient information at this time to determine an appropriate remedy.  The Court must meet

with the parties to discuss how to proceed as to the remedy.

**C.      Least Restrictive Environment**

A main component of the disagreement between the parties at the due process hearing

was whether the appropriate LRE for Chloe was in Susie Giesting's classroom at Anderson H.S.

or Cindy Gajus's "life skills" classroom at Turpin H.S.  However, in the briefs to this Court, the

parents focus more on their argument that Forest Hills should have provided Chloe with a greater

opportunity to participate in nonacademic general education classes and activities such as gym or

swimming, art, music, library, assemblies, and lunch in the cafeteria.  (Tr. 1723.)  They also

assert that Chloe should have been provided with more opportunities to participate in community

outings.

The IDEA requires that the IEP must be provided in the least restrictive environment.  20

U.S.C. § 1412(a)(5).  This mainstreaming requirement states that to the "maximum extent

appropriate," children with disabilities are to be educated with children who are not disabled.  *Id.*

Children with disabilities may be removed from regular educational environments "only when

---

[5]  In analyzing whether Chloe was provided sufficient transition services, the Court did not focus
on the parties' differing visions for Chloe's future.  The parents envision Chloe living and
working in a supported environment.  They hoped to get her enrolled at the Starfire U. program.
Forest Hills also envisioned Chloe living in a supported environment, but participating in a small
group/recreational activities.  (D.Ex. 13 at 285.)  The Court's analysis is not outcome-oriented.
The Court finds that Forest Hills denied Chloe a FAPE by not performing the necessary age-
appropriate assessments to determine Chloe's postsecondary goals and interests and to target
transition services to achieve those goals.

the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* School districts must provide a statement in the annual IEP for each student concerning what supplementary services will be provided to the child to enable the child to "to be involved in and made progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities." 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(b); *see also* 34 C.F.R. § 300.117. School districts must provide "supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings." 34 C.F.R. § 300.117. A student's IEP team is required to include at least one general education teacher to facilitate these goals if the student is or may be participating in the regular education environment. 20 U.S.C. § 1414(d)(1)(B)(ii).

The Sixth Circuit has set forth three factors for determining whether a disabled child may be removed from the general education environment: "(1) whether the disabled student would benefit from inclusion [in] general education, (2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting, and (3) whether the disabled child disrupts the general education setting." *Woods*, 487 F. App'x at 979 (quoting *McLaughlin*, 320 F.3d at 673, n. 4). The parents cite cases which discuss benefits that disabled students can gain from participation in general education classes apart from learning the curriculum. For example, the Fifth Circuit has stated that "the language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047–48 (5th Cir. 1989).

Chloe participated only in a general education dance class while at Anderson H.S. (Tr. 1896.) The Gibsons specifically asked for Chloe to participate in a swimming class. (Tr. 1724.)

There was a swimming component to the physical education general education curriculum for ninth grade students at Anderson H.S.  (Tr. 46.)  Forest Hills refused to place Chloe in a swimming class.  (Tr. 1727–29.)  School officials told the Gibsons that it would take Chloe too long to change clothes for swimming.  (Tr. 1733–34.)  The Gibsons also asked for Chloe to eat lunch in the cafeteria with regular education students as she had done in middle school.  (Tr. 1952.)  Susie Giesting did try permitting Chloe to eat in the cafeteria, but she stopped that practice when Chloe responded by throwing her lunch away so she could return to the classroom.  (Tr. 1953–55.)  Chloe continued to purchase lunch from the cafeteria and eat it in the multidisabilities classroom at least once per week.  (Tr. 1953.)

Forest Hills points out that regular education peer partners ate with the students in the multidisabilities classroom.  (Tr. 1951–52.)  The peer partners also participated with the special education students throughout the day in the classroom.  (Tr. 4155–55.)  The peer partners socialized with special education students and sometimes worked with them on IEP activities, such as by helping with reading or vocabulary words.  (Tr. 4155, 4936.)  Julie Rubin, Ph.D., a special education expert who testified on behalf of Forest Hills, testified that the peer partner program provided educational benefits to both the regular and special education students.  (Tr. 4933–34.)  As for the decision to have Chloe eat in the classroom, Forest Hills emphasized that Chloe was able to work on skills such as developing bilateral coordination by making sandwiches with two hands, clearing dishes, and loading the dishwasher.  (Tr. 1936, 1955, 1970–71, 4144–45.)

Also, the Gibsons requested as early as 2006 that Chloe participate in community outings and assemblies.  (Tr. 1044, 2023–24, 2881–82.)  Chloe previously had participated in special education community outings in seventh and eighth grades.  (Tr. 2024–25.)  Chloe did not go on

30

community outings during her first year at Anderson H.S. because the school focused on helping her make the transition to high school and get used to the new building. (Tr. 2025.) Chloe did not begin to take community outings until her third year at Anderson H.S., when faculty began to walk her to a nearby Stein Mart store. (Tr. 2680–81.) Laurie Gibson testified that when the Gibsons asked for Chloe to be taken to a restaurant, Giesting replied that such an outing would not be "purposeful" for Chloe. (Tr. 2682.)

A regular education teacher did not participate in Chloe's IEP team meetings in violation of 20 U.S.C. § 1414(d)(1)(B)(ii). (Tr. 2831.) The Sixth Circuit has stated that the input of a regular education teacher is important to help determine "the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might be met within that classroom." *Deal*, 392 F.3d at 860 (on importance of participation of regular education teacher). Parents suggest that if an IEP general education teacher had participated, that teacher might have suggested ways in which Chloe could have participated in more general education classes and activities with appropriate supports and the way in which such participation would have benefitted her. However, they cite no evidence in the record which supports that speculation. Parents provide no evidence from a general education teacher as to specific classes or activities Chloe could have taken or how those classes or activities would have provided a meaningful educational benefit to her.

The IHO determined that Chloe's placement in the multidisabilities classroom was the appropriate LRE for Chloe. (Doc. 1:11-cv-628, Doc. 2-2, at 47.) She noted that experts for both Forest Hills and the Gibsons testified that the Turpin "life skills" classroom would not have been an appropriate placement for Chloe. (*Id.* at 43.) She also noted that the community outings to Stein Mart provided Chloe with an opportunity to practice communication, safety, and money

31

skills. (*Id.* at 44.) She found that there were no other appropriate stores or locations within a safe and practicable walking distance for Chloe. (*Id.*) Finally, as to the participation of a general education teacher, the IHO stated:

> Since there was no need for specific discussion regarding that class, and since Student participates in every other aspect of her education in the self contained multiple disabilities class, the requirement that a regular education physical education teacher attend meeting, exalts form over substance and does not rise to the level of a violation of a FAPE.

(*Id.* at 55.)

The SLRO also determined that Chloe's placement in the self-contained classroom at Anderson H.S. had been "educationally appropriate" and advanced Chloe "towards making meaningful progress." (No. 1:11-cv-628, Doc. 2-5 at 183.) She also agreed with the IHO that the failure to include the participation of a general education teacher in the IEP process did not amount to a violation of FAPE. (*Id.* at 179.) She found that "there was no evidence that attendance at the IEP meetings by a regular education teacher would have been relevant to the Student's IEP." (*Id.*) As for the request for swimming, the SLRO found that swimming "would require far more time and organization than the rest of her adaptive physical education program due to Student's particular transition issues (i.e. changing clothes, drying off, changing clothes again) [and] was not possible without reducing some other more important aspect of her program." (*Id.* at 180.)

The Gibsons, as the parties challenging the IEPs, had the burden to prove by a preponderance of the evidence that the IEP was inadequate in that it did not comply with the LRE standard. *See Woods*, 487 F. App'x at 974 (explaining standard); *Deal*, 392 F.3d at 854 (same). The placement of a child inside or outside the general education classroom is a question requiring educational expertise. *Woods*, 487 F. App'x at 979. Therefore, more weight is to be

given to the SLRO's determination.  *See McLaughlin*, 320 F.3d at 669.  Despite the IDEA's least

restrictive environment provision, "Congress [has] recognized that regular classrooms simply

[will] not be a suitable setting for the education of many handicapped children."  *Woods*, 487 F.

App'x at 979 (quoting *Rowley*, 458 U.S. at 181, n. 4).  This Court agrees with the IHO and

SLRO that Chloe's placement in the multidisabilities classroom at Anderson H.S. was

appropriate and was designed to provide her with meaningful educational benefit.  Chloe's

participation with the peer partners and her community outings also aided in the achievement of

a meaningful educational benefit.  Likewise, the Gibsons have provided no evidentiary basis for

the Court to disagree with the SLRO's conclusion that the failure to include a regular education

teacher on the IEP team did not amount to a denial of FAPE.

**D.      Denial of FAPE**

      The Gibsons filed their request for a due process hearing on December 14, 2009.  The

IDEA has a two-year statute of limitations.  20 U.S.C. § 1415(f)(3)(C).  Accordingly, the

relevant IEPs for determining whether Chloe received a FAPE are those in effect on or after

December 14, 2007.  Chloe had three IEPs in effect during the relevant timeframe: (1) the IEP

from November 16, 2007 through November 15, 2008 (D.Ex. 10); (2) the IEP from November 6,

2008 through November 5, 2009 (D.Ex. 11); and (3) the IEP in effect from October 28, 2009

through October 27, 2010 (D.Ex. 13).  To provide FAPE, "a school district is only required to

provide educational programming that is reasonably calculated to enable the child to derive more

than *de minimis* educational benefit."  *Deal*, 392 F.3d at 861.  Moreover, that educational benefit

must be "meaningful" as "gauged in relation to the potential of the child at issue."  *Id.* at 862.

One aspect of a meaningful education benefit is progress towards the goal of self-sufficiency

"especially where self-sufficiency is a realistic goal for a particular child."  *Id.* at 864.  The court

must consider each student's "capabilities and potentialities" when determining whether an educational benefit is meaningful, but the court must be careful "not to set unduly low expectations" for the student. *Id.*

The IHO concluded that Chloe's IEPs were deficient in several respects. (No. 1:11-cv-628, Doc. 2-2 at 48, 50.) She found that the goals related to bilateral coordination and "traveling in the environment while managing materials and equipment" had "been mastered and [were] not sufficiently challenging to move Student forward." (*Id.* at 50.) She also criticized the math goals as "unclear and vague" and lacking an objective to "distinguish coins and paper money or to develop skills for determining price and the amount of money required to make a purchase." (*Id.*) She noted that the 2009–2010 IEP had no math goal (*Id.*) As for reading, the IHO stated that the Gibsons had established that Chloe "appear[ed] capable of reading beyond the teacher created function and safety word lists which are currently being utilized." (*Id.* at 48.) She concluded that Chloe "should be provided with a structured reading program for students with disabilities to increase her reading fluency." (*Id.*) The IHO ordered Forest Hills to provide more specific IEP goals and compensatory education in the areas of reading and math. (*Id.* at 50–51.) Because Forest Hills did not properly challenge the findings related to reading and math to the SLRO, they are not at issue in this judicial review. The SLRO concluded that the IEPs had been designed to provide Chloe with FAPE in all respects other than math and reading. (*Id.* at 183–84.)

The Gibsons devote more than thirty pages of arguments in their primary brief and twenty pages in their reply brief on the issue of whether Chloe was denied a FAPE. (Doc. 28 at 218–241; Doc. 34 at 602–23.) Some of the arguments related to FAPE, such as whether Forest Hills was required to provide Chloe with an assistive technology assessment, whether Chloe

34

received appropriate transition services, and whether Chloe was placed in the appropriate LRE, will not be re-stated here.  The SLRO's opinion that the IEPs provided Chloe with FAPE in areas other than reading and math is a matter requiring education expertise so more weight is to be accorded to her decision.  *See Deal*, 392 F.3d at 865 (stating that the court should give due deference to the administrative law judge's findings regarding whether a meaningful educational benefit was accorded to the student); *McLaughlin*, 320 F.3d at 669.

The Gibsons argue that Forest Hills denied Chloe FAPE by failing to ensure her access to the general education curriculum.  IEPs are required to state how a student's disability affects her involvement and progress in the general education curriculum and what supplementary aids and services she requires to be involved in and make progress in the general education curriculum. 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa) and (d)(1)(A)(i)(IV)(bb).  Two of Chloe's three relevant IEPs state that she was not able to participate in general curriculum statewide testing and that she would need to participate in alternate assessments.  (D.Ex. 10 at 214; D.Ex. 13 at 296.)  The Gibsons argue that Forest Hills could have provided her access to the general education curriculum by teaching her Cindy Gajus's "life skills" curriculum from Turpin H.S. which adapted the general education curriculum for the disabled students.  (Doc. 28 at 220–21.) However, a preponderance of the evidence demonstrated that Chloe would not have been able to participate successfully in the "life skills" curriculum and that placement in the multidisabilities classroom was the appropriate LRE.

The 2009–2010 IEP addresses the ways in which Chloe's IEP was intended to address specific general education content areas.  It provided as the science example "sorting objects according to specific properties i.e., color, shape, size."  (D.Ex. 13 at 287.)  Social studies examples were "completing task in an assembly line fashion, completing a school job, selecting a

preferred item for purchase, exchanging money with prompts for goods at school/community,
[and] making choices." (*Id.*) Chloe's teacher, Susie Giesting, testified that she did not examine
the general education science curriculum and attempt to adapt it to Chloe. (Tr. 1899–1902.)
Instead, she borrowed resources from the general education science teachers which were relevant
to the issues she discussed in her classroom. (*Id.*) She testified specifically that she might
borrow a video about fish in the ocean when she discussed taking vacations with her students.
(*Id.*) She would also take her students to view the aquariums in the science wing and to view
soap-making demonstrations. (*Id.*)

In reviewing whether Chloe was denied FAPE with respect to progress in general
education academic areas other than reading and math, the Court is mindful of Chloe's particular
abilities and challenges. The Gibsons agree that Chloe's IEPs needed to contain functional non-
academic goals such as self-care and grooming, bilateral coordination, and moving through the
environment. Focusing on these goals required time which otherwise would have been devoted
to academic progress. Further, Chloe had minimal ability to read independently. She had a
history of making stuttered progress in academic and functional areas, with periods of
progression followed by periods of regression, caused at least in part by her seizure disorder.
Given these facts, the Court does not find by a preponderance of the evidence that the IEPs were
inadequate to provide FAPE in respect to general education academic areas apart from reading
and math.

The Gibsons identify an assortment of other educational goals and services they wish had
been provided to Chloe. They complain that the IEPs were not designed to address Chloe's
communication deficits such as by increasing sentence length, number of exchanges, volume, or
initiations of conversation. (Doc. 34 at 609.) The IHO found that Chloe had "significant"

communication needs and stated that IEP goals, objectives, and related services should be

provided based on the results of an assistive technology assessment. (No. 1:11-cv-628, No. 2-2

at 47.) The SLRO disagreed. She determined that Chloe received appropriate communication

services. (No. 1:11-cv-628, No. 205 at 174.) The SLRO stated as follows in regards to Chloe's

prompt dependency:

> The evidence did show that Student was prompt dependent in many areas,
> although her dependency on prompts had been substantially reduced over the
> years. The lack of a goal addressing her prompt dependency behaviors on her
> IEPs was not a denial of FAPE. Decreasing prompt dependency was a part of
> Student's educational program across all areas, even though it had not expressly
> been stated as a goal. The IHO ordered that it now be added as a goal. There was
> no showing that Student suffered any loss of educational opportunity as a result of
> not having such a goal previously, as is required to show a denial of FAPE.

(No. 1:11-cv-628, Doc. 2-5 at 184.)

The IEPs did purport to address Chloe's communication needs. For example, the 2007–

2008 IEP stated that Chloe needed to "increase appropriate interactions with peers and adults."

(D.Ex. 10 at 206.) It called for the use of low-tech assistive technology such as visual supports,

keyboard, picture schedule, and selected software programs to support reading and writing of

events. (*Id.* at 207.) The 2008–2009 IEP called for Chloe to receive 120 minutes of direct

speech and language services from a specialist. (D.Ex. 11 at 225.) The IEP provided an

objective that year of "responding verbally to a peer or adult greeting or question 4/5 trials (w/o

prompting)." (*Id.* at 224.) The 2009–2010 IEP also called for Chloe to receive 120 minutes of

individual and small group services from a speech and language specialist "to initiate and

respond to conversations, answer questions, and provide reading assistance." (D.Ex. 13 at 293.)

The Gibsons also argue that the IEPs should have contained goals for using the telephone

in an emergency, learning to write or keyboard her name, address, and phone number, and

learning stranger danger and how to cross the street. (Doc. 28 at 230–33; Doc. 34 at 621.)

However, the IHO and the SLRO both disagreed with the latter contention. The IHO found as follows:

> Student has made significant progress in transitioning, functional independence, daily living skills and community skills. At this juncture, skills relating to writing personal information are of lesser importance, since Student is unlikely to be left alone, and can carry that information on an identification card in the unlikely event that she is alone and in need of help. While Student could be taught some elementary stranger danger concepts, in light of the fact that she is not left without adult supervision and has other more pressing academic needs, this goal should not be given priority. Given Student's cognitive limitation and lack of math skills, it is unlikely that she will be able to be effectively taught to grasp the concept of time beyond reading numbers on a digital clock.

(No. 1:11-cv-628, Doc. 2-2 at 41.) The SLRO did not address these communication and life skills issues individually, but did find that the IEPs were "designed to confer educational benefit to Student" and that all areas of her program other than math and reading "were appropriate." (No. 1:11-cv-628, Doc. 2-5 at 183.) The decisions of the IHO and the SLRO are justified by the evidence in this case as to these communication and life skills issues.

Accordingly, other than with respect to transition services, as was discussed earlier in this Order, the Gibsons have not demonstrated that the relevant IEPs were inadequate to provide Chloe with a FAPE.

## E.    Meaningful Participation in the IEP Process

Finally, the Gibsons assert that they were denied meaningful participation in the IEP process. The IDEA requires that parents be included on the IEP team for each child with a disability. 34 C.F.R. § 300.321(a)(1). The school district must take steps to ensure that the parents are present at or given the opportunity to participate in each IEP team meeting. 34 C.F.R. § 300.322(a). The Gibsons make two primary arguments about their purported lack of meaningful participation. First, they assert that they were denied meaningful participation in the

formulation of IEPs. Second, they assert that they were denied meaningful participation in an April 21, 2009 meeting held to plan for Chloe's triennial multifactor evaluation.

"The IEP conference is the primary opportunity for parental involvement in the process of developing an IEP." *Knable,* 238 F.3d at 766. The failure to hold an IEP conference can result in a finding that the parents were denied a meaningful participation in the IEP process. *See id.* "[S]chool officials are permitted to form opinions and compile reports prior to IEP meetings." *Deal*, 392 F.3d at 858. However, they must be "willing to listen to the parents" and provide parents "the opportunity to make objections and suggestions." *N.L. v. Knox Cty. Schs.*, 315 F.3d 688, 694 (6th Cir. 2003). The parental participation must be "meaningful," and merely allowing the parents to speak at a meeting may not be sufficient. *Deal*, 392 F.3d at 858. However, "when a parent fully participates in the IEP Team meeting and is an active participant in the final determination of the child's eligibility, there is no substantive harm caused when school-appointed experts and school officials confer ex parte so as to coordinate the drafting of an assessment report." *N.L.*, 315 F.3d at 694.

The IHO determined that the Gibsons had not been denied meaningful participation in the IEP process. She stated in her findings of fact that the Gibsons "made progress difficult by making numerous and ever changing demands." (No. 1:11-cv-628, Doc. 2-2 at 42.) She stated that Jim Gibson had "glared" at witnesses at the hearing and that Laurie Gibson appeared to have an "aggressive and distrusting attitude." (*Id.*) She concluded that the Gibsons "participated in numerous meetings, have been given full opportunities to both ask questions and express their opinions and desires" and that Forest Hills "modified IEP's [sic] numerous times to incorporate their requests regarding present levels, goals and community outings." (No. 1:11-cv-628, Doc. 2-2 at 47.) The SLRO agreed that the "evidence was overwhelming that Parents had meaningful

participation." (Doc. 1:11-cv-628, Doc. 2-5 at 178.) She also faulted the Gibsons for making the process adversarial. (*Id.* at 178–79.)

The Court will focus only on the relevant time period beginning December 2007 to determine whether Forest Hills denied the Gibsons meaningful participation in the IEP process. Forest Hills cites to evidence in the hearing record which demonstrates that the Gibsons participated in multiple formal and informal meetings with Forest Hills, including meetings held on February 19, 2008, October 21, 2008, November 5, 2008, and October 27, 2009. (Tr. 2600–01, 3418–21, 3769–70; P.Ex. E6; D.Ex. 11 at 219; D.Ex. 56 at 610; D.Ex. 13.) The February 19, 2008 meeting was held to discuss how the parties could move forward with less disagreements. The parties jointly chose doctors to evaluate Chloe at that meeting. (Tr. 2600–01, 3418–21, 3769–70.) The October 21, 2008 meeting was held to discuss the reports received as a result of the evaluations that followed from the February 19, 2008 meeting. (P.Ex. E6.) The meeting notes indicate that Forest Hills provided the Gibsons with copies of two evaluation reports prior to the meeting. (*Id.*)

Forest Hills provided the parents with a proposed draft IEP on October 31, 2008 in advance of the November 5, 2008 IEP team meeting. (P.Ex. AA.) Forest Hills identified a list of changes and additions made to the IEP present levels, goals, and objectives as a result of the Gibsons' input. (Doc. 31 at 564–66 (comparing P.Ex. AA to D.Ex. 11).) The revised IEP included a community outings goal for which the Gibsons had long advocated, though the parents noted their dissatisfaction with the specifics of the goal as written. (D.Ex. 11 at 251.) After the meeting, the Gibsons, through their attorney, sent a letter to Forest Hills in which they agreed the November 5, 2008 meeting involved a "much more productive discussion of the issues." (D.Ex. 96.) They noted that Forest Hills had incorporated some of their requested

40

changes in the revised IEP, but they criticized Forest Hills for not making other changes. (*Id.*) A similar process occurred the following year. Forest Hills sent a draft proposed IEP to the Gibsons prior to their October 27, 2009 team meeting and then issued a revised IEP with minor changes. (Doc. 31 at 566–67 (comparing D.Ex. 56 to D.Ex. 13).)

The Gibsons do not deny that they attended multiple IEP team meetings and were given the opportunity to make requests and voice concerns. They dispute, however, that their participation was meaningful. The Gibsons give as an example that Forest Hills had predetermined that Chloe would return to the multidisabilities classroom at Anderson for the 2009–2010 school year and did not give due consideration to the Gibson's request in June 2009 for a new placement. They further contend that Forest Hills refused to discuss the issue in a June 2009 meeting. The Gibsons cite to P.Ex. E1 at 5 to support these allegations. (Doc. 34 at 658.) P.Ex. E1 is a set of handwritten meeting notes presumably written by a Forest Hills employee. However, the Court does not see any discussion of Chloe's LRE or placement in the meeting notes. The Court therefore has no evidence that Forest Hills refused to discuss the placement issue at the meeting. Forest Hills denied the request for new placement in a written notice dated July 6, 2009. (Doc. 34-3 at 690.)

Turning to the facts underlying the second argument, the Gibsons allege that they were denied meaningful participation in a multifactored evaluation ("MFE") meeting held on April 21, 2009. The purpose of the meeting was to plan for the mandatory triennial MFE of Chloe to confirm that she qualified as a student with a disability under the IDEA. *See* 20 U.S.C. §1414(a)(2)(B)(ii). The IDEA requires the school district to give the parents prior notice of the evaluations they intend to conduct. 34 C.F.R. § 300.304(a). As part of the re-evaluation process, the IEP team must review current data on the disabled student, including testing data, classroom

41

observations, and information provided by the parents, but the IEP team is not required to have a meeting to conduct its review.  34 C.F.R. § 300.305(a) & (b).

Beginning no later than February 6, 2009, the parties had attempted to find a mutually-agreeable time for this MFE planning meeting.  (P.Ex. CCC at 1, 14.)  The MFE was due to be performed in March 2009.  (P.Ex.P at 10.)  Both the parents and Forest Hills suggested dates that were not agreeable to the other.  At some point in March 2009, Forest Hills suggested a meeting date of April 21, 2009.  The parents responded that they were not available on April 21, but that they wanted to participate in the MFE planning meeting.  (P.Ex. CCC at 14.)  Forest Hills informed the Gibsons that they would go forward with the April 21 meeting without the parents due to their inability to find a mutually agreeable date.  (*Id.* at 1.)  After the meeting, Forest Hills sent the Gibsons (1) the completed evaluation planning form indicating what assessments would be performed and who would perform the assessment, (2) an invitation to attend the assessments on May 12, 2009, and (3) a parental consent form for the assessments.  (P.Ex. P.)  The Court does not find a violation of the MFE requirements based on these facts.  Forest Hills was not required to hold an IEP team meeting to plan for the MFE.  The Court will not fault Forest Hills for conducting the planning meeting without the Gibsons given that the parties were unable to find an agreeable date, the MFE was overdue, and Forest Hills sought the Gibsons input regarding and consent for the evaluations.

The Court has carefully evaluated the parties' arguments on parental participation.  The Gibsons point to a host of IEP concerns they raised which were not addressed to their satisfaction, including a request for an assistive technology assessment and the implementation of research-based reading program.  Nonetheless, the Gibsons have not established by a preponderance of the evidence that Forest Hills denied them meaningful participation.  The

relationship between the parties was characterized by mutual distrust and acrimony. This bred an environment where miscommunications and disagreements were taken as signs of disrespect for each other or disregard for Chloe. Disagreements over fundamental issues such as the best LRE placement for Chloe and Chloe's post-schooling future made it difficult for the parties to agree on a myriad of day-to-day issues. However, the record demonstrates that the Gibsons participated in the IEP process at meetings and through back-and-forth written communication with Forest Hills. They were given the opportunity to voice their opinions and goals regarding Chloe's education. The Court will not find a denial of FAPE based on lack of meaningful parental participation.

**F.      Prevailing Party Status**

The Gibsons seek attorney fees as the prevailing party pursuant to 20 U.S.C. § 1415(i)(3)(B). The IDEA gives this District Court "discretion" to award "reasonable" attorney fees to "to a prevailing party who is the parent of a child with a disability." *Id.* The fees awarded "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(C). "No bonus or multiplier may be used" to calculate the fees award, but the Court may reduce the fees award in appropriate circumstances. 20 U.S.C. § 1415(i)(C) & (F).

The parties agreed at a conference held with the Court on May 17, 2012 to hold the prevailing party and attorney fees issue in abeyance until the resolution of the substantive issues.

**VI.    CONCLUSION**

For the foregoing reasons, the SLRO Final Decision is **AFFIRMED IN PART AND REVERSED IN PART**.  The SLRO Final Decision is reversed to the extent that the Court concludes that Forest Hills violated the IDEA by not providing Chloe with adequate transition services.  The Court further orders that a status conference will be held on June 25, 2013 at 10:30 a.m. to discuss how to proceed on the transition services remedy and attorney fees issues.

**IT IS SO ORDERED.**


S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court